## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KATHERINE GUILL, et al.,     )
          )
    Plaintiffs,     )
          )
      v.     )     Case No.19-CV-1126
          )     Class Action
BRADLEY R. ALLEN, SR., et al.,     )
          )
    Defendants.     )

## BRIEF IN SUPPORT OF PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

This class action challenges Defendants' practice of jailing people pretrial, without a meaningful hearing or representation by counsel, solely because they cannot afford to pay secured bail. The Court has ordered a preliminary injunction requiring procedural safeguards at bail determinations, including counsel for indigent arrestees at first appearance. The uncontroverted evidence demonstrates that before the preliminary injunction, Defendants' practices violated Plaintiffs' constitutional rights to equal protection, substantive due process, procedural due process, and representation by counsel. Plaintiffs are entitled to summary judgment on these claims.

1

# FACTS

## I.  Parties

The Plaintiff class consists of all people arrested and charged with non-domestic violence offenses who are or will be detained in the Alamance County Detention Center ("jail") because they cannot afford monetary conditions of pretrial release. (Doc. 67 at 2.)

Defendant Chief District Judge Allen oversees administrative supervision of the district court and the magistrates in his district, including scheduling magistrates' availability and designating magistrates to appoint counsel. N.C.G.S. § 7A-146. Defendant Senior Resident Superior Court Judge Lambeth promulgates, in consultation with the chief district judge, the bail policy for Alamance County's Superior Court (District 15A). *See* N.C.G.S. § 15A-535.

Defendant Alamance County magistrates conduct initial appearances for people who are arrested and brought to the jail. With some exceptions, magistrates determine arrestees' conditions of release at initial appearance. (Ex. 1, "In Re Pretrial Release Policy - District 15A" ("Pretrial Rel. Policy") at 5.)

Defendant Sheriff Terry Johnson detains people who have been booked into the jail who cannot pay secured bail. (Ex. 2, Johnson Resp. to RFA 4.) He is the final policymaker for the jail in Alamance County. *See* N.C.G.S. § 162-22; (Ex. 3, Johnson Dep. 63:15-17.)

The following sections describe Defendants' practices before entry of the consent preliminary injunction.

## II.     Initial Appearance Is Not a Meaningful Hearing

People booked into the jail receive an "initial appearance" where a magistrate informs them of their charges, determines probable cause, and determines conditions of release including secured bail. N.C.G.S. § 15A-511(b)-(e). Initial appearances are not recorded (Ex. 4, Hollan 66:21-22), and arrestees were not provided with court-appointed counsel. (*Id.* 66:9-23; Ex. 5, Nance 30:4-14.)

Before the preliminary injunction, Magistrates conducting initial appearance did not give arrestees notice of the questions at issue in the bail determination, like ability to pay. (*See* Ex. 4, Hollan 85:15-86:7; Ex. 5, Nance 104:1-13.) Magistrates did not inquire into ability to pay or allow arrestees to present evidence or argument. (Ex. 4, Hollan 45:14-22, 74:17-75:11, 80:5-11, 89:11-90:14, 199:13-22; Ex. 5, Nance 113:8-15, 258:14-17.) Magistrates relied on the arresting officer's testimony and arrestee's criminal history information, which arrestees had no opportunity to dispute. (Ex. 4, Hollan 73:7-21, 78:4-80:11; Ex. 5, Nance 159:12-23.) They did not hold the government to any burden of proof (Ex. 4, Hollan 107:2-25, 217:24-218:7, Ex. 5, Nance 104:14-105:5, 164:13-22), or consider alternatives to secured bail. (Ex. 4, Hollan 95:21-97:8, 247:8-248:5.) Magistrates made no findings at all. (*See id.* 219:4-9; Ex. 5, Nance 137:7-12.)

For anyone who could not afford to pay for their release, magistrates' secured bail orders were de facto detention orders. (Doc. 3-3 ¶ 19; Doc. 3-2 ¶ 15; Doc. 3-1 ¶ 11.) People who paid were released. (Ex. 6, "Release and Transfer Procedures" at 337.)

### III.    First Appearance Is Not a Meaningful Hearing

First Appearance is an arrestee's first hearing in front of a judge. (Ex. 7, Allen 147:1-150:19, 151:5-15.) Judges advise defendants of their charges and the maximum punishments they face, and issue secured bail orders. (*Id*. at 151:5-15.) A prosecutor is present. (*See id.* 170:20-171:7.)

Before the preliminary injunction, judges typically did not review bail that had been set by magistrates. (Ex. 8, Lambeth 64:20-65:9; Ex. 7, Allen 172:15-22.) Judges did not affirmatively inquire into ability to pay, or make individualized findings to support these bail determinations. (Ex. 8, Lambeth 225:12-226:5, 227:6-8; Ex. 7, Allen 185:21-186:23, 189:10-190:7; Ex. 9, Crabbe. 74:8-13.) Arrestees were not provided with court-appointed counsel. (*See* Ex. 7, Allen 163:13-164:11.) If arrestees made an uncounseled request for bail reduction, prosecutors proffered information opposing the arrestee. (Ex. 7, Allen 176:7-178-9.) Judges did not allow arrestees to respond to these proffers if related to the facts of their case. (Ex. 7, Allen 179:13-180:3.) Judges made no findings regarding arrestees' ability to pay or the necessity of detention. (*Id.* 189:13-190:7; Ex. 8, Lambeth 225:12-226:5.)

Even though judges attempted to stop arrestees from speaking, arrestees nevertheless waived their right to silence and regularly made uncounseled arguments for release. (Ex. 10, Barrow 43:2-12; Ex. 8, Lambeth 206:2-16, 208:15-18; Ex. 9, Crabbe 74:19-76:13.) Some detained arrestees waived counsel and entered a plea at the first appearance. (Ex. 11, Ussery Email; Ex. 8, Lambeth 241:11-242:20; Ex. 7, Allen 210:6-

4

211:1.) Many of those arrestees received "time served" sentences. (*Id.* 220:15-221:3.)
Plaintiffs detail the potential prejudice associated with these uncounseled decisions
below.

## IV.    Detention After First Appearance Coerces Guilty Pleas

Detention following first appearance sometimes exceeds the likely penalty for
pleading guilty. (Ex. 8, Lambeth 259:11-17, 262:19-263:4; Ex. 4, Hollan 208:2-5.)
People are often coerced into resolving their cases with a plea to time served because
their bail order forces them to serve time before even facing a prosecutor at the
bargaining table. (Ex. 12, Kabakoff ¶¶ 16,18; Ex. 13, Colbert ¶ 15.) Plaintiffs detail
evidence of the coercive effect of pretrial detention in the Sixth Amendment section
below.

Alamance County has a dedicated employee, the "Court Liaison," who helps cases
reach disposition by facilitating guilty pleas in exchange for release. Arrestees who want
to plead guilty contact the Court Liaison, and these admissions of guilt are forwarded to
prosecutors. (Ex. 10, Barrow 77:14-78:20; Ex. 14, Paschal Email; Ex. 15, Bane Email;
Ex. 16, Frazier Email; Ex. 17, Pryor Email; Ex. 18, Lipscomb Email; Ex. 19, Currie
Email.)

Arrestees wishing to plead guilty also contact Michael Graves, a local community
activist and member of the Sheriff's advisory board. (Ex. 20, Charns Email.) Mr. Graves
estimates that 25-30% of arrestees who contact him want to plead guilty to a sentence of

5

time served to get out of jail. (Ex. 21, Graves ¶ 4.) Mr. Graves contacts prosecutors to facilitate guilty pleas. (*Id*. ¶ 3.)

## V.     Secured Bail Is No More Effective Than Unsecured Bail

Secured bail does not make it likelier that someone will return to court or less likely that someone will commit a new crime pretrial. (Ex. 22, Jones ¶ 59.) It is irrelevant to public safety. (*Id*.) Nonfinancial conditions of release—like court-date reminders and risk-based pretrial monitoring—ensure court appearance and reduce recidivism better than secured bail while avoiding the significant costs associated with secured bail. (*Id*. ¶¶ 60-62.)

## VI.    Counsel at First Appearance Helps Avoid Inculpatory Statements and Increase Chances of Release

First appearance can prejudice case outcomes in two ways: by prompting arrestees to make uncounseled statements that inadvertently waive defenses, and by ordering pretrial detention that coerces arrestees into pleading guilty. Arrestees often waive their right to silence and make uncounseled arguments for release. (*Supra*, subsection III.) Pretrial detention orders issued at first appearance often jail arrestees for longer than the penalty they would face for pleading guilty. (*Supra*, subsection IV; Ex. 13, Colbert ¶ 15.) Plaintiffs detail this potential to substantially prejudice arrestees' rights in the Sixth Amendment section below.

Counsel's presence at first appearance can help avoid these harms. As to uncounseled statements, counsel can speak on behalf of the arrestee and draw on their legal knowledge to avoid making harmful concessions. (Ex. 23, El-Khouri ¶¶ 23-24; Ex.

24, Ferguson ¶ 30.) As to pretrial detention, counsel can more effectively advocate for release: representation dramatically increases the likelihood that someone will be released pretrial, impacting a case's ultimate outcome. (Ex. 25, Morgan ¶ B; Ex. 13, Colbert ¶ 11.)

Defendants themselves testified to these benefits. Since July 2020, Defendants have provided counsel at first appearance under the preliminary injunction. Counsel present evidence in support of release including employment and housing status, childcare obligations, other community ties, and alternatives to jail like drug treatment. (Ex. 7, Allen 180:4-16.) Judge Allen testified that judges rely on this evidence to lower bail. (*Id.* 180:4-21, 221:16-222:4.) Mr. Barrow testified that counsel helps things "run more smoothly" and results in more people released from custody. (Ex. 10, Barrow 61:10-24.) Judge Lambeth testified that counsel helps both the defendant and the court, and better protects arrestees' rights. (Ex. 8, Lambeth 181:6-13; 265:19-266:3.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the moving party establishes that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the nonmoving party must set forth specific facts showing a genuine issue for trial. *Id.*

7

## QUESTIONS PRESENTED

Whether Plaintiffs are entitled to summary judgment on their claims of:

1.     Wealth-based detention under the Fourteenth Amendment.

2.     Substantive due process under the Fourteenth Amendment.

3.     Procedural due process under the Fourteenth Amendment.

4.     The right to counsel under the Sixth Amendment.

## ARGUMENT

**I.     Defendants Violated Plaintiffs' Right Against Wealth-Based Detention.**

Wealth-based detention orders are subject to heightened scrutiny—the government cannot jail arrestees via unaffordable secured bail without first finding that no less-restrictive alternatives would reasonably assure government interests. Yet that was precisely the practice in Alamance before the preliminary injunction: indigent arrestees remained in jail because they could not pay secured bail, while Defendants made no findings that such detention was necessary or that alternative conditions of release were insufficient. That practice violates the Fourteenth Amendment.

The Supreme Court "has long been sensitive to the treatment of indigents in our criminal justice system." *Bearden v. Georgia*, 461 U.S. 660, 664 (1983). Over fifty years ago, the Court recognized that a person may not be "subjected to imprisonment solely because of his indigency." *Tate v. Short*, 401 U.S. 395, 398 (1971); *see also Pugh v. Rainwater*, 572 F.2d 1053, 1056 (5th Cir. 1978) (en banc).

8

"Due process and equal protection principles converge in the Court's analysis in these cases." *Bearden*, 461 U.S. at 665. Courts must conduct "a careful inquiry into such factors as the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, and the existence of alternative means for effectuating the purpose." *Id.* at 666-67 (cleaned up); s*ee also Alexander v. Johnson*, 742 F.2d 117, 123 n.8 (4th Cir. 1984) (requiring "careful scrutiny" of the *Bearden* factors).

The government must satisfy heightened scrutiny to justify wealth-based detention. It is only permissible "if the state's interests … could not be vindicated in any other way." *Id.* at 124 n.9. The government cannot meet this burden when it does not "inquire into" the arrestee's ability to pay, "consider alternate measures … other than imprisonment," and enter "evidence and findings" that the arrestee is able to pay, or that alternatives to jail are inadequate. *Bearden*, 461 U.S. at 665.

### A. Plaintiffs Have a Fundamental Interest in Freedom from Incarceration That Defendants Extinguish by Jailing Them.

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process Clause] protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The Supreme Court has recognized "the importance and fundamental nature of" this interest for presumptively innocent criminal defendants challenging a bail statute. *United States v. Salerno*, 481 U.S. 739, 750 (1987); *see also Barker v. Wingo*, 407 U.S. 514, 532–33 (1972) (discussing harms inflicted by pretrial detention). Lower courts have observed the same in cases

9

concerning pretrial detention. *See, e.g.*, *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014) (en banc); *Buffin v. City & Cnty. of San Francisco*, No. 15-CV-04959-YGR, 2018 WL 424362, at *6 (N.D. Cal. Jan 16, 2018).

Here, Defendants did not examine arrestees' ability to pay secured bail. This resulted in the named Plaintiffs—poor people, some with disabilities, some charged with low-level misdemeanors—and others like them sitting in jail for days, weeks, or months simply because they couldn't buy their release. (Doc. 3-1 ¶¶2-19; Doc. 3-2 ¶¶14-18; Doc. 3-3 ¶¶ 2-12; Ex. 22, Jones ¶¶18, 64.) Judge Lambeth acknowledged this reality; he agreed "that the new policy does a better job than the old policy of preventing people from sitting in jail pretrial simply because they are poor." (Ex. 8, Lambeth 266:11-15.)

Accordingly, the first two *Bearden* factors—the personal interest and the extent to which it is affected—strongly favor Plaintiffs.

## B. Defendants Cannot Satisfy Heightened Scrutiny.

When the government penalizes someone for their poverty, courts must give "careful scrutiny" to "the existence of alternative means for effectuating the [government's] purpose." *Alexander*, 742 F.2d at 124 n.8 (quoting *Bearden*, 461 U.S. at 667); *see also Rainwater*, 572 F.2d at 1057 ("The incarceration of those who cannot [pay], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements."). Here, Defendants imposed unaffordable secured bail with no findings that less-restrictive alternatives were

10

inadequate. Imposing secured bail without individualized consideration and findings does not meaningfully advance any legitimate government interest.

First, Defendants did not address arrestees' ability to pay. Judges Lambeth and Allen testified that neither initial nor first appearances involved any inquiry into an arrestee's ability to pay, corroborating testimony from the courtroom clerk on first appearances and Defendant Nance on initial appearances. (Ex. 8, Lambeth 225:12-226:5, 227:6-8; Ex. 7, Allen 185:21-186:23, 189:10-190:18; Ex. 9, Crabbe 74:8-13; Ex. 5, Nance 113:8-15.)

Nor did Defendants consider alternatives to secured bail. Before the preliminary injunction, Defendants imposed secured bail without making any findings that less-restrictive alternatives—such as a written promise to appear or unsecured bail—would not adequately protect government interests. (Ex. 4, Hollan 219:4-9; Ex. 5, Nance 137:7-12.)

Defendants Lambeth, Allen, and Hollan also testified that judges made no findings in support of secured bail orders issued at initial appearance or first appearance. (*E.g.*, Ex. 8, Lambeth 225:12-226:5 (judges at bail hearings did not "make express findings about an arrestee's ability to pay a particular secured bail amount," "likelihood of appearance at future hearings," or "likelihood of causing injury to another person"); Ex. 7, Allen 189:13-190:7 (same); Ex. 4, Hollan 85:14-25 (magistrates did not assess ability to pay at initial appearance).) Judges thus failed to determine whether their orders would operate to detain, whether such detention was necessary, or whether alternatives to detention were

adequate to meet the state's interests. (Ex. 8, Lambeth 228:8-14 (conceding individualized inquiries and findings at bail hearings are a "new component of due process" in Alamance County).)

Accordingly, Plaintiffs are entitled to summary judgment on their *Bearden* claim.

## II.    Defendants Violated Plaintiffs' Substantive Due Process Rights.

Under the substantive component of the Due Process Clause, "interference with a fundamental right warrants the application of strict scrutiny." *Bostic v. Schaefer*, 760 F.3d 352, 375 (4th Cir. 2014). Defendants cannot meet this exceptionally demanding test.

As discussed above, freedom from detention—including pretrial detention—is "fundamental." *Reno v. Flores*, 507 U.S. 292, 301-02 (1993) (citing *Salerno* as case involving "fundamental liberty interest"). Government action that infringes upon a fundamental right must be "narrowly tailored to serve a compelling governmental interest." *Id.* at 302.

Thus, pretrial detention is permissible only if necessary to advance the government's compelling interests in preventing flight or danger to the community. The Supreme Court has "upheld preventive detention based on dangerousness only when limited to especially dangerous individuals and subject to strong procedural protections." *Zadvydas v. Davis*, 533 U.S. 679, 690–91 (2001) (citing *Salerno*). In *Salerno*, the Court upheld pretrial detention where a "'judicial officer finds that no condition or combination of conditions'" of release will satisfy the government's interests. 481 U.S. at 742 (quoting

12

18 U.S.C. 3142(e)). Absent such a "sharply focused scheme," the government may not detain a presumptively innocent person. *Foucha v. Louisiana*, 504 U.S. 71 81, 83 (1992).

Here, Defendants regularly curtailed the fundamental right to liberty by detaining arrestees without any findings that no conditions of release would reasonably assure the government's interests. Defendants cannot show that their bail scheme is narrowly tailored to prevent flight or danger to the community.

Defendants cannot show that jailing people using secured bail without individualized findings advances legitimate government interests better than less restrictive alternatives. While the government has legitimate interests in ensuring public safety and court appearance, courts have found that secured bail does little, if anything, to promote these goals. *See, e.g.*, *ODonnell v. Harris Cnty.*, 892 F.3d 147, 1621 (5th Cir. 2018) (finding no "link between financial conditions of release and appearance at trial or law-abiding behavior before trial," and that "secured bail might *increase* the likelihood of unlawful behavior" (quotation marks omitted)), *overruled on other grounds, Daves v. Dallas Cnty.*, 22 F.4th 522 (5th Cir. 2022) (en banc).

The same is true here. Empirical studies discussed by Plaintiffs' expert Dr. Jones confirmed that pretrial detention does not make it likelier that an arrestee will return to court, or any less likely that they will break the law when released. "Lower-risk defendants who are detained for two to three days after arrest are 39% *more* likely to be arrested for new pretrial criminal activity than are comparable lower-risk defendants who are released immediately (within one day)." (Ex. 22, Jones ¶22 (emphasis added).)

13

"Empirical studies also show that unsecured and/or non-financial conditions are at least as effective as secured bail at achieving court appearance, and more effective than secured bail at achieving public safety[.]" (*Id.* ¶68.) Rather than promote public safety or future court appearance, secured bail and pretrial detention are likelier to inflict serious costs on the community as well as state and local government. (*Id.* ¶¶37-40.)

Indeed, Defendants agree that jailing certain populations, such as people with mental health issues or substance abuse disorders, does not serve their interests. (*See* Ex. 8, Lambeth 327:13-22; Ex. 3, Johnson 127:8-128:2.) Sheriff Johnson testified that he is a strong proponent of keeping people with mental health issues out of the jail because jailing these individuals does not advance public safety. (Ex. 3, Johnson 136:11-137:1, 137:23-138:4.) Before the preliminary injunction, jail staff regularly contacted district attorneys seeking to get individuals released because the charges were low-level or because of crowding or health concerns. (Ex. 26, Collected Emails from Sheriff's Office Staff.)

Nor can Defendants demonstrate that their bail scheme was the least restrictive means of advancing their interests. Unlike the "sharply focused scheme" in *Salerno*, Defendants' practices were entirely *un*limited as to who may be detained. *See Foucha*, 504 U.S. at 81. Defendants made no findings regarding dangerousness or flight risk— detention was determined solely by whether the arrestee could pay bail. (*See* Ex. 10, Barrow 53:7-18 (people who remain in jail do not necessarily have more serious charges, they just cannot pay bail).)

14

Defendants also followed no standard for determining whether detention was necessary in individual cases, making no findings regarding how a person's fundamental right to liberty was outweighed by the government's interests, nor applying any evidentiary standard. *Supra* p. 3. Like the unconstitutional scheme in *Foucha*, arrestees were never entitled to an adversary hearing at which the State must prove by clear and convincing evidence that they were demonstrably dangerous to the community, or that they posed an unmanageable flight risk. 504 U.S. at 81. Arrestees were detained based solely on a "description of [their] behavior" constituting *any* criminal offense, in the absence of any positive testimony that they are a flight risk or a danger necessitating detention. *Id.* at 82.

In sum, Defendants made no serious effort to "carefully limit[]" infringement of Plaintiffs' fundamental rights, instead implementing an impermissible "scattershot attempt to incapacitate those who are merely suspected of … crimes." *Salerno*, 481 U.S. at 747. Accordingly, Plaintiffs are entitled to summary judgment on their substantive due process claim.

## III. Defendants Violated Plaintiffs' Procedural Due Process Rights.

Procedural due process claims require courts to weigh (1) the private interest at stake; (2) the risk of erroneous deprivation through the procedures used, as well as the probable value of additional procedural safeguards; and (3) the government's interest, including the administrative burdens of additional procedures. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Here, Plaintiffs' private interest in pretrial liberty is fundamental,

the risk of erroneous deprivation is high, and Defendants have no legitimate interest in avoiding additional procedural safeguards.

### 1. Plaintiffs' Private Interest Is Fundamental.

As discussed above, the interest in freedom from detention is "fundamental." *Supra* pp. 8-9. Defendants acknowledge the importance of pretrial liberty. Judge Lambeth testified that pretrial liberty "lets people be out working, be with their families, take care of their families, get the treatment they need that they can't get sitting in a jail cell." (Ex. 8, Lambeth 325:8-16.) Sheriff Johnson testified that many detainees with mental health problems would be better served in a non-carceral setting. (Ex. 3, Johnson 127:8-24; 129:2-8.) Plaintiffs' experts confirmed that detained arrestees often face dangerous conditions that make it difficult to plan a defense. (Ex. 24, Ferguson ¶23.)

Therefore, this factor weighs strongly in favor of Plaintiffs.

### 2. The Risk of Erroneous Deprivation Is High.

The Supreme Court has recognized that due process requires robust procedures to protect against the erroneous deprivation of a person's liberty. *See Morrissey v. Brewer*, 408 U.S. 471, 488-89 (1972) (explaining what due process requires at a parole revocation hearing). These protections include:

**Adequate notice**. "[N]otice is essential to afford the" person whose liberty is at stake "an opportunity to challenge the contemplated action and to understand the nature of what is happening to him." *Vitek v. Jones*, 445 U.S. 480, 496 (1980). The notice must be tailored, "in light of the decision to be made, to the capacities and circumstances of

16

those who are to be heard, to insure that they are given a meaningful opportunity to present their case." *Mathews*, 424 U.S. at 349 (quotation marks omitted).

**A prompt and meaningful opportunity to be heard**. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (quotation marks omitted). Because a "more expeditious hearing would significantly reduce the harm suffered," too lengthy of a delay gives rise to a due process violation. *Coleman v. Watt*, 40 F.3d 255, 261 (8th Cir. 1994).

**Detailed factual findings**. An "elementary requirement" of due process is that a decisionmaker "state the reasons for his determination and indicate the evidence he relied on[.]" *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970). *Bearden* held that a court could not revoke someone's probation "absent evidence and findings that the defendant was somehow responsible for the failure or that alternative forms of punishment were inadequate." 461 U.S. at 665. In cases like this one, a judge must make findings on the record either that the arrestee has the ability to pay the amount needed for release, or that the government has no alternative to imposing detention. *See ODonnell v. Harris Cnty.*, 251 F. Supp. 3d 1052, 1145-46 (S.D. Tex. 2017) *aff'd as modified*, 892 F.3d 147 (5th Cir. 2018).

**Clear and convincing evidence**. The Supreme Court has never permitted an evidentiary standard lower than "clear and convincing" evidence in any case involving the deprivation of bodily liberty. *See Santosky v. Kramer*, 455 U.S. 745, 756 (1982)

17

(discussing Court's requirement of clear and convincing evidence when the individual interest at stake in a state proceeding are both "particularly important" and "more substantial than loss of money" (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979)); *Cruzan ex re. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 282-83 (1990) (explaining Court has required clear and convincing evidence for deportation, denaturalization, civil commitment, termination of parental rights, allegations of civil fraud, and other types of civil cases). This standard is required for bail hearings. *E.g.*, *Caliste v. Cantrell*, 329 F. Supp. 3d 296, 313 (E.D. La. 2018).

**Counsel**. *Salerno* identified the "right to counsel at the detention hearing" as a key procedural safeguard against unlawful detention. 481 U.S. at 751-52. "[W]ithout representative counsel the risk of erroneous pretrial detention is high." *Caliste*, 329 F. Supp. 3d at 314. Empirical evidence shows that the absence of counsel at bail hearings is associated with more restrictive pretrial release conditions and more days spent in pretrial detention. (Ex. 25, Morgan ¶ 44.)

Here, as detailed in the fact section above, the challenged policies and practices did not provide any of these protections. Magistrates did not give arrestees any notice of the questions at issue. Bail hearings were cursory and arrestees could not present any evidence. Magistrates did not apply the clear and convincing evidence standard, and testified that no evidentiary standard was triggered by the threat of detention. Judicial officials made no findings regarding arrestees' ability to pay, risk of nonappearance, or danger to the community. Indigent arrestees were not provided counsel. Without these

18

procedures, arrestees face a high risk of erroneous detention. This factor therefore strongly favors Plaintiffs.

### 3. Additional Procedures Advance Government Interests.

Defendants' bail practices before the preliminary injunction did not serve any legitimate government interest. The additional procedures, however, advance the government's interest in promoting basic fairness and avoiding the cost and societal harm of unnecessary incarceration. *Morrissey*, 408 U.S. at 483-84. In fact, as discussed above, Defendants acknowledged that the preliminary injunction resulted in a much-improved system. *Supra* p. 6.

Each *Mathews* factor favors Plaintiffs as a matter of law. Plaintiffs are therefore entitled to summary judgment on their procedural due process claim.

### IV. Failure to Provide Counsel at First Appearance Violates the Sixth Amendment.

First appearance in Alamance County requires the assistance of defense counsel. The Sixth Amendment requires counsel at every "critical stage of prosecution," which is any proceeding where "potential substantial prejudice to a defendant's rights inheres in the particular confrontation," and counsel can "help avoid that prejudice." *Vance v. North Carolina*, 432 F.2d 984, 988 (4th Cir. 1970) (quoting *United States v. Wade*, 388 U.S. 218, 227 (1967)).

At Alamance first appearances, "defenses may be … irretrievably lost" through an arrestee's uncounseled bail arguments. *Hamilton v. Alabama*, 368 U.S. 52, 54 (1961). First appearance also imposes pretrial detention orders that often "settle the accused's

19

fate," imprisoning them for longer than the penalty imposed for pleading guilty. *Wade*, 388 U.S. at 227. No party disputes that counsel's presence can "help avoid" these prejudices. *Vance*, 432 F.2d at 988. Because first appearance inherently risks substantial prejudice to an arrestee, and counsel can help avoid that prejudice, first appearance is a critical stage of prosecution. *See Booth v. Galveston Cnty.*, 352 F. Supp. 3d 718, 738 (S.D. Tex. 2019) ("There can really be no question that an initial bail hearing should be considered a critical stage of trial.").

### A. First Appearance in Alamance County Risks Substantial Prejudice By Prompting Inculpatory Statements.

Defendants' statements at first appearance—their first hearing before a judge— can substantially prejudice their rights. Substantial prejudice occurs when a defendant is "presented with the opportunity" to "irrevocably waive any defenses or make any irreversible admissions of guilt." *United States v. Owen*, 407 F.3d 222, 226–27 (4th Cir. 2005).

Binding precedent on early appearances from other states is instructive. Alabama's arraignments are a critical stage because the defendant can waive an insanity plea: "Available defenses may be as irretrievably lost … as they are when … counsel waives a right for strategic purposes," and thus, what happens at arraignment "may affect the whole trial" if the accused makes harmful concessions leading to a conviction or harsher sentence. *Hamilton v. Alabama*, 368 U.S. 52-55 (1961). Maryland's preliminary hearings are also a critical stage, even though the hearings do not require a plea under Maryland law. *White v. Maryland*, 373 U.S. 59–60 (1963) (per curiam). *An admission of guilt*

20

*prompted by the preliminary hearing* is a risk of prejudice serious enough to make the hearing a critical stage. *Id.* at 60.

Thus, a hearing need not require affirmative prompts to create an unacceptable risk of arrestees speaking and prejudicing their cases. The Supreme Court has repeatedly protected arrestees from the reality that, even without express questioning, the government can create "powerful psychological inducement[s]" to waive the right to silence which are effectively interrogation. *United States v. Henry*, 447 U.S. 264, 274, 277 (1980). These "inducements" create a critical stage of prosecution because of the obvious risk of prejudicing a defendant's case. *Id.*

There can be no dispute that first appearance in Alamance County prompts arrestees to make inculpatory statements. At first appearance, arrestees are informed of the allegations against them and the maximum penalty they face, then advised of their right to remain silent during a hearing on whether they should be released from jail. (Ex. 7, Allen 151:5-15.) The judge then hears from the District Attorney, and asks the arrestee whether they wish to speak. (Ex. 10, Barrow 38:2-5.) Arrestees must "make critical decisions without counsel's advice" about waiving either the right to silence or right to be heard. *See Lafler*, 566 U.S. at 165; *Nelson v. Payton*, 415 F.2d 1154, 1157 (4th Cir. 1969) (describing "decisions which may make the difference between freedom and incarceration" as "critical"). Judge Lambeth testified that "it's human nature" for an arrestee to try to advocate for themselves in this situation. (Ex. 8, Lambeth 210:9-12.)

21

Alamance first appearances thus carry an inherent risk of substantial prejudice to arrestees' rights. Arrestees routinely make an uncounseled choice to waive their right to silence at first appearance. (Ex. 10, Barrow 43:11-12 (defendants commented on the allegations "quite often"); Ex. 8, Lambeth 206:2-16, 208:15-18; Ex. 9, Crabbe 74:19-75:8.) Even without a guilty plea, arrestees inadvertently "waive defenses" and make "irreversible admissions of guilt." (Ex. 8, Lambeth 40:21-22 (describing risk that people incriminate themselves).) Announcing the charges naturally prompts arrestees to explain, for example, that the complainant's version of events is "worse than what really happened." (*Id*. 210:09-12. *E.g.*, *id.* 204:10-11 (arrestees commonly make comments like, "Judge, I have got a drug problem."); Ex. 10, Barrow 43:8-12 (arrestees commonly make comments like, "I never touched her."); Ex. 4, Hollan 88:5-23 (describing initial appearance: "They'd say 'the person is lying' or 'they hit me first.'").) As Judge Lambeth testified, "the prosecutor prosecuting them is standing ten feet from them listening to every word." (Ex. 8, Lambeth at 207:4-6; *see* Ex. 7, Allen. 33:8-34:7 (describing presence of prosecutor at first appearance), Ex. 9, Crabbe 77:11-13 (describing prosecutors taking notes).)

Experienced North Carolina defense practitioners agree. (Ex. 12, Kabakoff ¶ 25; Ex. 24, Ferguson ¶¶ 28-32.) Catherine El-Khouri, who staffs first appearances in Mecklenburg County, has "observed only a handful of arrestees who did not attempt to speak to the judge during their appearance. Most arrestees attempt to speak about the charges against them." (Ex. 24, El-Khouri ¶ 22.) These statements harm the outcome of

22

plea bargaining: prosecutors write them down and use them for investigations, or threaten to introduce harmful admissions at trial, limiting potential defense strategies. (Ex. 23, El-Khouri ¶ 22; Ex. 12, Kabakoff ¶ 25; Ex. 24, Ferguson ¶¶ 28, 30-32; Ex. 13, Colbert ¶¶ 14-25 (reporting the same for other jurisdictions).)

Accordingly, the "uncounseled choice" inherent in Alamance first appearances—the choice between waiving one's right to a bail hearing and waiving one's right to silence—has the potential to substantially prejudice the defendant's rights through waiver of defenses and irreversible admissions of guilt.

### B. Alamance First Appearances Risk Substantial Prejudice Through Pretrial Detention Orders.

Pretrial detention orders issued at first appearance in Alamance County can substantially prejudice an arrestee's rights. "Substantial prejudice" under the Sixth Amendment is prejudice to the outcome of the criminal case. *Wade*, 388 U.S. at 227. This analysis is a "pragmatic assessment" of the "realities of modern criminal prosecution," which relies on pleas induced through high-stakes pretrial proceedings. *Patterson v. Illinois*, 487 U.S. 285, 298 (1988); *Wade*, 388 U.S. at 224. Thus, "substantial prejudice" includes prejudice to the outcome of plea bargaining, which "is almost always the critical point for a defendant." *Missouri v. Frye*, 566 U.S. 134, 143–44 (2012) (observing that 94% of state criminal prosecutions end in guilty pleas: "[P]lea bargaining is … not some adjunct to the criminal justice system; it is the criminal justice system."); *Lafler v. Cooper*, 566 U.S. 156, 164–65 (2012) (holding that the right to counsel is intended to

23

protect fairness of "the whole course of a criminal proceeding," including plea negotiations).

Many pretrial proceedings inherently risk substantial prejudice because "the results might well settle the accused's fate and reduce the trial itself to a mere formality." *Wade*, 388 U.S. at 224. The Supreme Court has held that Alabama's preliminary hearings risk substantial prejudice through the loss of an early opportunity to argue "matters such as the necessity for an early psychiatric examination or bail." *Coleman v. Alabama*, 399 U.S. 1, 9 (1970). The Fourth Circuit has interpreted *Coleman* to apply to a prior version of North Carolina's preliminary hearing: "[I]n North Carolina, as in Alabama, the accused needs counsel in order to effectively argue for benefits such as bail." *Vance*, 432 F.2d at 988–89. While the early appearance framework has changed, the basic principle—loss of an early opportunity to effectively argue for bail—remains.

The risk of a harsher sentence also constitutes substantial prejudice. Plea negotiations risk substantial prejudice through the lost opportunity to "plea[d] to a lesser charge or a sentence of less prison time." *Frye*, 566 U.S. at 147. Likewise, preliminary hearings in juvenile cases risk substantial prejudice because they determine whether youths will be punished with incarceration and for how long. *Kemplen v. Maryland*, 428 F.2d 169, 173–74 (4th Cir. 1970).

Alamance first appearances prejudice a criminal case's outcome because the bail determination effectively dictates whether an offense will be punished with incarceration.

24

It is typical for many charges[1] to plead to probation or other non-carceral sentences if a

person is released, but plead to jail time if the person is detained. (Ex. 8, Lambeth

262:19-263:4.) Bail orders at first appearance often jail arrestees who wouldn't face

another day of incarceration if they could afford bail. (Ex. 8, Lambeth 259:11-17; Ex. 4,

Hollan 208:2-5.) Such people are often coerced into resolving their cases with a plea to

time served because their bail order forces them to serve time before even facing a

prosecutor at the bargaining table. (Ex. 12, Kabakoff ¶¶ 16,18; Ex. 13, Colbert ¶ 15.)

People who refuse a plea will remain in jail for a period that is unlimited by statute or

local policy. (Ex. 8, Lambeth 259:23-260:18; Ex. 24, Ferguson ¶ 17; Ex. 12, Kabakoff ¶

20 (North Carolina law cedes trial scheduling authority to prosecutors … trial is an

unreachable goal in the distant future and the only way to regain freedom … in the

foreseeable future [] is to accept a plea offer.").)  Like the juvenile hearings in *Kemplen*,

428 F.2d at 173–74, first appearance can effectively determine whether an offense will be

punished with a period of incarceration.

Judges Allen and Lambeth testified that pretrial detention affects Alamance

County arrestees' decisions to plead guilty. (Ex. 8, Lambeth 242:21-243:11 (people who

had been released did not enter early guilty pleas because "they were going home"); Ex.

---

[1] Distinguishing between misdemeanors and felonies is misleading, because both types of offenses commonly plead to no jail time at all. "[I]t is preferable to disregard the characterization of the offense as felony, misdemeanor or traffic offense. Nor is it adequate to require the provision of defense services for all offenses which carry a sentence to jail or prison. Often, as a practical matter, such sentences are rarely if ever imposed for certain types of offenses, so that for all intents and purposes the punishment they carry is at most a fine." *Argersinger v. Hamlin*, 407 U.S. 25, 39 (1972).

25

7, Allen 230:13-19 ("I'm sure" it factored in).) Local policy has recognized this reality for years. (Ex. 27, Washburn Memo re Bonds ("It shouldn't be necessary to plead guilty just because you are in jail, nor should you remain in jail, certainly not longer than the maximum sentence, just because you cannot raise bail.").) The creation of Mr. Barrow's Court Liaison position to facilitate the volume of guilty pleas further confirms this reality. (Ex. 10, Barrow 78:1-11 ("If they have been in there six or seven days, they might want to plead guilty in an attempt to get out … So they might send me a message, 'I want to take care of my case and plead guilty.' … And I'll take it from there ….").) When asked whether people say they want to plead guilty to get out of jail, Mr. Barrow responded, "Oh, yes." (*Id.* 81:22-24.)

Kiosk messages to Mr. Barrow from detained arrestees illustrate the coercive effect of Alamance's pretrial detention practices. Some show people abandoning valid defenses in exchange for release:

> [I] have 2 court dates for mist larceny for taking food from stores. Food never left stores but my intentions were to take for survival and nothing more. GUILTY AS CHARGED but please know that daddys will do desprate things at desperate times and desperate times it was. No legal representation needed cause again [I] admit full guilt. These boys need their daddy back. Please give me your thoughts on speeding up court dates and putting this behind me Sir.

(Ex. 15, Bane Email.) Mr. Bane's jailers responded by planning to schedule a court date "next week." *Id.* In another, an arrestee begs to plead guilty so his family's lives are not derailed:

> My fiance … is the sole income provider of our home and I
> take care of our children …. My court date is over 2 months
> away from now and we are on the verge of her losing her
> job and our home due to not having anyone to take care of
> our children.… I WILL PLEA GUILTY TO MY OFFENSE
> AND TAKE PROBATION FOR THE SAKE OF OUR[]
> CHILDREN AND SITUATION !!!

(Ex. 14, Paschal Email.) Mr. Paschal had been detained for 7 days on $4,000 secured bail when he sent this message.

Even when a sentence of incarceration is the likely outcome, pretrial detention results in *longer* sentences. People accept unfavorable plea deals to get out of pretrial detention and into prison sooner because prison facilities are preferable to jail. (Ex. 7, Allen 213:16-214:13, 257:15-258:1; Ex. 23, El-Khouri ¶¶ 15, 18; Ex. 12, Kabakoff ¶ 21; Ex. 24, Ferguson ¶ 21.)

Plaintiffs' five unrebutted experts agree that pretrial detention coerces people into pleading guilty for the reasons stated above. Two seasoned North Carolina defenders agreed that "Detained clients often … accept plea deals that they … would otherwise reject as too harsh because it is the fastest way out of jail," (Ex. 12, Kabakoff ¶ 16-17, 21); and "many clients whose charges would have ultimately been dismissed had they been released pretrial[] instead[] agree to sentences of incarceration in order to speed their release," (Ex. 24, Ferguson ¶¶ 19-21.) Catherine El-Khouri, a public defender for 35 years, ran a program designed to alleviate the coercive nature of pretrial detention ordered at first appearance. Despite her efforts to expedite investigation, her clients still accepted unfavorable plea deals: "defenses and triable issues are of no comfort for clients

faced with lengthy detention while waiting to get into court." (Ex. 23, El-Khouri ¶¶ 14-16.) Professors Colbert and Morgan confirmed that this effect is consistent with studies from other jurisdictions showing that pretrial detention is correlated with worse case outcomes. (Ex. 25, Morgan ¶ 10; Ex. 13, Colbert ¶ 11.)

The coercive effect of pretrial detention is further compounded by restrictions on the detainee's ability to participate in their own defense. The period immediately following first appearance is critical for case investigation: evidence can be destroyed, witnesses lost, and memories faded. (Ex. 23, El-Khouri ¶ 17; Ex. 12, Kabakoff ¶ 23; Ex. 13 Colbert ¶16.) Ordering detention at first appearance effectively hamstrings the defense investigation during this critical period. Clients cannot facilitate meetings with witnesses, walk attorneys through the scene, or even use the internet. (Ex. 12, Kabakoff ¶ 23; Ex. 24, Ferguson ¶ 22; Ex. 13, Colbert ¶ 16.) Confidential communication is limited to difficult-to-arrange in-person meetings with attorneys, where reviewing electronic evidence can be challenging. (Ex. 3, Johnson 72:13-75:16 (attorneys can bring laptops to client meetings only at deputies' discretion); Ex. 23, El-Khouri ¶¶ 19-21; Ex. 12, Kabakoff ¶¶ 22-24; Ex. 24, Ferguson ¶¶ 22, 24-25, 27.)

Even worse, the government has access to a list of every expert who consults with the defendant, and a recording of every phone call the defendant makes. (Ex. 3, Johnson 81:15-82:12, 186:20-187:5; Ex. 24, Ferguson ¶¶ 24, 26; Ex. 13, Colbert ¶ 17.) These limitations on participation in one's defense further exacerbate preexisting prejudice to the fairness of plea bargaining. Furthermore, detained arrestees cannot show the court

that they can hold employment, comply with release conditions, and avoid additional arrests, all of which reflect favorably on defendants at sentencing. (Ex. 13, Colbert ¶ 18; Ex. 24, Ferguson ¶ 23.) Judges Lambeth and Allen testified that they consider factors like a person's employment and compliance with terms of pretrial release when sentencing defendants, but people who are detained lose out on these mitigating factors. (Ex. 8, Lambeth 264:20-265:18; Ex. 7, Allen 223:9-224:16.)

Accordingly, there can be no dispute that detention ordered at first appearance can substantially prejudice a defendant's rights.

### C. Counsel's Presence at First Appearance Can Help Avoid Substantial Prejudice

Counsel's presence at first appearance can "help avoid" the risk of coercive pretrial detention and harmful admissions. *Vance*, 432 F.2d at 988. For example, in *Coleman*, the court listed ways lawyers could help arrestees avoid prejudice, such as asserting legal defenses, examining witnesses, discovering the state's case, and making arguments on bail. 399 U.S. at 9. The Fourth Circuit, applying *Coleman* to a prior version of North Carolina's preliminary hearing, held that "[I]n North Carolina, … the accused needs counsel in order to effectively argue for benefits such as bail." *Vance*, 432 F.2d at 988–89. *Cf. United States v. Freeman*, 24 F.4th 320, 327–28 (4th Cir. 2022) (describing counsel's professional obligation to argue against improper upward guidelines departure for flight from the jurisdiction).

Counsel also helps protect the vulnerable client from prosecutorial overreach and effectively reconstruct any unfairness at trial, *Wade*, 388 U.S. at 230–32; avoid

29

incarceration "predicated on misinformation or misreading of court records," *Mempa v. Rhay,* 389 U.S. 128, 133 (1967); provide "information about the [client's] background and prior record which may be otherwise unavailable," and "suggest … alternative[s]" to incarceration, *Kemplen v. Maryland*, 428 F.2d 169, 174–75 (4th Cir. 1970).

All of that is true here. According to Judge Lambeth, lawyers "do a better job advocating for people than they do for themselves," (Ex. 8, Lambeth 28:1-3), and an attorney's presence is "helpful to a defendant, and, frankly, to the court," (*Id.* 181:11-12; *accord* Ex. 7, Allen 251:22-23.) As *Coleman*, *Vance*, and *Freeman* recognize, counsel's expertise is necessary to understand the legal elements of bail determinations, make competent arguments about the nature and strength of the allegations against the arrestee, and propose terms of release. (Ex. 8, Lambeth 28:20-29:11, 225:4-11, 263:18-264:3 ("I always want to hear a [release] plan.")); (Ex. 23, El-Khouri ¶¶ 24, 28-30; Ex. 12, Kabakoff ¶¶ 27-28; Ex. 24, Ferguson ¶¶ 12-16; Ex. 13, Colbert ¶¶ 14, 22-23 28-30.) In contrast, unrepresented arrestees are "ill-equipped to perform [such a] task." *State v. Gordon*, 339 S.E.2d 836, 838 (N.C. App. 1986). (Ex. 8, Lambeth 199:21-24, 200:13 (testifying it is "foolish" to "be representing yourself against somebody … where you are not trained on the law and they are"); Ex. 23, El-Khouri ¶ 32; Ex. 12, Kabakoff ¶ 33.) *Cf. Gordon*, 339 S.E. 2d at 838 (holding right to counsel applied at suppression hearing because the defendant did not understand what was happening).

Counsel can also contact witnesses and gather evidence—an employer who verifies income, a family member who promises transportation to court—and proffer that

evidence with the credibility of an officer of the court. (Ex. 8, Lambeth 29:12-17, 35:1-7, 36:8-37:9; Ex. 23, El-Khouri ¶¶ 25-30; Ex. 12, Kabakoff ¶¶ 29-31; Ex. 24, Ferguson ¶¶ 10-11, 14; Ex. 13 Colbert ¶¶ 23-24.) Judges rely heavily on such evidence. (Ex. 8, Lambeth 186:5-8, 195:15-23.) Without counsel present, arrestees have no way to put evidence before the court. (*Id.* 227:13-23. *Cf.* Ex. 4, Hollan 90:11-14 (what arrestees say at initial appearance is irrelevant).) In addition, Ms. El-Khouri's expert testimony revealed that, as the Court decried in *Mempa*, first appearances are littered with mistakes that go uncorrected without experienced counsel present, including some which, "if unaddressed, could lead to weeks of unnecessary or even illegal pretrial detention." (Ex. 23, El-Khouri ¶¶ 31, 33; Ex. 12, Kabakoff ¶ 32.)

Later appointment of counsel does not cure this prejudice. *See Ash*, 413 U.S. at 316 (asking "whether confrontation with counsel at trial can serve as a substitute for counsel at the pretrial confrontation"). Inculpatory statements infect plea negotiations from the moment they are uttered: "It is illogical to say that the right is not violated until … the statement's admission into evidence. … In such circumstances the accused continues to enjoy the assistance of counsel; the assistance is simply not worth much." *Kansas v. Ventris*, 556 U.S. 586, 592 (2009).

Nor can subsequent appointment of counsel undo the fact that, by the time counsel could reasonably be heard on bail reduction, the client has already been jailed, often effectively serving their sentence. The prejudice has already accrued to the client's negotiation position and cannot be undone.

31

***

In sum, first appearances in Alamance County inherently risk substantial prejudice to arrestees' rights, both through the coercive effect of pretrial detention imposed at that proceeding, and through irrevocable waiver of defenses or admissions of guilt people make trying to talk their way out of jail. Because counsel's presence can help avoid these prejudices, first appearance is a critical stage. "[B]eyond protecting individual defendants," the right to counsel is "critical to the ability of the adversarial system to produce just results." *United States v. Duncan*, 800 F.3d 642, 648 (4th Cir. 2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 685 (1984)). *Accord Smith v. Stein*, 982 F.3d 229, 234 (4th Cir. 2020) (holding that denial of representation at a critical stage "creates a risk of an unreliable verdict which is intolerably high"). Guilty pleas extracted from people detained at first appearance are not the product of a reliable, functioning adversarial system. They result from the unfair imbalance of power between the prosecutor and unrepresented defendant at first appearance. The Sixth Amendment right to counsel prohibits such a result.

## V. The Violations of Plaintiffs' Rights Result from Defendants' Official Policy or Custom.

Each defendant is liable for causing the foregoing constitutional violations. Judges Allen and Lambeth, as the officials responsible for promulgating policies on pretrial release, are liable for this unconstitutional "practice that is so persistent and widespread as to constitute a custom or usage with the force of law," *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quotation marks omitted), and for their "continued inaction in the

32

face of documented widespread abuses." *Randall v. Prince George's Cnty.*, 302 F.3d 188, 206 (4th. Cir. 2002). (*See* Doc. 100 at 2-4 (conceding that Judges Lambeth and Allen failed to remedy the widespread violations at issue before this lawsuit was filed, and convened just one meeting during the 18 months preceding this lawsuit to consider addressing them). It is uncontested that the Magistrate Defendants issue the secured bail orders injuring arrestees at initial appearance, and that the Sheriff executes these orders.

## CONCLUSION

The Court should grant Plaintiffs summary judgment on all counts.


Respectfully submitted, this the 1ˢᵗ day of August, 2022.

/s/  Katherine Hubbard
Katherine Hubbard (D.C. Bar 1500503)*
Jeffrey Stein (D.C. Bar 1010724)*
Carson White (Cal. Bar 323535)*
CIVIL RIGHTS CORPS
1601 Connecticut Ave NW, Suite 800
Washington, DC 20009
Tel: 202-894-6124
Fax: 202-609-8030
Email: katherine@civilrightscorps.org
              jeff@civilrightscorps.org
              carson@civilrightscorps.org

Daniel K. Siegel (N.C. Bar 46397)
AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL FOUNDATION
P.O. Box 28004
Raleigh, NC 27611
Tel: 919-834-3466
Email: dsiegel@acluofnc.org


Trisha Trigilio (TX Bar No. 24075179)*
Brandon Buskey (AL Bar ASB2753-A50B)*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
CRIMINAL LEGAL REFORM PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212-284-7364

Email: trishat@aclu.org
              bbuskey@aclu.org

33

*Appearing by special appearance in accordance with Local Rule 83.1(d).*

**Attorneys for Plaintiffs**

## CERTIFICATION OF WORD COUNT

I hereby certify that the foregoing memorandum complies with this Court's Order (Doc. 95) in that, according to the word processing program used to produce this brief, the document does not exceed 8,000 words exclusive of caption, title, signature lines, and certificates.

Dated: August 1, 2022

/s/ Katherine Hubbard
Katherine Hubbard
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of electronic filing to all counsel of record who have appeared in this case.

/s/ Katherine Hubbard
Katherine Hubbard
Counsel for Plaintiffs