IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

No: 1:19-cv-1126-NCT-LPA

| | |
|---|---|
| KATHERINE GUILL, on behalf of herself and those similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>BRADLEY R. ALLEN, SR., in his official capacity as Chief District Court Judge, *et al.*,<br><br>        Defendants. | **MEMORANDUM OF LAW OF JUDICIAL DEFENDANTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>LR7.3(f), LR7.6 |

    Judicial Defendants provide this Memorandum of Law in opposition to Plaintiff's

motion for summary judgment ("the Motion") (Doc. 106), brief in support of the Motion

(Doc. 107), and supporting exhibits (Doc. 107-1 to 107-28).

## STATEMENT OF FACTS

    Judicial Defendants incorporate by reference the Statement of Facts contained in

their memorandum of law in support of their motion for summary judgment.  (Doc. 100,

pp 2-10)

1

# ARGUMENT

## I. BECAUSE PLAINTIFFS' EQUAL PROTECTION AND DUE PROCESS CLAIMS[1] ARE MOOT, PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT.

Plaintiffs' summary judgment materials exclusively address the 1995 pretrial release policy in place when Plaintiffs filed this action. (Doc. 107, 107-1 to 107-28; Doc. 1) Judicial Defendants have never attempted to defend the constitutionality of the 1995 policy. Prior to this lawsuit, Judicial Defendants started taking steps to change the 1995 policy, which steps continued thereafter. (Doc. 99-1, ¶¶ 19-38; Doc. 99-2, ¶¶ 5-28) Judicial Defendants created a new pretrial release policy ("the Bond Policy"), including provisions resulting from extensive collaboration and negotiation with Plaintiffs over six months of discussions. (Doc. 99-1, ¶¶ 40-41; Doc. 99-2, ¶¶ 30-31)

The Bond Policy reiterates North Carolina's statutory presumption against secured bonds and establishes a presumption against monetary conditions of release. It requires written findings, made by clear and convincing evidence, explaining why a judicial official believes a secured bond is necessary, and the findings are provided to detained arrestees. It directs judicial officials to conduct an individualized ability-to-pay analysis and utilizes specified benchmarks that establish a presumption of indigence for an arrestee. A separate administrative order expedites first appearance hearings for detained arrestees and requires

---

[1] As Judicial Defendants explained in support of their summary judgment memorandum (Doc. 100, p 13), they do not contend that Plaintiffs' claim predicated on a purported procedural due process right to representation by counsel at bail determination hearings is moot, only that it is properly addressed under the Sixth Amendment (*Id.* at pp 19-20).

oral and written advisements to them explaining the nature and purpose of a first appearance and what factors the court considers when reviewing conditions of release. (Doc. 99-1, ¶¶ 42-50 & Exs. C and D thereto; Doc. 99-2, ¶¶ 32-41 & Exs. C and D thereto)

Judicial Defendants consented to a preliminary injunction (Doc. 56), adopted the Bond Policy and associated administrative orders to implement the Consent Preliminary Injunction Order ("Consent PI") requirements, and underwent training prior to implementation. (Doc. 99-1, ¶¶ 67-71; Doc. 99-2, ¶¶ 32-41) Judicial Defendants have not revised the Bond Policy since its implementation on July 1, 2020. Defendant Lambeth has provided sworn testimony that he will retain all its key features moving forward. (Doc. 99-2, ¶ 37) By their actions, Judicial Defendants have clearly indicated their commitment to the Bond Policy. To the extent doubt remains, Defendant Lambeth has executed a second affidavit expressly saying that he will not reinstitute the 1995 policy. (Ex. A, Second Lambeth Aff., ¶ 2)

Except for the provision of counsel for first appearances, the Bond Policy and the separate administrative order furnished every form of relief Plaintiffs sought in the Complaint. Judge Lambeth explained that he will retain those protections and will not reinstitute the 1995 policy. (Doc. 99-2, ¶¶ 33-34, 37; Ex. A, Second Lambeth Aff., ¶¶ 2-3) For the reasons outlined in Judicial Defendants' own summary judgment materials, which Judicial Defendants incorporate by reference, Plaintiffs' claims under the Equal Protection and the Due Process Clauses are moot. *See, e.g.*, *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 349 (4th Cir. 2017) (affirming summary judgment where fire chief rescinded challenged policies, issued revised versions that omitted offensive provisions, and swore

3

to operate under new policies); *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1231 (4th Cir. 1989) (dismissing as moot claims challenging Virginia statute, similar to a North Carolina version struck down as unconstitutional, that state officials had not threatened to enforce against plaintiff and had not asserted a right to enforce in the future).

## II. PROCEDURAL DUE PROCESS DOES NOT REQUIRE REPRESENTATION BY COUNSEL AT BAIL DETERMINATION HEARINGS.

For their procedural due process argument, Plaintiffs correctly rely on *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). (Doc. 107, p 15) However, Plaintiffs also rely on two cases – *United States v. Salerno*, 481 U.S. 739 (1987) and *Caliste v. Cantrell*, 329 F. Supp. 3d 296 (E.D. La. 2018) – for their specific contention that procedural due process requires representation by counsel for arrestees at bail determination hearings. That reliance is misplaced.

In *Salerno*, the Court addressed a facial challenge to the federal Bail Reform Act based, in part, on substantive and procedural due process grounds. *Salerno*, 481 U.S. at 746. Rejecting the procedural due process claim, the Court noted that, "to sustain [the Bail Reform Act's procedures] against such a challenge, we need only find them 'adequate to authorize the pretrial detention of at least some [persons] charged with crimes.'" *Id.* at 751 (quoting *Schall v. Martin*, 467 U.S. 253, 264 (1984)). The *Salerno* Court went on to identify the Act's procedural protections, which included: (1) the right to testify and proffer information; (2) the right to cross-examine witnesses; (3) a requirement that the judicial official rely on statutorily enumerated factors; (4) a requirement that the Government prove its case by clear and convincing evidence; (5) a requirement that "the judicial official

4

include written findings of fact and a written statement of reasons for a decision to detain"; and (6) a right to immediate appellate review. *Salerno*, 481 U.S. at 751-52. While the Court found that, collectively, "these extensive safeguards suffice to repel a facial challenge," it never said that the Due Process Clause required any specific one, let alone representation by counsel at federal bail determination hearings. *Id.* at 752. *See also Edwards v. Cofield*, 301 F. Supp. 3d 1136, 1145 (M.D. Ala. 2018) (noting *Salerno* "did not hold that the procedural safeguards provided by the Bail Reform Act of 1984 are constitutionally required; rather, it held that they were constitutionally sufficient").

The *Caliste* court applied *Mathews* and concluded that "the right to counsel at a bail hearing to determine pretrial detention is also required by due process" because of the "vital importance of pretrial liberty." *Caliste*, 329 F. Supp. 3d at 314. However, *Caliste* appears to be the only court to have ever expressly done so. *But see Hill v. Hall*, No. 3:19-cv-00452, 2019 U.S. Dist. LEXIS 173758, at *47 (M.D. Tenn. Oct. 7, 2019) (discussing that plaintiff "received all the process to which he was due: an individualized hearing of which he had adequate advance notice and where he was represented by counsel and permitted to present witnesses and cross-examine the government's witnesses."); *Torres v. Collins*, No. 2:20-CV-0026-DCLC, 2020 U.S. Dist. LEXIS 245043 (E.D. Tenn. Nov. 30, 2020) (citing *Hill* for "minimum constitutional standards that must be followed in making bail determinations"). Moreover, the *Caliste* court's holding is contrary to the Supreme Court's holding in *Turner v. Rogers*, 564 U.S. 431, 452-53 (2011). In *Turner*, the Court held that "the Due Process Clause does not *automatically* require the provision of counsel at civil contempt proceedings to an indigent individual who is subject to a child support order,

5

even if that individual faces incarceration (for up to a year)." *Id.* at 446 (emphasis in original). This is especially so when "the State provides alternative procedural safeguards equivalent to those we have mentioned (adequate notice of the importance of ability to pay, fair opportunity to present, and to dispute, relevant information, and court findings)." *Id.* at 448.

As the Supreme Court explained in *Albright v. Oliver*, where the Framers established a specific amendment in the Bill of Rights to address the Government's authority to act, the specific amendment – and not the generalized language of the Fourteenth Amendment – controls the analysis. 510 U.S. 266, 273 (1994) (plurality opinion). Specifically, the *Albright* Court noted that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Discussing this same principle in the context of the right to counsel, Justice Thomas, dissenting in *Turner*, wrote that "if the Due Process Clause created a right to appointed counsel at all proceedings with the potential for detention, then the Sixth Amendment right to appointed counsel would be unnecessary." *Turner*, 564 U.S. at 452-53 (Thomas, J., dissenting). As Justice Thomas explained, "[t]he fact that one constitutional provision expressly provides a right to appointed counsel in specific circumstances indicates that the Constitution does not also *sub silentio* provide that right far more broadly in another, more general, provision." *Id.* at 453 (Thomas, J., dissenting). The Sixth Amendment's specific right to counsel should govern the Court's

6

analysis and discourage this Court from finding a procedural due process right to representation at bail determination hearings.

### III. PLAINTIFFS' EXHIBIT 20 (Doc. 107-21) AND EXHIBIT 21 (Doc. 107-22) CONTAIN INADMISSIBLE HEARSAY AND SHOULD BE STRICKEN.

Judicial Defendants object to consideration of Doc. 107-21 and Doc. 107-22, which Plaintiffs submitted in support of the Motion. Doc. 107-21 is unauthenticated and is inadmissible hearsay, and substantial portions of Doc. 107-22 are inadmissible hearsay. This Court should strike all of Doc. 107-21 and the offensive portions of Doc. 107-22 because both are offered for the truth of the matter asserted.

"'It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp.2d 331, 352 (D. Md. 2011) (quoting *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)). Additionally, summary judgment declarations cannot be based upon hearsay. *Maryland Highways Contractors Ass'n v. Maryland,* 933 F.2d 1246, 1252 (4th Cir. 1991), *cert. denied,* 502 U.S. 939 (1991).

In the Facts section of their memorandum of law, Plaintiffs cite to Exhibits 20 (Doc. 107-21) and Exhibit 21 (Doc. 107-22), explaining that:

> Arrestees wishing to plead guilty also contact Michael Graves, a local community activist and member of the Sheriff's advisory board. (Ex. 20, Charns Email.) Mr. Graves estimates that 25-30% of arrestees who contact him want to plead guilty to a sentence of time served to get out of jail. (Ex. 21, Graves ¶ 4) Mr. Graves contacts prosecutors to facilitate guilty pleas.

(Doc. 107, pp 5-6) Exhibit 20 consists of a series of emails sent by multiple individuals, including three representatives of the North Carolina Office of Indigent Defense Services ("NCIDS") as well as Michael Graves. (Doc. 107-21, pp 2-9). Plaintiffs do not disclose the source of these emails, and no sender or recipient – including Mr. Graves himself (*see* Doc. 107-22) – has provided an affidavit or declaration confirming their authenticity. For that reason alone, this Court should refuse to consider the entirety of Doc. 107-21.

However, the absence of authenticity is not the only problem; the emails also consist entirely of inadmissible hearsay. The Rules of Evidence define "hearsay" as a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). Hearsay is not admissible unless authorized by federal statute or rule. Fed. R. Evid. 802.

No statute or rule permits admissibility of Doc. 107-21. None of the emails are non-hearsay admissions by a party opponent. *See* Fed. R. Evid. 801(d)(2). None of the Rule 803 exceptions to hearsay apply. Plaintiffs have provided no evidence or documentation that the emails constitute business records of NCIDS or any other entity, *see* Fed. R. Evid. 803(6), nor have Plaintiffs demonstrated that the emails qualify as public records, *see* Fed. R. Evid. 803(8). Accordingly, this Court should strike Doc. 107-21 in its entirety as inadmissible hearsay.

This Court should also strike Mr. Graves declaration because it is not based on personal knowledge and because substantial portions are inadmissible hearsay. A declaration submitted in support of summary judgment must (1) be made on personal

8

knowledge, (2) set out admissible facts, and (3) show that the declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56 (2010 advisory committee's notes). Any and all portions of declarations that do not conform with the requirements set forth in Rule 56(c)(4) may be subject to a motion to strike. *See Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (holding that the court properly struck affidavit sections found to be conclusory, hearsay, irrelevant, or not based on personal knowledge)

Because the first, second, fourth, and fifth sentences of Paragraph 4 of that declaration either contain inadmissible hearsay or contain information beyond Mr. Graves's personal knowledge, this Court should strike them. (Doc. 107-22) Mr. Graves gives no indication how he has personal knowledge of the "facts" he avers in the first or second sentences about the negative consequences suffered by those detained in jail. (Doc. 107-22, ¶ 4) His averments are based upon communications he has had with detained individuals (Doc. 107-22, ¶ 3), and the content of the information provided by those arrestees is inadmissible hearsay with no relevant purpose other than to prove the truth of the matter asserted. (Doc. 107, ¶ 4) In the fourth sentence of Paragraph 4, Mr. Graves attempts to offer "facts" derived from conversations he has had with detained individuals and the purported motivations they have allegedly shared for wanting to plead guilty. This, too, is an impermissible attempt to package the out-of-court statements of others as "personal knowledge" of a fact witness, and because Plaintiffs offer it for the truth of the matter asserted (Doc. 107, pp 5-6) (citing Doc. 107-22, ¶ 4), it is impermissible hearsay.

9

The fifth sentence, while not hearsay on its face, directly refers to the type of requests Mr. Graves allegedly receives from detained arrestees in Alamance County and that he characterizes in the fourth sentence. Whatever personal knowledge Mr. Graves possesses comes directly from the same inadmissible hearsay that renders the fourth sentence improper. Accordingly, all but the second sentence of Paragraph 4 of Mr. Graves's declaration should be stricken.

### IV. BECAUSE JAY FERGUSON, CATHERINE EL-KHOURI, AND MICHAEL KABAKOFF DO NOT QUALIFY AS EXPERT WITNESSES, THEIR REPORTS SHOULD BE EXCLUDED.

Judicial Defendants object to this Court's consideration of the Expert Reports of Michael Kabakoff (Doc. 107-13), Catherine El-Khouri (Doc. 107-24), and Jay H. Ferguson (Doc. 107-25), because they do not qualify as expert witnesses.

District courts serve as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). This "gatekeeper" function requires a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. The proponent of the expert testimony bears the burden to establish its admissibility by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

Rule 702 of the Federal Rules of Evidence explains the scope of the court's gatekeeper function:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. To be reliable, the testimony "must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (*citing Daubert*, 509 U.S. at 590, 592–93). To assess whether expert testimony is "sufficiently reliable to be admissible," a court considers several factors: (1) whether a particular theory or technique "can be or has been tested"; (2) whether the theory or technique "has been subjected to peer review and publication;" (3) "the known or potential rate of error" of the particular scientific technique; (4) whether the acceptance of the particular scientific technique has been "general" or "widespread." *Daubert*, 509 U.S. at 593–94.

In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999), the Supreme Court applied *Daubert*'s reliability requirement and factors to cases involving experience-based expert testimony to ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the

opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, Advisory Comm. Notes; *see also Casey*, 823 F. Supp. 2d at 345 n.9 (quoting *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007)). An expert must use a reliable, objective methodology to explain how factual observations or assumptions lead to conclusions. *See, e.g., Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 418-420 (7th Cir. 2005) (holding that a "witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term"); *Oglesby*, 190 F.3d at 244 (finding expert opinion unreliable if based on belief or speculation and that an expert opinion "must be derived using scientific or other valid methods").

Because Mr. Ferguson, Ms. El-Khouri, and Mr. Kabakoff do not satisfy these standards, the Court should strike their reports.

### Mr. Ferguson[2]

From 1990 to 1992, Mr. Ferguson did criminal defense work in Alamance County, but has not handled more than one or two first appearances in Alamance County since 1992. (Ex. B, Ferguson Dep., 24:5-9; 27:6-21) From 1990 to 1992, he was on the court-appointed list and ten to twenty percent of his practice involved cases in which he was assigned to represent a defendant after the first appearance had been conducted. (*Id.*, 31:16-32:5) Once he moved to Durham County, half of his practice has been civil litigation

---

[2] Mr. Ferguson acknowledges in his report that he has never given prior testimony as an expert witness. (Doc. 107-25, ¶ 4) He testified that he was retained one time as a consulting expert in a civil lawsuit involving legal malpractice, but never prepared a written report and never testified. (Ex. B, Ferguson Dep., 19:13-21:10)

and half criminal defense. (*Id.*, 32:20-33:2) From 1992 to 2017, Mr. Ferguson watched first appearances in Durham County District Court two to three times per week. (*Id.*, 43:15-44:11) He has personally represented detained, paying clients at first appearances in North Carolina only "a handful of times a year. Not very often." (*Id.*, 66:25-67:5) In his report, Mr. Ferguson explains that

> [b]ased on my experience as a criminal defense attorney for the past 31 years, it is my opinion that first appearances carry an inherent risk of pretrial detention (described in subsections A and B below) and inculpatory statements (described in subsections C and D below) that can irrevocably prejudice the outcome of a criminal case. Representation by counsel at first appearance is necessary to protect arrestees from this prejudice. Even for the more serious cases, counsel matters, because being detained is so damaging.

(Doc. 107-25, ¶ 8) Mr. Ferguson does not identify any studies he has conducted or any data he has collected to substantiate his opinions. (Doc. 107-25). In his deposition, Mr. Ferguson confirmed that his offered opinions are "all based on [his] personal experience." (Ex. B, Ferguson Dep., 146:2-10) Mr. Ferguson's opinions are based on either sporadic, anecdotal observations or outright assumptions. For example,

- Mr. Ferguson stated that, "as a result of high bond amounts at first appearance, clients will often plead guilty to time served in order to be released." (Doc. 107-25, ¶ 19) Mr. Ferguson based this opinion on what he learned from detained, non-capital clients he represented through his role as court-appointed counsel in Durham County between 1992 and 1998. (Ex. B, Ferguson Dep., 103:2-105:14) Yet Mr. Ferguson admitted that he "can't say that they took [the guilty plea] because they are innocent," and acknowledged

13

that he did not "know their motivation" for pleading guilty. (*Id.*, 110:11-20, 111:22-112:1) He admitted that he could only estimate that had observed a defendant plead guilty at first appearance "ten" times and could not recall any of his own clients who had. (*Id.*, 76:5-23) He provided no data to support this estimate.

- Mr. Ferguson wrote that he has had cases where he was retained or appointed after a first appearance where "the defendant had made inculpatory statements at first appearance when unrepresented, and those statements of the defendant are provided to me by the State in discovery." (Doc. 107-25, ¶ 30) In his deposition, however, Mr. Ferguson could recall that happening only "two to three" times over his more than thirty years of criminal defense work. (Ex. B, Ferguson Dep., 139:15-140:5)

- He wrote in his report that he had "seen instances where a defendant believes they are helping their case but actually confess to or admit certain elements of the crime." (Doc. 107-25, ¶ 31) However, in his deposition, Mr. Ferguson explained that he had seen a defendant admit some element of the offense "maybe 15 times" in his career and could recall only one instance when a defendant confessed to the crime itself. (Ex. B, Ferguson Dep., 140:6-141:12)

- Mr. Ferguson's report states that, "[w]hen clients are detained, they may get frustrated and write letters to the court or the prosecutor saying things they should not share." (Doc. 107-25, ¶ 24) In his deposition, however, Mr.

14

Ferguson said that had happened only twenty times in his entire career. (Ex. B, Ferguson Dep., 124:13-125:12)

- Mr. Ferguson's report states that "detention also negatively impacts case outcomes because the longer someone is detained, the more likely it is that a jailhouse informant will claim to have harmful information to a client's case. (Doc. 107-25, ¶ 27) Yet Mr. Ferguson testified that he had dealt with that problem "about five times, maybe – maybe a little less." (Ex. B, Ferguson Dep., 128:15-129:1)

All of these examples demonstrate that that Mr. Ferguson's opinions are based on unsupported assumptions, or estimates given in a deposition without any supporting data or indication that the estimate is reliable. As Mr. Ferguson uses no "reliable, objective methodology to explain how" his observations support his conclusions, his report should be stricken and not considered in support of the Motion. *See, e.g., Oglesby*, 190 F.3d at 244.

**Ms. El-Khouri[3]**

Ms. El-Khouri bases her opinions exclusively on her "experience and personal knowledge" from thirty-five years as a public defender in the Mecklenburg County Public Defender's Office ("the Office"). (Ex. C, El-Khouri Dep., 35:1-3; Doc. 107-24, ¶¶ 3, 5) Yet, Ms. El-Khouri has limited first appearance experience. Until the pandemic, Ms. El-Khouri testified that she had observed a first appearance "probably a couple dozen times"

---

[3] Ms. El-Khouri has never previously given testimony as an expert witness. (Doc. 107-24, ¶ 4)

15

over her entire career.  (*Id.*, 46:22-47:1) During the pandemic, she participated in the Office rotation, which assigned one attorney per week to first appearances.  (*Id.*, 45:14-24) In June 2021, just nine months before her deposition, Ms. El-Khouri was assigned exclusively to handle first appearance court every day.  (*Id.*, 47:12-48:17)

This limited experience is not a sufficient basis for Ms. El-Khouri's opinions.  *See, e.g.*, *Casey*, 823 F. Supp. 2d at 345 n.9.  This is especially so when one considers that Ms. El-Khouri's testimony establishes that her experiences in Mecklenburg County cannot be imputed to Alamance County's system.  Ms. El-Khouri testified that Mecklenburg County judges do not conduct first appearance as Alamance County judges do.  According to Ms. El-Khouri, only "two or three" of the five to six judges who preside over first appearances abide by the statutory requirements for those hearings.  (Ex. C, El-Khouri Dep., 53:3-18, 109:14-110:3) Some of the judges do not advise defendants of their right to remain silent and that anything they say could be used against them, although they may do so "after the arrestee has already spilled his guts."  (*Id.*, 130:10-17) Only "sometimes" do judges address the statutory factors in N.C.G.S. 15A-534 governing conditions of release without Ms. El-Khouri raising the issue herself.  (*Id.*, 136:2-12) Judges have essentially stopped inquiring about whether defendants are even indigent and qualify for appointed counsel.  (*Id.*, 158:25-159:10)

Ms. El-Khouri's description of Mecklenburg County first appearances is entirely inconsistent with the testimony of those involved in the Alamance County criminal justice system.  Even before the Bond Policy was implemented by Judicial Defendants, Alamance County judges advised defendants of the charges and maximum punishment they were

16

facing, of their right to an attorney, and their right to remain silent. (Ex. D, Lambeth Dep., 196:15-198:20, 220:6-16) (Ex. E, Allen Dep., 63:9-64:20, 150:11-151:15, 160:23-161:12, 163:1-164:11) (Ex. F, Crabbe Dep., 71:25-72:9, 76:7-9). In addition, if any defendant attempted to address the facts of the case at first appearance in his courtroom, Defendant Allen would interrupt them, tell them to exercise their right to remain silent, and instruct them not to discuss the underlying circumstances of the charged offense(s). (Ex. E, Allen Dep., 179:9-180:3) Accordingly, her experience in Mecklenburg County is not a reliable measure of what happens in Alamance County.

Further, Ms. El-Khouri's opinions do not originate from any reliable, objective methodology, nor are they backed by any data sufficient to surpass the standards of Rule 702. For example:

- Ms. El-Khouri states that "defendants or arrestees are understandably worried about whether to speak up at first appearances and what to say to gain their release" (Doc. 107-24, ¶ 32). These opinions are just something she "would assume" and "just based on her experience," but not any data or methodology. (Ex. C, El-Khouri Dep., 154:12-155:2) As for defendants being "worried about what to say," that assumption is based in part on the fact that "maybe a dozen" defendants of the "lots of thousands" she has represented telling her of such a worry (*Id.*, 155:3-156:13).

- Ms. El-Khouri states that "I believe my presence helps arrestees to better manage their emotions." (Doc. 107-24, ¶ 32) The basis for this statement

17

derives from what a single courtroom deputy tells defendants to calm them down.  (Ex. C, El-Khouri Dep., 156:14-157:3)

As these examples demonstrate, Ms. El-Khouri's opinions should be stricken as unreliable under Rule 702 and as more prejudicial than probative under Rule of Evidence 403 because they have the potential to confuse the Alamance County first appearance proceedings with the very different situation in Mecklenburg County.

### Mr. Kabakoff[4]

Starting in 2009, Mr. Kabakoff did criminal defense work; he did not represent clients at first appearances but observed those hearings occasionally if he happened to be in the courtroom.  (Ex. D, Kabakoff Dep., 65:18-66:7) He joined the Office in August 2010, (Doc. 107-13, ¶ 9), but had minimal involvement in first appearances until around 2012 when he staffed first appearances "quite often" for domestic violence cases.  (Ex. G, Kabakoff Dep., 69:11-23) From 2016 to 2018, he did not staff first appearances at all, except for the one or two dozen times he might have covered for a colleague.  (*Id.*, 71:3-22, 74:7-20) He staffed first appearances between 2018 and spring of 2021 around ten times, (*id.*, 87:8-12), and since then has observed "a substantial portion of a first appearance shift" "maybe 30 times," (*Id.*, 88:11-89:3).

Mr. Kabakoff bases his opinions entirely on this limited experience and personal knowledge.  (Doc. 107-13, ¶ 3) These opinions lack sufficient evidentiary basis and are

---

[4] Mr. Kabakoff has never been qualified by any court as an expert witness.  (Ex. G, Kabakoff Dep., 27:6-28:14)

premised upon personal observations, assumptions, and unreasonable inferences that provide no indicia of reliability. For example:

- Mr. Kabakoff states that "pretrial detention prejudices case outcomes by coercing defendants into plea bargains in exchange for their freedom . . . ." (Doc. 107-13, ¶ 15) This opinion is based on his limited experience and observations, a CLE presentation by a Civil Rights Corps attorney (which organization represents the Plaintiffs), and his reading of the *ODonnell v. Harris County* case. (Ex. G, Kabakoff Dep., 108:8-110:6) Yet, Mr. Kabakoff admitted only a defendant would know why that plea is taken. (*Id.*, 133:6-13) He acknowledged that some plead guilty because they believe they will be found guilty, and that "[t]here are many reasons why a person might enter a plea," where those reasons have nothing to do with the arrestee being detained pretrial. (*Id.*, 138:18-139:24)

- Mr. Kabakoff states that "[Detained indigent clients] often receive worse plea offers and case dispositions than similarly situated clients who are released pending trial." (Doc. 107-13, ¶ 21) However, he considered individuals similarly situated based exclusively on the charged offense and did not account for pretrial risk assessment scores or other criteria. (Ex. G, Kabakoff Dep., 171:9-172:20) Further, he could not provide numbers or percentages detailing the frequency of this scenario. (*Id.*, 173:12-14)

- Mr. Kabakoff opines that "[b]onds set at first appearances are seen as presumptively valid and accurate determinations." (Doc. 107-13, ¶ 19) That opinion is based on the fact that he's "done a lot of bond hearings in misdemeanor cases where judges

19

have said, 'Well, Judge So-and-so set this . . . and I'm not going to touch that.'"
According to Mr. Kabakoff, this was a "very common" thing to hear at bond
hearings (Ex. G, Kabakoff Dep., 154:24-155:13), but only for the period from 2009
to 2012 (*id.*, 156:7-13). He has no other evidence to support this opinion. (*Id.*,
165:1-6) Further, he has no evidence that this routinely occurs in Alamance County
and the record evidence confirms that the two counties' practices vary considerably.

- Mr. Kabakoff opines that lack of representation at first appearances has a prejudicial
  effect on case outcomes. (Doc. 107-13, ¶¶ 14-33) This opinion is premised on his
  assumption that "prosecutors listen closely for inculpatory, inconsistent, or
  otherwise damaging statements. It is common practice for prosecutors to make a
  record of these statements through notations on the case file." (*Id.* ¶ 25) Yet he
  admitted that he does not know if prosecutors are making a record of inculpatory
  statements and acknowledged that prosecutors could be making notes about an
  arrestee's demeanor. (Ex. G, Kabakoff Dep., 196:21-199:18, 199:23-200:2, 201:5-
  10) At most he testified that it is "not rare that what transpired at the first appearance
  will be discussed at a subsequent proceeding, such as a bond hearing." (*Id.*, 195:16-
  196:16) Accordingly, Mr. Kabakoff has no first-hand knowledge of what notes
  prosecutors may be writing, let alone any evidence of a prejudicial effect to
  detainees of that practice.

As these examples make clear, Mr. Kabakoff's opinions are not based on sufficient
experience or reliable methodology or data, are premised on limited experience in a county
that significantly differs from Alamance County in practice and are riddled with

unsupported assumptions and conjuncture. Accordingly, his report should be stricken under Rules 702 and 403. *See, e.g., Oglesby*, 190 F.3d at 244.

## V. THE SIXTH AMENDMENT DOES NOT ENTITLE ARRESTEES TO REPRESENTATION BY COUNSEL AT HEARINGS WHERE CONDITIONS OF RELEASE ARE DETERMINED.

In their response, Plaintiffs argue that Judicial Defendants' failure to provide them counsel at first appearances violates the Sixth Amendment. (Doc. 107, pp 19-29) As Plaintiffs incorporate this briefing by reference in their response to Judicial Defendants' motion for summary judgment (*see* Doc. 108, pp 12, 14, 15), Judicial Defendants will address those arguments in their reply brief and prospectively incorporate those to-be-briefed arguments here for the Court's consideration.

As for the issues raised in Section IV.C of Plaintiffs' memorandum of law, Judicial Defendants have already acknowledged that having counsel at first appearances and bail review hearings benefits arrestees and makes those hearings proceed more smoothly. (Doc. 100, p 19) Nevertheless, the gap between counsel being "helpful" and "constitutionally required" is larger than Plaintiffs acknowledge, and the cases Plaintiffs cite do not bridge that chasm.

For example, Plaintiffs contend that three cases – *Coleman v. Alabama*, *Vance v. North Carolina*, and *United States v. Freeman* – "recognize [that] counsel's expertise is necessary to understand the legal elements of bail determinations, make competent arguments, about the nature and strength of the allegations against the arrestee, and propose terms of release." (Doc. 107, p 30) In *Coleman*, however, the Supreme Court considered the specifics of Alabama's preliminary hearing, which included testimony of witnesses "to

21

determine whether there is sufficient evidence against the accused to warrant presenting his case to the grand jury, and, if so, to fix bail if the offense is bailable." *Coleman*, 339 U.S. 1, 8 (1970). Counsel's potential influence in the effectiveness of arguments "on such matters as the necessity for an early psychiatric evaluation or bail" was not a singular basis identified by the Court for establishing that the preliminary hearing was a critical stage of Coleman's case, just one of four reasons. *Id.* at 9-10.

In *Freeman*, the Fourth Circuit evaluated the effectiveness of the defendant's trial counsel when, at sentencing, the attorney waived meritorious objections to the presentencing report that would have lowered defendant's minimum sentence by nearly ten years. *Freeman*, 24 F.4th 320, 326-27 (4th Cir. 2022). Accordingly, nothing in *Freeman* addresses the role of counsel at bail hearings, or any constitutional requirement for such a role under the Sixth Amendment.

Finally, in *Vance*, the Fourth Circuit addressed a North Carolina preliminary hearing – not a first appearance – that included the direct and cross-examination testimony of witnesses, the potential for the unsworn examination of the defendant himself, the right of the accused to introduce his own witnesses, and the potential that witness testimony presented could be used before the grand jury or, under certain conditions, at trial. *Vance*, 432 F.2d 984, 989 (1970). Although *Vance* echoed *Coleman*'s statement that "the accused needs counsel in order to effectively argue for benefits such as bail or early psychiatric evaluations, it explained that "the assistance of counsel is necessary . . . to safeguard the accused's trial defenses," not obtain pretrial release on bail. *Id.* Specifically, *Vance* held

that the North Carolina **preliminary** **hearing** was a critical stage at which assistance of counsel was required. *Id.* (emphasis added).

Plaintiffs later claim that the North Carolina Court of Appeals has held that the "the right to counsel applied at [a] suppression hearing because the defendant did not understand what was happening." (Doc. 107, p 30) (citing *State v. Gordon*, 79 N.C. App. 623, 626, 339 S.E.2d 836, 838 (1986)). *Gordon* held no such thing. After his court appointed attorney moved to withdraw, Gordon indicated that he was working on gathering funds to hire private counsel, but when the court refused to delay the prosecution further to allow that to happen, he said he wanted to represent himself. *Id.* at 623-24, 339 S.E.2d at 836-37. The trial court immediately proceeded with a suppression hearing despite Gordon saying he knew nothing about his case. *Id.*, 339 S.E.2d at 837. Reversing the defendant's conviction, *Gordon* held that the defendant had not waived his right to **all** counsel and that the trial court had erred by allowing the defendant to proceed pro se at the hearing without having conducted the necessary statutory inquiry contained in N.C.G.S. § 15A-1242. *Id.* at 625-26, 339 S.E.2d at 838. *Gordon* did not involve counsel's assistance at a bail hearing, did not ascribe a lack of knowledge about bail (or any other proceeding) to all unrepresented defendants, and did not hold that the defendant's lack of knowledge about the proceeding entitled him to counsel under the Sixth Amendment.

As these examples demonstrate, Plaintiffs' reach exceeds their grasp. Their cited authority neither compels nor suitably supports a conclusion that representation by counsel is necessary to avoid substantial prejudice at North Carolina first appearances. The Court should deny summary judgment to Plaintiffs on that issue.

23

## VI. ANY PURPORTED VIOLATIONS OF PLAINTIFFS' RIGHTS ARE NOT THE RESULT OF AN OFFICIAL POLICY OR CUSTOM OF JUDICIAL DEFENDANTS.

Plaintiffs contend that "each defendant is liable for causing" the purported constitutional violations they identify. (Doc. 107, p 32) In support of that general proposition, Plaintiffs cite two cases – *Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003) and *Randall v. Prince George's Cnty.*, 302 F.3d 188 (4th Cir. 2002). *Lytle*, however, addresses § 1983 liability against municipalities, not State actors. *Lytle*, 326 F.3d at 471 (noting that "[o]nly in cases where **the municipality** causes the deprivation 'through an official policy or custom' will liability attach) (emphasis added). Meanwhile, the passage from *Randall* on which Plaintiffs rely was discussing the standard for supervisory liability under § 1983 and, specifically, how a plaintiff can demonstrate deliberate indifference by a supervisor. *Randall*, 302 F.3d at 206 (explaining that deliberate indifference may be satisfied by "[a] supervisor's continued inaction in the face of documented and widespread abuses") (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)). Since Plaintiffs have not sued Judicial Defendants under either municipal liability or supervisory liability theories, this argument is without merit.

## CONCLUSION

For the foregoing reasons, this Court should deny the Motion.

Respectfully submitted, this the 31st day of August, 2022.

JOSHUA H. STEIN
Attorney General

/s/Joseph Finarelli
Joseph Finarelli
Special Deputy Attorney General
N.C. Bar No. 26712
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
Telephone: (919) 716-6531
Facsimile:  (919) 716-6755
E-mail:  jfinarelli@ncdoj.gov
*Attorney for Judicial Defendants*

## **CERTIFICATION OF WORD COUNT**

The undersigned hereby certifies that the foregoing memorandum complies with this Court's Order (Doc. 95) in that, according to the word processing program used to produce this brief (Microsoft Word), the document does not exceed 8,000 words exclusive of caption, cover, signature lines, index, and certificate of service.

This 31st day of August, 2022.

/s/Joseph Finarelli
Joseph Finarelli
Special Deputy Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **MEMORANDUM OF LAW OF JUDICIAL DEFENDANTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will serve a copy on all counsel of record.

This, the 31st day of August, 2022.

/s/Joseph Finarelli
Joseph Finarelli
Special Deputy Attorney General