IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KATHERINE GUILL, on behalf of herself and others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) 1:19cv1126 |
| BRADLEY R. ALLEN, SR., in his official capacity as Chief District Court Judge, | ) ) ) ) |
| BRENDA BROWN, KELLY COUNCILMAN, DAVID CRABBE, DEMETRIUS-JEFFERY EDWARDS, BERTRAM HEATHCOTE, WENDY HUNTER, AMELIA KNAUFF, BOBBIE NANCE, HELENA RODGERS, KIMESHA THORPE, JOHN WATTERSON, SUSAN WORTINGER, in their official capacity as magistrates of the Alamance County District Court, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| D. THOMAS LAMBETH, JR., in his official capacity as Senior Resident Superior Court Judge, | ) ) ) ) |
| and, | ) ) |
| TERRY S. JOHNSON, in his official capacity as Alamance County Sheriff, | ) ) ) ) |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

This case involves constitutional challenges to the pre-trial hearing process in criminal cases in Alamance County, North

Carolina.  Plaintiff Katherine Guill, on behalf of herself and others similarly situated, filed this class action against numerous Defendants in their official capacity as magistrates and judges in Alamance County (collectively the "Judicial Defendants"), as well as the Alamance County Sheriff Terry S. Johnson.  (Doc. 1.)  Plaintiffs claim violations of their Fourteenth and Sixth Amendment rights.  Before the court are cross-motions for summary judgment (Docs. 99, 104, and 106) on which the court heard argument on March 3, 2023.

For the reasons set forth below, the court dismisses as moot Counts I, II, and III, which challenge the county's pretrial procedures under the Fourteenth Amendment to the U.S. Constitution, given that the county abandoned its 1995 policy for bail determinations over three years ago in favor of a substantially different policy that provides virtually all the relief Plaintiffs request, and the court denies the parties' cross-motions for summary judgment as to Count IV, which challenges the county's pretrial procedures under the Sixth Amendment's right to counsel.

I.   **BACKGROUND**

A.   **Statutory Framework for Pretrial Release**

The North Carolina General Statutes provide a baseline for determinations of pretrial release for North Carolina courts, outlining three judicial settings where pretrial release

2

determinations may be made: (1) initial appearances presided over by any judicial official, frequently a magistrate; (2) first appearances presided over by district or superior court judges (or, if a judge is unavailable within 72 hours, a magistrate or clerk of court); and (3) subsequent hearings before judges of the trial division, upon motion of a party or the court sua sponte. (See Doc. 72-1 at 5.) These proceedings tend to occur sequentially, although they may be combined depending on the circumstances. N.C. Gen. Stat. 15A-601(b).

Initial appearances are mandated by North Carolina General Statute § 15A-511 and provide the first opportunity for a pretrial release determination with a defendant brought before a judicial official, though not necessarily a judge. Relevant here, the statute requires the following:

(a) Appearance before Magistrate.--

(1) A law-enforcement officer making an arrest with or without a warrant must take the arrested person without unnecessary delay before a magistrate as provided in [N.C. Gen. Stat. §] 15A-501.

(2) The magistrate must proceed in accordance with this section, except in those cases in which he has the power to determine the matter pursuant to [N.C. Gen. Stat. §] 7A-273. In those cases, if the arrest has been without a warrant, the magistrate must prepare a magistrate's order containing a statement of the crime with which the defendant is charged.

. . .

3

(b)   Statement by the Magistrate.-- The magistrate must inform the defendant of:

   (1)   The charges against him;

   (2)   His right to communicate with counsel and friends; and

   (3)   The general circumstances under which he may secure release under the provisions of Article 26, Bail.

(c)   Procedure When Arrest Is without Warrant; Magistrate's Order.-- If the person has been arrested, for a crime, without a warrant:

   (1)   The magistrate must determine whether there is probable cause to believe that a crime has been committed and that the person arrested committed it, and in the manner provided by [N.C. Gen. Stat. §] 15A-304(d).

   (2)   If the magistrate determines that there is no probable cause the person must be released.

   (3)   If the magistrate determines that there is probable cause, he must issue a magistrate's order:

      a.   Containing a statement of the crime of which the person is accused in the same manner as is provided in [N.C. Gen. Stat. §] 15A-304(c) for a warrant for arrest, and

      b.   Containing a finding that the defendant has been arrested without a warrant and that there is probable cause for his detention.

   (4)   Following the issuance of the magistrate's order, the magistrate must proceed in accordance with subsection (e) and must file the order with any supporting affidavits and records in the office of the clerk.

4

(d) Procedure When Arrest is Pursuant to Warrant.-- If the arrest is made pursuant to a warrant, the magistrate must proceed in accordance with subsection (e).

(e) Commitment or Bail.-- If the person arrested is not released pursuant to subsection (e), the magistrate must release him in accordance with Article 26 of this Chapter, Bail, or commit him to an appropriate detention facility pursuant to [N.C. Gen. Stat. §] 15A-521 pending further proceedings in the case.

(f) Powers Not Limited to Magistrate.-- Any judge, justice, or clerk of the General Court of Justice may also conduct an initial appearance as provided in this section.

N.C. Gen. Stat. § 15A-511(a)-(f).

Except when consolidated with an initial appearance, the next statutory proceeding for a defendant is the first appearance, the first pretrial release proceeding to be conducted by a judge. The North Carolina General Statutes provide:

(a) Any defendant charged in a magistrate's order under [N.C. Gen. Stat. §] 15A-511 or criminal process under Article 17 of this Chapter, Criminal Process, with a crime in the original jurisdiction of the superior court must be brought before a district court judge in the district court district . . . in which the crime is charged to have been committed. This first appearance before a district court judge is not a critical stage of the proceedings against the defendant.

Any defendant charged in a magistrate's order under [N.C. Gen. Stat. §] 15A-511 or criminal process under Article 17 of this Chapter, Criminal Process, with a misdemeanor offense and held in custody must be brought before a district court judge in the district court district . . . in which the crime is charged to have been committed. This first appearance before a district court judge is not a critical stage of the proceedings against the defendant.

. . .

5

(b)  When a district court judge conducts an initial appearance as provided in [N.C. Gen. Stat. §] 15A-511, the judge may consolidate those proceedings and the proceedings under this Article.

(c)  Unless the courthouse is closed for transactions for a period longer than 72 hours or the defendant is released pursuant to Article 26 of this Chapter, Bail, first appearance before a district court judge must be held within 72 hours after the defendant is taken into custody or at the first regular session of the district court in the county, whichever occurs first. . . . If the defendant is not taken into custody, or is released pursuant to Article 26 of this Chapter, Bail, prior to a first appearance, the first appearance must be held at the next session of district court held in the county. This subsection does not apply to a defendant whose first appearance before a district court judge has been set in a criminal summons pursuant to [N.C. Gen. Stat. §] 15A-303(d).

(d)  Upon motion of the defendant, the first appearance before a district court judge may be continued to a time certain.  The defendant may not waive the holding of the first appearance before a district court judge but he need not appear personally if he is represented by counsel at the proceeding.

(e)  The clerk of the superior court in the county in which the defendant is taken into custody may conduct a first appearance as provided in this Article if a district court judge is not available in the county within 72 hours after the defendant is taken into custody . . . . A magistrate may conduct the first appearance if the clerk is not available. . . . [T]he clerk or magistrate[, in conducting a first appearance,] shall proceed under this Article as a district court judge would . . . .

N.C. Gen. Stat. § 15A-601.  In addition to this general mandate,

North Carolina General Statute § 15A-602 requires that "[e]xcept

when [a defendant] is accompanied by his counsel, the judge must

inform the defendant of his right to remain silent and that

6

anything he says may be used against him."  Moreover:

(a)  The judge must determine whether the defendant has retained counsel or, if indigent, has been assigned counsel.

(b)  If the defendant is not represented by counsel, the judge must inform the defendant that he has important legal rights which may be waived unless asserted in a timely and proper manner and that counsel may be of assistance to the defendant in advising him and acting in his behalf.  <u>The judge must inform the defendant of his right to be represented by counsel and that he will be furnished counsel if he is indigent</u>.  The judge shall also advise the defendant that if he is convicted and placed on probation, payment of the expense of counsel assigned to represent him may be made a condition of probation, and that if he is acquitted, he will have no obligation to pay the expense of assigned counsel.

. . .

(e)  If the defendant desires to waive representation by counsel, the waiver must be in writing in accordance with the provisions of Article 36 of Chapter 7A of the General Statutes except as otherwise provided in this Article.

N.C. Gen. Stat. § 15A-603(a), (b) & (e) (emphasis added).[1]

Finally, after the initial or first appearance, a criminal defendant and his counsel may move the appropriate judicial official for reconsideration of a bail determination or conditions of pretrial release, or the court may raise the issue sua sponte. The North Carolina General Statutes provide:

(e)  A magistrate or a clerk may modify his pretrial release order at any time prior to the first appearance

---

[1] Under state law, the authority having custody of a person who is without counsel for more than 48 hours must inform the designee of the Office of Indigent Defense Services, where applicable, or the clerk of superior court, who shall take appropriate action toward having counsel appointed. N.C. Gen. Stat. § 7A-453.

7

before the district court judge. At or after such first appearance, except when the conditions of pretrial release have been reviewed by the superior court pursuant to [N.C. Gen. Stat. §] 15A-539, a district court judge may modify a pretrial release order of the magistrate or clerk or any pretrial release order entered by him at any time prior to:

> (1) In a misdemeanor case tried in the district court, the noting of an appeal; and

> (2) In a case in the original trial jurisdiction of the superior court, the binding of the defendant over to superior court after the holding, or waiver, of a probable-cause hearing.

N.C. Gen. Stat. § 15A-534(e).

Furthermore, the statutory scheme provides basic procedures and protections that must be followed at any determination of pretrial release. Section 15A-534(a) mandates that a judicial official impose at least one of the following conditions of pretrial release: (1) a written promise to appear; (2) unsecured bond; (3) custody release to a person or organization agreeing to supervise the defendant; (4) secured bond; or (5) house arrest with electronic monitoring, which also requires a secured bond. The statute creates a <u>presumption</u> that one of the first three options - those that do <u>not</u> require a secured bond - be applied "unless [the judge] determines that such release will not reasonably assure the appearance of the defendant as required; will pose a danger of injury to any person; or is likely to result in destruction of evidence, subornation of perjury, or

8

intimidation of potential witnesses." N.C. Gen. Stat. § 15A-534(b). In addition, when making determinations of pretrial release conditions, judicial officials need not apply formal rules of evidence but must take into account "all evidence available to him which he considers reliable" and relevant to the inquiry. N.C. Gen. Stat. § 15A-534(g).

Beyond these specific statutory mandates, North Carolina reposes in the senior resident superior court judge, in consultation with the chief district court judge and district judges of the court, the responsibility of promulgating procedures and policies for pretrial release within their respective jurisdictions across the state's 100 counties.[2] Individual counties may do so as long as the policies are not inconsistent with the statutory mandates. Here, Plaintiffs do not challenge North Carolina's statutory framework, but rather the pretrial release policies Alamance County enacted pursuant to this

---

[2] N.C. Gen. Stat. § 15A-535(a) provides:

> Subject to the provisions of this Article, the senior resident superior court judge for each district or set of districts as defined in [N.C. Gen. Stat. §] 7A-41.1(a) in consultation with the chief district court judge or judges of all the district court districts in which are located any of the counties in the senior resident superior court judge's district or set of districts, must devise and issue recommended policies to be followed within each of those counties in determining whether, and upon what conditions, a defendant may be released before trial and may include in such policies, or issue separately, a requirement that each judicial official who imposes condition (4) or (5) in [N.C. Gen. Stat. §] 15A-534(a) must record the reasons for doing so in writing.

provision, to which the court now turns.

**B.   The 1995 Policy**

In accordance with the statutory mandate, in June 1995, Senior Resident Superior Court Judge J. B. Allen, Jr., of North Carolina Judicial District 15-A, which covers Alamance County, issued pretrial release and bond policies (the "1995 Policy"). (Doc. 1-1 at 3.)  The policies took effect on July 1, 1995, and replaced policies dating back to May 1, 1987.  (Id.)  The 1995 Policy enumerated four forms of pretrial release: release on a written promise to appear; release on unsecured bond; release to the custody of a designated person or organization agreeing to supervise the defendant; or release on a secured appearance bond secured by a cash deposit, mortgage, or at least one solvent surety.  (Id. at 6.)  It also set out fourteen factors for a judicial official to consider in choosing among the pretrial release options.  (Id. at 7.)

The 1995 Policy demands that a "Secured appearance" not be imposed unless a "magistrate first determines that release [pursuant to any of the other three forms] will (a) not reasonably assure the appearance of defendant as required[;] (b) pose a danger of injury to any person[;] [or] (c) likely result in destruction of evidence, subornation of perjury, or intimidation of potential witnesses." (Id. at 8.)  If a magistrate determines that the other forms of release are insufficient, he "must impose" a secured bond

10

under the "Secured appearance" requirement.  (Id. at 9.)

The 1995 Policy also set forth several guidelines.  Relevant here are the following:

> A.  A magistrate should not, except under extraordinary circumstances, grant pretrial release by personal recognizance, unsecured bond or custodial release to any person who is not a permanent resident of North Carolina, or who has committed multi larceny or shoplifting offenses or who has possessed professional larceny equipment.
>
> B.  On misdemeanor charges a magistrate may – but is not required to – accept the defendant's oral and unconfirmed answers to the release criteria.
>
> C.  A magistrate should not grant pretrial release by personal recognizance, unsecured bond, or custodial release to any person charged with a felony unless the magistrate has personal knowledge of outside confirmation of a sufficient number of favorable circumstances from the criteria listed under paragraph V above to justify another form of release.

(Id. at 10.)  The policy ends with "Suggested Bail Bonds," which are "not minimums" but "merely suggested maximum bonds," noting that "[t]he circumstances of each individual case will govern each decision."  (Id. at 15 (emphasis omitted).)

## C.  Efforts to Revise the 1995 Policy

In 2007, Defendant D. Thomas Lambeth, Jr., became a District Court Judge in Alamance County.  (Doc. 99-2 ¶ 2.)  At some point during his tenure, he attended a seminar "regarding the use of money bail as a pre-trial release condition" at the University of North Carolina School of Government.  (Id. ¶ 5.)  In 2017, Governor Roy Cooper appointed Judge Lambeth to the Superior Court bench in

11

Alamance County, and he was installed on July 14, 2017. (Id. ¶ 7.) The following year, Judge James Roberson retired, and Judge Lambeth became the county's Senior Resident Superior Court Judge. (Id. ¶ 9.) Judge Roberson informed Judge Lambeth that he had begun assembling stakeholders to revise the 1995 Policy, which was still in effect in 2018. (Id. ¶ 10.)

In the fall of 2018, the Alamance County Sheriff's Office was working with "Alamance Steps Up," a grant-funded group focused in part on providing "pretrial release opportunities for arrestees who had mental health or substance abuse treatments needs and who, prior to arrest, had been receiving treatment in or had been placed in group homes or sober living facilities to facilitate their treatment and recovery efforts." (Id. ¶ 13.) The group invited Judge Lambeth to join, and he attended two meetings along with several other Alamance County judges, the district attorney, and the clerk of court. (Id. ¶ 14.) Judge Lambeth informed the group that he wanted their help in revising the 1995 Policy, but the November 2018 election ushered in a new district attorney, clerk of superior court, and superior court judge. (Id. ¶ 15-16.)

On January 18, 2019, following the November 2018 elections, North Carolina Attorney General Josh Stein invited Alamance County representatives, among others, to participate in a "Pretrial Roundtable." (Id. ¶ 18-19.) Several Alamance County stakeholders attended, including Defendant Chief District Court Judge Bradley

12

R. Allen, Sr., Defendant Alamance County Sheriff Johnson, Magistrate Rhonda Crisp, District Attorney Sean Boone, and Clerk of Court Meredith Edwards. (Id. ¶ 19.) According to Judge Lambeth, "the attendees discussed issues related to pretrial release as well as the principles embodied in the bond policy adopted earlier that month by Judicial District 30B, which consists of Haywood County and Jackson County, as part of a pilot project overseen by the School of Government." (Id. ¶ 20.) Judge Lambeth further states that, at the roundtable, Alamance County stakeholders and others discussed their "mutual interest in revising the 1995 Policy and the importance of our District Court Judges reviewing misdemeanor pretrial conditions sooner for in-custody defendants who did not bond out quickly." (Id. ¶ 21.) After the roundtable, Judge Allen led the Alamance County district court judges in adopting and implementing a misdemeanor first appearance docket, "whereby in-custody defendants charged with non-domestic violence misdemeanor offenses who could not quickly obtain release on a secured bond set by a magistrate at the time of arrest had their pretrial release conditions reviewed earlier, often within seventy-two hours of arrest." (Id. ¶ 22.)

On January 24, 2019, Judge Lambeth received copies of bond policies adopted by other North Carolina counties, which, he says, he "hoped to use as a starting point of discussion with our bond committee." (Id. ¶ 23.) On October 22, 2019, he called together

the "first bond policy committee meeting," at which time he "appointed a work group . . . for the express purpose of drafting a revised version of the 1995 Policy for presentation to the larger bond policy committee." (Id. ¶¶ 25-27.) At the October 22 meeting, Judge Lambeth stated that he wanted a new policy in place by early 2020 and distributed copies of at least one example of such a policy. (Id. ¶ 27.) Judge Lambeth also requested and collected information from the University of North Carolina School of Government and spoke with Senior Resident Superior Court Judge Bradley Letts of Judicial District 30B about his experience with his new bond policy. (Id. ¶ 28.)

On November 12, 2019, three weeks after Judge Lambeth's October 22 meeting to draft a new bond policy to be implemented by early 2020, Plaintiffs filed this lawsuit challenging the 1995 Policy. (Doc. 1.)

### D. Consent to Abandon the 1995 Policy

Following the filing of this lawsuit, Judge Lambeth and Judge Allen continued to meet and exchanged communications with attorneys for the Judicial Defendants, counsel for Plaintiffs, and counsel for Sheriff Johnson to discuss revisions to the pretrial release policy. (Doc. 99-2 ¶ 30.)

In May 2020, the parties in this case reached an agreement on the contents of a new, revised pretrial release policy. (Id. ¶ 31.) As a consequence, the Defendants agreed to a mutually-

14

negotiated proposed consent preliminary injunction in this case, which was submitted to – and approved by – Judge N. Carlton Tilley, Jr. (Doc. 56 ¶ 2.) Among other particulars, the parties agreed that, by July 20, 2020, in-custody individuals would receive a hearing within 48 hours of arrest; individuals would have "a meaningful opportunity to be heard" as to "appropriate conditions of release or detention"; and that prior to setting a condition of release, "the judicial officer must conduct an inquiry into the individual's ability to pay the full amount of the monetary bail." (Id. ¶¶ 7, 12.)

### E. The 2020 Bond Policy

#### 1. Authority and Purpose

On June 18, 2020, Judges Lambeth and Allen, acting pursuant to North Carolina General Statute § 15A-535(a), signed an administrative order adopting the "Pretrial Release and Bond Policy for District 15A" (the "2020 Bond Policy"). (Doc. 72-1 at 2-3.) The purpose of the 2020 Bond Policy was outlined as follows:

> The purpose of this Policy is to provide uniform guidance for the implementation of N.C.G.S. Chapter 15A, Article 26, and related statutes governing the pretrial release of criminal defendants. Relevant statutes may be explained in this Policy and in some cases set forth almost verbatim, but nothing in this Policy is intended to amend, abrogate, or repeal any statute cited. In the event of direct and irreconcilable conflict, the relevant statute controls over any content of this Policy."

(Id. at 4.) Further, as to pretrial release, the new policy

15

acknowledged the following:

> The purpose of pretrial release is to impose the least
> restrictive conditions that will reasonably assure a
> defendant's appearance in court, protect against injury
> to any person, and prevent interference with criminal
> proceedings. The right to pretrial release recognizes
> the presumption of innocence and promotes a defendant's
> right to a fair trial, by facilitating access to counsel,
> freedom of movement to secure witnesses, and the general
> ability to prepare a defense.

> It is recognized that pretrial release may create a risk
> that the accused will flee, commit another crime, or
> interfere with the criminal proceeding. These are
> calculated risks codified in the legislature's statutory
> presumption in favor of pretrial release that must be
> taken within our system of justice.

> Making pretrial release contingent upon the payment of
> money bail that a person cannot afford results in a *de
> facto* detention order. Thus, without the necessary
> safeguards, the use of secured money bail can deprive
> people of their constitutional rights.

> Secured monetary bail that is set in an amount higher
> than what a person can pay implicates that person's
> rights to pretrial liberty and against wealth-based
> detention under the Constitution of the United States.

> Moreover, while monetary bail that is higher than what
> a defendant currently can meet is not *per se* excessive,
> bail in an amount higher than an amount reasonably
> calculated to minimize these risks is excessive and
> unlawful under the Eighth Amendment to the Constitution
> of the United States and under Article I, Section 27 of
> the Constitution of the [sic] North Carolina. Bail may
> not be used as punishment.

(Id.)

### 2. 2020 Bond Policy for Pretrial Release

The 2020 Bond Policy states that pretrial release
determinations "incorporate the state law pertaining to

16

eligibility for release" and "[t]hese provisions are to be applied in a manner consistent with the U.S. Constitution." (Id. at 5.) It references the three judicial settings at which pretrial release may be determined, and it builds upon the evidentiary prescription established in § 15A-534(g). (Id. at 5-6.) Namely, it orders that the presiding official "take into account all evidence available and deemed reliable, and any evidence the presiding official considers must be disclosed to the defendant, unless . . . prohibited by law." (Id. at 5.) This information includes "any source of information deemed reliable . . . from the defendant, an arresting officer, [or] other witnesses." (Id. (emphasis added).) As one of its supplemental measures, the 2020 Bond Policy also provides that "[a]t any setting at which conditions of release are considered for a defendant represented by counsel, the defendant shall be allowed to communicate fully and confidentially with his attorney before and during the proceeding." (Id.)

### 3. Determining Pretrial Release

The 2020 Bond Policy outlines considerations in determining a defendant's eligibility for release, which, again, are to be applied in coordination with state law "in a manner consistent with the U.S. Constitution." (Id. at 8.) The 2020 Bond Policy enumerates examples of "'No Bail' Scenarios" when "release is not authorized," or at least when defendants are not presumptively

17

entitled to bail, and "official[s] also shall document . . . a brief description of the basis for denying release." (Id.; see id. at 8-18.) The examples conform with state or federal law, e.g., capital cases (N.C. Gen. Stat. 15A-533(c)), military deserters (10 U.S.C. § 808, et seq.), and recidivist drug traffickers (N.C. Gen. Stat. 15A-533(d)). (See id. at 8-10.) Certain types of defendants, such as "Unruly or Intoxicated Defendants" or "Defendant[s] Too Impaired for Safe Release," may have their determination of eligibility for release delayed (id. at 11-14), but determinations for such defendants are also made in accordance with state statute (see, e.g., id. at 12 (citing N.C. Gen. Stat. §§ 15A-511(a)(3), 15A-534.2)).

### 4.   Determining Conditions of Release

The 2020 Bond Policy, in accordance with North Carolina General Statute § 15A-534(a), requires judicial officials to impose one of the conditions that do not require a secured bond unless a defendant meets the criteria for such or unless state law or the 2020 Bond Policy provides otherwise. (Id. at 18-19.) The Alamance County policy mirrors the statutory language in its criteria,[3] firmly incorporating the presumption of § 15A-534(b)

---

[3] The 2020 Bond Policy states:

   Unless a relevant North Carolina General Statute or this
   Policy otherwise requires a secured bond, a judicial official
   may not impose a secured bond, unless release of the defendant

18

against secured bond.[4] (Id.) Further ensuring that secured bonds are imposed sparingly, the policy dictates that judicial officials imposing a secured bond must make written findings of the basis for the imposition. (Id. at 20.) While "[d]etailed descriptions of findings and extensive facts underlying those findings are not required," the findings must include the following:

> (a) Individual findings, based on clear and convincing evidence, that support the judicial official's determination that a secured bond is warranted as provided pursuant to [N.C. Gen. Stat. §] 15A-534.
>
> (b) A finding, based on clear and convincing evidence, that either (i) the defendant is able to pay the bond imposed, or (ii) the defendant appears to be unable to pay the bond imposed, but pretrial detention is necessary, because no less-restrictive type of release will serve the State's compelling interests in assuring appearance, avoiding risk of injury, or avoiding interference with the criminal proceeding.

(Id. at 20-21.)

The 2020 Bond Policy goes further than the statute by stating

---

> under one of the three preferred types of release listed above (written promise, unsecured bond, or custody release) will:
>
> > a. Not reasonably assure the presence of the defendants as required;
> >
> > b. Pose a danger of injury to any person; or
> >
> > c. Likely result in the destruction of evidence, subornation of perjury, or intimidation of witnesses (hereafter "interference with the criminal proceeding").

(Doc. 72-1 at 20 (emphasis in original).)

[4] The 2020 Bond Policy cites to § 15A-534(a), but the presumption is explained in subparagraph (b).

19

that "[a]lthough not explicitly required by [N.C. Gen. Stat. §] 15A-534(a), this Policy recommends a presumption in favor of the non-monetary types of release, written promises and custody releases, over the monetary forms of an unsecured or secured bond." (Id. at 19.) The presumption against a secured bond for "low-level misdemeanors" is even stronger. (Compare id. at 19-20 with id. at 19.) The 2020 Bond Policy also outlines a presumption against using multiple types of release and states that electronic house arrest should not be imposed within the district. (Id. at 18-19.)

Attached to the 2020 Bond Policy is "Appendix A," which contains a flow chart for decision-making under the policy and "shall be deemed a sufficient proxy for evaluating the appropriate type of release for most defendants at initial appearances, except for defendants set out in paragraph [7]b."[5] (Id. at 21.) The attachment provides that "[i]n cases for which the appropriate type of release is unclear and not readily apparent from [Appendix A], or for subsequent decisions to modify the conditions of release, a judicial official should consider each of the factors listed in this section in detail in making a decision." (Id.) It then lists numerous factors for consideration and requires the

---

[5] Paragraph 7(b) of Section IV.B. of the policy addresses instances in which a magistrate or clerk sets conditions of release after a senior judicial official of the trial division has already set out conditions of release. (Doc. 72-1 at 21.)

judicial official to examine the following: the nature and circumstances of the offense charged; the weight of evidence against the defendant; the defendant's family ties; the current employment status and history; the financial resources and ability to pay any bond imposed, including ownership of real property; the defendant's character, mental condition, and length of residency in the community; the defendant's record of convictions; the defendant's history of flight to avoid prosecution; any history of failures to appear at court proceedings; and "[a]ny other evidence deemed relevant to the issue of pretrial release." (Id. at 21-22.)

When evaluating a defendant's financial resources and ability to pay a bond, "[i]ndividualized [c]onsideration [i]s [r]equired." (Id. at 22.) Specifically, the 2020 Bond Policy states:

(a) When a defendant is eligible for release pursuant to [N.C. Gen. Stat.] 15A-533 and related statutes, the circumstances of each individual case will govern the decision of a judicial official in determining both the type of release to be imposed under [N.C. Gen. Stat.] 15A-534(a) and the amount of any monetary bond in the event an unsecured or secured bond is imposed. A rigid bail schedule is incompatible with such an individualized decision. Decisions about pretrial release therefore should consider all of the relevant statutory factors, including the defendant's ability to pay, as detailed below.

(b) A defendant's inability to post a secured bond does not prohibit the imposition of a secured bond as a matter of law, but because the imposition of an unaffordable bond results in a *de facto* detention order, the following is required:

21

(1) A judicial official shall not impose a total secured bond amount above what the defendant can afford, absent a finding based on clear and convincing evidence that no less restrictive alternative can sufficiently prevent the defendant's failure to appear, injury to any person, or interference with the criminal proceeding, documented by written findings . . . .

(2) <u>Exception</u>: In cases involving a non-resident of North Carolina charged only with an infraction(s) but for whom conditions of release are being imposed, ability to pay is determinative. . . .

c. Guidelines for Monetary Bonds

(1) In imposing a monetary bond as a condition of release, whether secured or unsecured, a judicial official should abide by the guidelines set out in Appendix B to this Policy.

(<u>Id.</u> at 22-23.) The 2020 Bond Policy also requires written findings if a judicial official imposes a monetary bond in excess of the recommended amount in the policy, and the reasons for doing so must be documented in a release order. (<u>Id.</u> at 23.) The policy outlines the following for determining evidence of a defendant's financial resources:

The court shall consider the defendant's social and economic circumstances when setting conditions of release. Prior to setting or modifying a condition of release that includes secured or unsecured monetary bail, <u>the court shall conduct an inquiry into the defendant's ability to pay</u> the full amount of the monetary bail. The purpose of the inquiry shall be to determine the amount of money the defendant can pay at the time of the proceeding. <u>Such inquiry shall allow the prosecutor, defense counsel, and the defendant the opportunity to provide the court with information</u>

22

> pertinent to the defendant's ability to pay monetary
> bail, as appropriate to the context of the setting at
> which conditions of release are being determined. This
> information may be provided by proffer and may include
> statements by the defendant's relatives or other persons
> who are present at the hearing and have information about
> the defendant's ability to pay monetary bail. All
> information shall be admissible if it is relevant and
> reliable, regardless of whether it would be admissible
> under the rules of evidence applicable at criminal
> trials. If the court finds that there is insufficient
> reliable evidence to make any determination of the
> defendant's ability to pay, the court shall so state in
> any written findings made in imposing the conditions of
> release.

(Id. (emphasis added).) The 2020 Bond Policy then provides numerous examples of when a defendant is "presumed unable to afford any amount of secured bond, unless rebutted by other competent evidence of ability to pay." (Id.)

The 2020 Bond Policy also offers examples of additional conditions of release that a judicial official can impose in accordance with state statutes, as well as special conditions of release in particular circumstances. (Id. at 24-34.)

### F. Initial Appearances

The 2020 Bond Policy applies to initial appearances within the county. (Id. at 5.) An appendix to an administrative order implementing the 2020 Bond Policy known as the First Appearance Order, which is addressed in more detail below, sets out two versions of an "Oral Notice to Defendant at Initial Appearance": one for "Initial Appearance for New Charge(s)," and the other for "Initial Appearance for Warrantless Arrest for Violation of

23

Conditions of Release." (Doc. 72-2 (In Re In-Custody First Appearances – District 15A (the "First Appearance Order")) at 6.) The oral notice for new charges at initial appearance advises the defendant of his or her rights in the proceeding and reads as follows:

> This is an initial appearance, but it is <u>not</u> your trial. I cannot try or dismiss the charges against you. You will be able to address the charges against you with the court soon, and if you want a lawyer to assist you in court and cannot afford one, the court will appoint one for you. Right now, I must determine whether you must be held in jail while your case is pending and any conditions for your release from jail during that time. If I have to set conditions for your release, I will be considering information about several factors, including your history with the courts, if any, and the nature of your current charges. If the conditions I impose include a monetary bond for your release, I must consider your financial situation and your ability to pay a bond. You have the right to provide me with information or evidence about those decisions, but you also have the right to remain silent. Anything you say might be used later in evidence against you, so you should not discuss the events that led to your arrest. When we are done, you will get a copy of the order I enter that includes any conditions for your release that I impose. You or your attorney can challenge my decision at a future hearing.

(<u>Id.</u> at 6 (emphasis in original).) The oral notice for initial appearance for warrantless arrest for violation of conditions of release provides much of the same. (<u>Cf. id.</u>)

According to the Judicial Defendants, since July 1, 2020, initial appearances in Alamance County conform to the following procedures:

> The magistrate's office is located in the same building as the jail. In the magistrate's office, there are two

24

large windows with counters that faces [sic] a holding
area in the jail.  Magistrates are able to speak with
officers and defendants through the windows.

If it was a warrantless arrest, the magistrate will speak
with the officer at the window to obtain sworn testimony
on probable cause and issue the magistrate's order.  The
defendant is not present at the window when the
magistrate is speaking with the officer to obtain
probable cause, though the defendant is usually within
ear shot.

The magistrate orders are issued on AOC-CR-116 form and
will contain a description of the information provided
by the officer that established probable cause.  The
officer typically types in the information to the AOC-
CR-116 form prior to being sworn and giving oral
testimony on probable cause to the magistrate.  If
probably [sic] cause is found following receipt of the
oral testimony, the magistrate will confirm the
information in the AOC-CR-116 is correct as sworn and
issue the order. . . .

After the magistrate's order is issued, or at the start
of the Initial Appearance if a magistrate's order is not
required, the officer will bring the defendant to the
window.  The officer does not stand next to the defendant
at the window or participate in the Initial Appearance
at this point in the process, though an officer remains
in the room with the defendant.

Magistrates will read a notice to the defendant that
explains the purpose of the initial appearance, his/her
rights, and the information magistrates will try to
collect to determine appropriate conditions of release.
We keep a laminated copy of the notice at each of the
window [sic].  The notice that we read is set forth as
Appendix A to the First Appearance Order . . . .

                         . . .

Magistrates will then speak with a defendant if the
defendant is willing to do so.  The magistrate will swear
in the defendant if the defendant is willing to speak
with them.

The magistrate will then speak with the defendant about

                          25

their ability to pay and collect financial information from defendants, such as: whether they rent or own, their housing costs, money available in bank accounts, disability income, food stamp income, other government subsidy income, whether they work, their income, etc.

Magistrates will speak to defendants about their connection to the community, asking defendants for the following types of information: their address, who they live with, their current job and how long they have worked there, and whether they are a student.

Magistrates will also assess a defendant's demeanor to determine if there are any potential mental health issues to flag.

Magistrates will consider the nature and circumstances of the charges as presented in the order establishing probable cause (e.g., magistrate order's [sic], warrant for arrest, order for arrest).

Magistrates also collect information regarding the defendant's pending or past criminal history and history of failures to appear. They will ask defendant if they have any pending charges and if they have an attorney for those charges. They will also ask defendants if they have ever served a sentence and collect information on any served sentence.

Magistrates spend approximately five to ten minutes speaking with a defendant during the Initial Appearance. . . .

. . .

A magistrate will evaluate the information collected to determine the appropriate condition of release under the [2020] Bond Policy and the considerations of N.C.G.S. § 15A-534(b). A summary of the process for making this evaluation under the Bond Policy is provided in a flow chart attached as Appendix A to the Bond Policy.

. . .

In addition to determining the conditions of release, the magistrate will also go over the defendant's charges with them.

26

. . .

> At the end of the initial appearance, a magistrate
> provides in-custody defendants with a written [sic]
> informing them of next steps in their case and how to
> post a bond. The notices that we provide are included
> as Appendix B (Alamance County charges) and Appendix C
> (Out-of-County charges) to the First Appearance
> Policy . . . .

(Doc. 99-3 ¶ 30 (subparagraph numbering omitted).) Defendants offer an example of a questionnaire used by magistrates in conducting inquiries, which asks defendants to provide basic background information on living arrangements, financial ability to pay, and prior active incarceration sentences, among other things. (See id. at 19-21.)

### G. First Appearances

The First Appearance Order likewise implements procedures for "first appearances for arrestees charged with any criminal offense, misdemeanor or felony, and those arrested for probation violations, for which venue lies in this District" and "review of conditions of pretrial release ('bail review hearings') for arrestees with cases pending in other judicial districts in the State." (Doc. 72-2 at 2.) The First Appearance Order provides:

> This Order is intended to ensure that no defendant is
> held in custody prior to trial solely because the
> defendant cannot afford to post bond, to ensure fairness
> and the elimination of unjustifiable delay in the
> administration of justice, to facilitate the just
> determination of every criminal proceeding, and to
> preserve the public welfare and secure the fundamental
> human rights of individuals with interests in criminal
> court cases.

27

(Id.)  Effective on or after July 1, 2020, it has the following additional provisions:

> 2.  Defendants who are in custody shall be taken before a judge of the appropriate trial division within forty-eight (48) hours of arrest or at the next available session of court in the event that court is not in session within forty-eight (48) hours of the defendant's arrest.
>
> 3.  Each weekday when court is in session, the Detention Center Liaison (or his/her designee) and staff of the Clerk of Superior Court shall identify those defendants covered by this Order who are in custody and have not had a first appearance before a judge.
>
> 4.  Staff of the Clerk of Superior Court shall create a docket ("In-Custody First Appearance Docket," hereafter "Docket") for each trial division, as needed, listing each of the qualifying defendants.

(Id. at 2-3.)  The order also provides that counsel will be made available for defendants as follows:

> 5.  For the purposes of implementation of this Order, the role of contract counsel is as follows:
>
> > a.  Contract counsel is hereby appointed to represent all defendants covered by this policy for the limited purpose of representation at the first appearance or bail review hearing, only, and shall be deemed to have entered a limited appearance for that purpose as provided in Chapter 15A, Article 4, without the necessity of a separate notice of limited appearance filed in each defendant's case.
> >
> > b.  Contract counsel shall not be deemed appointed for any defendant for whom other counsel appears and enters an appearance, whether limited or general, or for which a defendant declines the assistance of appointed counsel.

28

c. Contract counsel shall make all reasonable efforts to meet with each qualifying defendant listed on the Docket between 10:00 a.m. and 2:00 p.m. on the contract counsel's assigned day(s).

(Id. at 3.) Moreover, the order requires the following notice to the defendant:

6. The judicial official presiding at any initial appearance shall provide to the defendant notice of the nature of the initial appearance, and first appearance, if any, as follows:

a. Prior to conducting an initial appearance, the judicial official shall give the defendant oral notice of the general nature of the initial appearance as provided in [N.C. Gen. Stat.] 15A-511. Appendix A to this policy provides a sample oral notice for this purpose.

b. For any defendant committed to custody after the initial appearance, the judicial official shall inform the defendant orally of the general nature and scheduled date of the first appearance or bail hearing and that, if still in custody at the time of that appearance, the defendant will be given an opportunity to meet with counsel prior to and be represented at that appearance. In addition, for cases pending in Alamance County, the official shall provide the defendant with a copy of the written notice in Appendix B to this policy. For North Carolina cases pending in other counties, the official shall provide the defendant with a copy of the written notice in Appendix C to this policy.

(Id.)

The First Appearance Order further states:

8. At first appearances conducted pursuant to this Order, the court shall proceed as provided in Chapter

29

15A, Article 29, and as otherwise provided in this section.

> a. <u>Prior to conducting first appearances</u> pursuant to this Order, the court shall advise affected defendants generally about the nature of the proceeding and the issues to be considered and decided pursuant to Article 29. This advisement may be given to defendants collectively or to individual defendants as appropriate. For the purposes of this advisement, Appendix D to this policy reiterates briefly the requirements of Article 29 with additional detail for advising defendants about the scope of the court's review of eligibility for and conditions of release.
>
> . . .
>
> c. <u>The court shall ensure that the defendant has had an opportunity to consult privately with counsel with sufficient time before proceeding to prepare to address the matters to be decided at the first appearance, including but not limited to financial considerations and other factors related to the defendant's conditions of release, unless the defendant expressly waives the assistance of counsel at the first appearance</u>.

(<u>Id.</u> at 3-4 (emphasis added).)  The provisions outlining bail review hearings for defendants with out-of-county charges contain substantially similar requirements.  (<u>Cf. id.</u> at 4-5.)

Appendix B of the First Appearance Order provides a "NOTICE to Defendants Committed to Custody for Cases Pending in Alamance County." (<u>Id.</u> at 7.) Most relevant here, it addresses when a first appearance will occur and outlines the following:

> If your charge is pending in Alamance County, and you remain in jail, you will be taken to court to have a first appearance at the next available court session,

30

which may be earlier than the court date listed on your release order. Before the first appearance, you will have a chance to talk with a first appearance attorney appointed specifically to assist you at that appearance.

- The first appearance attorney is appointed to protect your rights at the first appearance, so you can talk with him or her confidentially. If the court later appoints an attorney to represent you for the rest of your case, it probably will not be the same person as the first appearance attorney.

- If you want to hire your own attorney or if you want to represent yourself, you do not have to accept the help of the first appearance attorney, but the court will not appoint a different attorney for this appearance.

- You have the right to hire an attorney, if you can afford it and want to be represented by someone other than an appointed attorney.

(Id.) The remainder of Appendix B outlines what happens at a first appearance, the factors the court will consider in determining conditions of release, and the court's process if a secured bond is imposed. (Id. at 8.)

Appendix C of the First Appearance Order concerns defendants in custody in Alamance County for cases pending in other counties and outlines much of the same as Appendix B. (Id. at 9.)

Finally, Appendix D to the First Appearance Order outlines important aspects of the first appearance and how it must conform to state requirements, including, among others, that "as part of every first appearance, the court must" advise defendants of the right to remain silent (N.C. Gen Stat. § 15A-602), determine

31

whether defendants have counsel and advise them of their right to counsel (N.C. Gen. Stat. § 15A-603(b)), review the sufficiency of the charges (N.C. Gen. Stat. § 15A-604), and review the defendant's eligibility for and conditions of pretrial release (N.C. Gen. Stat. § 15A-605(3)). (Doc. 72-2 at 11.) The judicial official must also advise the defendant of the conditions of release. (Id.)

## II. PROCEDURAL HISTORY

This lawsuit was filed on November 12, 2019, accompanied by a motion to certify a class of "All people who are arrested and charged with non-domestic violence offenses who are or will be detained in the Alamance County Detention Center because they are unable to pay monetary conditions of pretrial release." (Doc. 2 ¶ 2.) Plaintiffs also moved for a temporary restraining order (Doc. 5) and a preliminary injunction (Doc. 6). The complaint challenges the pretrial procedures of Alamance County as set out in the 1995 Policy, a copy of which is attached to the complaint. (Doc. 1-1.) The case was initially assigned to Judge N. Carlton Tilley, Jr.

Count I of the complaint alleges that Defendants, by enforcing a policy and practice that jails individuals without regard to their ability to pay, violate Plaintiffs' equal protection and due process rights pursuant to the Fourteenth Amendment as actionable under 42 U.S.C. § 1983. (Doc. 1 ¶¶ 98-103.) Count II alleges that Defendants, by denying pretrial detainees their fundamental

32

liberty interest in a manner not narrowly tailored and by failing to consider non-wealth-based detention factors, violate Plaintiffs' substantive due process rights under the Fourteenth Amendment pursuant to § 1983. (Id. ¶¶ 104-106.) Count III alleges that Defendants' "total lack of procedures" for pretrial detention violate the Fourteenth Amendment's due process guarantees enforceable through § 1983. (Id. ¶¶ 107-110.) Finally, Count IV alleges that Defendants, by not providing counsel for bail determinations, violate Plaintiffs' Sixth Amendment right to counsel, pursuant to § 1983. (Id. ¶¶ 111-114.)

On November 14, 2019, the court denied the motion for a temporary restraining order and scheduled a hearing on the motion for preliminary injunction for December 2, 2019, which was continued to March 16, 2020, by consent of the parties. The case was stayed on March 3, 2020, until April 30, 2020. (Doc. 51.)

On May 1, 2020, the parties filed a joint motion to "approve consent order for preliminary injunction" (Doc. 55), which the court granted on May 8, 2020 (Doc. 56). On October 19, 2021, Plaintiffs moved to enforce the preliminary injunction on the ground that funds for contract counsel at first appearances would not be renewed by the North Carolina Office of Indigent Defense Services. (Doc. 63.)

On October 25, 2021, the court granted Plaintiffs' motion to certify a class (Doc. 2) and defined the class as follows: "All

33

people who are arrested and charged with non-domestic violence offenses who are or will be detained in the Alamance County Detention Center because they are unable to pay monetary conditions of pretrial release" (Doc. 67). The court denied the motion to enforce the preliminary injunction, however, on December 3, 2021. (Doc. 83.)[6]

On June 28, 2022, the case was reassigned to the undersigned. On July 7, 2022, the Judicial Defendants filed the pending motion for summary judgment. (Doc. 99.) This was followed by Sheriff Johnson's motion for summary judgment (Doc. 104) and Plaintiffs' cross-motion for summary judgment on August 1, 2022 (Doc. 106). These motions are fully briefed.

On October 15, 2022, the Judicial Defendants withdrew their jury trial demand (Doc. 125), and the case was set for a bench trial on January 9, 2023 (Doc. 129). The parties moved jointly to continue the trial (Doc. 130), which motion the court granted, and a status hearing was set for March 3, 2023 (Doc. 133). At the hearing, the parties agreed there was sufficient evidence from which the court could resolve the case on the pending motions for summary judgment without the need for a bench trial. (Doc. 152 at 79-80.) Plaintiffs acknowledged they did not move for summary

---

[6] In the interim, two of the three Plaintiffs – Antonio Harrell and Lea Allison, were dismissed from the action on their own motions. (Docs. 62, 66.)

judgment as to their Sixth Amendment claim at initial appearances because they "did not necessarily feel that the evidence was sufficient" to do so. (Id. at 78 ("Although to clarify [], we did not seek summary judgment on the right to counsel at initial appearance.").) Later in oral argument, however, Plaintiffs contended that the record was sufficient, there are no facts in dispute, and thus there was no need for a bench trial. (Id. at 79-80.)[7] The court reserved ruling on whether it would allow Plaintiffs to seek summary judgment as to the Sixth Amendment claim for counsel at initial appearances. (Id. at 83-84 ("I'll resolve [the issue of whether Plaintiffs moved for summary judgment] . . . I'll look at the briefing, and I will figure it out and see what's there.").) Defendants agreed that the court could decide the case on the current record (Id. at 80; see Docs. 99, 100), and the court allowed the parties to file supplemental briefing (Docs. 145, 146).

Having reviewed the record and transcripts, the court finds that Plaintiffs did not properly move for summary judgment as to the Sixth Amendment claim at initial appearances, and the court therefore will not address their subsequent contentions as to it.

In light of the pending motions, the court reviews Plaintiffs'

---

[7] Although Plaintiffs oscillated between believing the factual record was sufficient or insufficient, they contended that "[t]he claim with respect to the right to counsel at initial appearance[s] is open and triable should the Court deny the Defendants' summary judgment motion." (Doc. 152 at 82.)

35

requested relief:

A. A declaratory judgment that Defendants violate the Named Plaintiffs' and class members' constitutional rights by issuing detention orders without due process;

B. A declaratory judgment that Defendants violate the Named Plaintiffs' and class members' constitutional rights by operating a system of wealth-based detention that keeps them in jail because they cannot afford to pay monetary conditions of release without an inquiry into or findings concerning ability to pay, without consideration of non-financial alternatives, and without findings that a particular release condition—or pretrial detention—is necessary to meet a compelling government interest;

C. A declaratory judgment that when Defendants are determining conditions of release, an individualized determination on release conditions must occur promptly and with the following procedures:

- Defendants must provide notice to the individual arrested that financial information will be collected and must explain the significance of the financial information to be collected;

- Defendants must determine each individual's ability to pay money bail and the amount of money they can afford;

- The individual arrested must be given an opportunity to be heard at the first opportunity concerning their ability to afford money bail and what nonmonetary release conditions, if any, are necessary. The individual must have the opportunity to present evidence, make arguments concerning those issues, and to contest any evidence or arguments offered by the government concerning those issues;

- The judicial official conducting the hearing must make substantive findings on the record by clear and convincing evidence about why an individual's continued incarceration is

36

> warranted and that no less restrictive
> alternatives to detention address the state's
> concerns;
>
> - The individual must be provided free counsel at
>   the hearing;
>
> D. A declaratory judgment that Defendants violate
> Plaintiffs' and class members' right to counsel under
> the Sixth Amendment by failing to provide counsel to
> indigent people at an individualized bail determination
> hearing;
>
> E. An order preliminarily and permanently enjoining the
> Sheriff from enforcing pretrial detention without
> written notice that a constitutionally valid process
> that complies with the above outlined process has been
> followed in each individual's case;
>
> F. An order requiring Senior Resident Lambeth, in his
> role as policymaker, to issue a new policy mandating a
> bail-setting process that meets constitutional
> requirements;
>
> G. A temporary restraining order requiring the Sheriff
> to release the Named Plaintiffs unless they are provided
> the procedures stated above;
>
> H. Any other order and judgment this Court deems
> necessary to permanently enjoin the Sheriff from
> enforcing a system of wealth-based pretrial detention
> that keeps arrestees in jail because they cannot afford
> a monetary release condition without an inquiry into or
> findings concerning ability to pay, without
> consideration of non-financial alternatives, and without
> any findings that a particular release condition—or
> pretrial detention—is necessary to meet a compelling
> government interest;
>
> I. An order certifying the class defined above;
>
> J. An order and judgment granting reasonable attorneys'
> fees and costs pursuant to 42 U.S.C. § 1988; and
>
> K. Any other relief this Court deems just and proper.

(Doc. 1 at 31-32.)

It is important to state the obvious: Plaintiffs' claims are based on the procedures of the 1995 Policy, a copy of which is attached to the complaint, and not on the 2020 Bond Policy, which did not even exist when the complaint was filed. (See, e.g., Doc. 107 at 2 ("The following sections describe Defendants' practices before entry of the consent preliminary injunction")(emphasis added); id. at 8 (alleging violations against wealth-based detention in Alamance County based on practices before the preliminary injunction); id. at 10 (alleging "Defendants did not examine arrestees' ability to pay secured bail"); id. at 14-15 (alleging violations of substantive due process based on the previous bail scheme [the 1995 policy]).) Indeed, each Plaintiff was processed under the 1995 Policy. Judicial Defendants contend that the court need not reach the merits of the majority of Plaintiffs' Fourteenth Amendment claims because the 2020 Bond Policy and the corresponding orders of the Judicial Defendants moot Plaintiffs' claims for relief in Counts I, II, and III. (See Doc. 112 at 2-3.)

The Judicial Defendants also make plain that they have "never attempted to defend the constitutionality of the 1995 Policy" and "created [the 2020 Bond Policy], including provisions resulting from extensive collaboration and negotiation with Plaintiffs over six months of discussions" in order to reform and replace the 1995 Policy. (Id. at 2 (citing Doc. 99-1 ¶¶ 40-41; Doc. 99-2 ¶¶ 30-

38

31).) The Judicial Defendants also contend that "[e]xcept for the provision of counsel for first appearances, the [2020] Bond Policy and the separate administrative order furnished every form of relief Plaintiffs sought in the Complaint." (Id. at 3.)

## III. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Basnight v. Diamond Devs., Inc., 146 F. Supp. 2d 754, 760 (M.D.N.C. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In determining a motion for summary judgment, the court views the "evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences." Id. Summary judgment should be denied "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." Guessford v. Pa. Nat'l Mut. Cas. Ins. Co., 983 F. Supp. 2d 652, 659 (M.D.N.C. 2013) (quoting Campbell v. Hewitt, Coleman & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994)).

While the movant bears the initial burden of demonstrating

39

the absence of a genuine dispute of material fact, once that burden has been met, the non-moving party must demonstrate the existence of a genuine dispute of material fact. Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). A mere scintilla of evidence is insufficient to circumvent summary judgment. Anderson, 477 U.S. at 252; Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013) ("[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (noting that there is an affirmative duty for "the trial judge to prevent factually unsupported claims and defenses from proceeding to trial" (internal quotation marks omitted)). Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. Anderson, 477 U.S. at 248–49. Trial is unnecessary only if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315–16 (4th Cir. 1993).

The standard of review on cross-motions for summary judgment does not differ from the standard applied when only one-party files a motion. Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d

351, 354 (4th Cir. 2011). Accordingly, the court must "consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Bacon v. City of Richmond, 475 F.3d 633, 638 (4th Cir. 2007) (internal quotation marks omitted). "When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted).

B. **Section 1983 Claims Against Judicial Defendants**

Plaintiffs bring each of their counts against the Defendants in their official capacities pursuant to 42 U.S.C § 1983. Section 1983 provides a means to vindicate violations of rights, privileges, and immunities secured by the Constitution and laws of the United States by persons acting under the color of state law, but the statute is not, itself, a source of substantive rights. Albright v. Oliver, 510 U.S. 266, 271 (1994); Doe v. Kidd, 501 F.3d 348, 355 (4th Cir. 2007) (citing 42 U.S.C. § 1983); Owens v. Balt. City State's Att'ys Off., 767 F.3d 379, 402 (4th Cir. 2014). To establish a cause of action, a plaintiff must demonstrate: "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." Jenkins v. Medford, 119 F.3d 1156, 1159–60 (4th Cir. 1997).

To establish causation under § 1983, a plaintiff must show an

41

"affirmative causal link" between acts or omissions of the culpable actor and the constitutional injury. Slakan v. Porter, 737 F.2d 368, 376 (4th Cir. 1984). Causation can be established in a variety of ways, including by evidence that the defendant violated the Constitution through direct intervention, Meyers v. Balt. Cnty., Md., 713 F.3d 723, 735 (4th Cir. 2013), by implementing or failing to remediate an unconstitutional policy, Gordon v. Schilling, 937 F.3d 348, 360 (4th Cir. 2019), or by failing to adequately train or supervise a subordinate officer, Shaw v. Stroud, 13 F.3d 791, 800 (4th Cir. 1994).

### 1. Fourteenth Amendment Claims

Plaintiffs in Counts I through III bring a § 1983 action against the Judicial Defendants for various violations of the Fourteenth Amendment to the United States Constitution. The Judicial Defendants maintain, however, that the court need not consider the merits of these counts because those claims have been mooted by the county's adoption of the 2020 Bond Policy. Those arguments are therefore considered first.

Article III of the Constitution empowers federal courts to "adjudicate actual, ongoing controversies." Honig v. Doe, 484 U.S. 305, 317 (1988) (citations omitted). When "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," the lawsuit becomes moot. Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) (citation

42

omitted). "The doctrine of mootness constitutes a part of the constitutional limits of federal court jurisdiction." Simmons v. United Mortg. & Loan Inv., LLC, 634 F.3d 754, 763 (4th Cir. 2011) (citation omitted). Namely, "[t]he mootness doctrine is rooted in the case-or-controversy limitation on federal judicial power contained in Article III, Section 2 of the Constitution." Lighthouse Fellowship Church v. Northam, 20 F.4th 157, 162 (4th Cir. 2021) (citation omitted). "When a case or controversy ceases to exist – either due to a change in the facts or the law – 'the litigation is moot, and the court's subject matter jurisdiction ceases to exist also.'" Porter v. Clarke, 852 F.3d 358, 363 (4th Cir. 2017) (quoting S.C. Coastal League v. U.S. Army Corp of Eng'rs, 789 F.3d 475, 482 (4th Cir. 2015)).

Defendants assert that their adoption of the 2020 Bond Policy, which imposes additional safeguards to pretrial detention proceedings and ultimately provides much of the relief sought by the Plaintiffs in Counts I through III, constitutes a sufficient change as to render the case moot as to those counts. (See Doc. 100 at 12-13.) Plaintiffs for their part do not contend that their relief as to these three counts has not been met. Instead, they argue that the voluntary cessation exception should apply (see, e.g., Doc. 108 at 2-10 (arguing their claims are not moot because the Judicial Defendants cannot show they will not regress to the 1995 Policy)) and that the court should rule on procedures under

43

the 1995 Policy (see, e.g., Doc. 107 (arguing constitutional violations existing prior to the 2020 Bond Policy)).

### a. 2020 Bond Policy Compared to 1995 Policy and Its Defects

Changes to a law that "discontinue a challenged practice" are sufficient to render a previously contested case moot. Holloway v. City of Va. Beach, 42 F.4th 266, 273 (2022). To be sure, "'minor and insignificant' changes that do not addresses the essence of a plaintiff's claims will not forestall legal challenges." Id. at 273 (quoting Valero Terrestrial Corp. v. Paige, 211 F.3d 112, 116 (4th Cir. 2000)). But when a challenged scheme is "superseded" because it has been "significantly amended," the claim against the original law becomes moot. Id. Whatever the merits of claims against an old framework, "any challenge to the new provisions presents a different case." Allee v. Medrano, 416 U.S. 802, 818 (1974). The question is whether the "legal framework" of the case is substantially altered so as to moot the initial claims. Holloway, 42 F.4th at 273-74.

A recent Fifth Circuit case is instructive. In Daves v. City of Dallas County, Texas, 64 F.4th 616, 621 (5th Cir. 2023), a class of arrestees from Dallas County sued the county for alleged constitutional violations during bail determinations. While the case was pending, the Texas legislature passed a new law that adopted many of the plaintiffs' requests. Id. at 621-22. The

44

district court found the claims moot, and the Fifth Circuit, sitting en banc, agreed. _Id._ at 633-36. The court found that "rul[ing] on the status of [the new Texas law] and its procedures at this point, based on evidence largely generated during proceedings that occurred pre-amendment, would constitute no more than an advisory opinion." _Id._ at 634. Further, the court stated that "the named plaintiffs have not been subject to bail proceedings since years before the advent of [the new Texas law]" which "call[ed] into question their ability to pursue this litigation for ongoing injunctive relief as injured parties." _Id._ Even though the plaintiffs "submitted some kind of video evidence purporting to demonstrate deficient proceedings in the immediate wake of the new law," this did not remedy the "minimal evidence in the record reflecting what actually happens in Dallas County after the effective date of [the new Texas law]." _Id._ Moreover, even though the _Daves_ plaintiffs argued that the new Texas law "fail[ed] to assuage their demands," the Fifth Circuit found many of plaintiffs' concerns were remedied and, to the extent they were not, the question in the case was "now whether the new state law, if applied assiduously by Dallas County magistrates, measures up to plaintiffs' proffered constitutional minima." _Id._ at 635.

By these standards, Plaintiffs' claims in Counts I, II, and III no longer present live questions for this court to address. Plaintiffs' complaint expressly targets Alamance County's 1995

45

Policy, a copy of which is attached to the pleading.  (See Doc. 1-1.)  Based on the 1995 Policy, Plaintiffs' complaint seeks the following relief:

> A.  A declaratory judgment that Defendants violate the Named Plaintiffs' and class members' constitutional rights by issuing detention orders without due process;
>
> B.  A declaratory judgment that Defendants violate the Named Plaintiffs' and class members' constitutional rights by operating a system of wealth-based detention that keeps them in jail because they cannot afford to pay monetary conditions of release without an inquiry into or findings concerning ability to pay, without consideration of non-financial alternatives, and without findings that a particular release condition—or pretrial detention—is necessary to meet a compelling government interest;
>
> C.  A declaratory judgment that when Defendants are determining conditions of release, an individualized determination on release conditions must occur promptly and with the following procedures:
>
>> [1][8] Defendants must provide notice to the individual arrested that financial information will be collected and must explain the significance of the financial information to be collected;
>>
>> [2] Defendants must determine each individual's ability to pay money bail and the amount of money they can afford;
>>
>> [3] The individual arrested must be given an opportunity to be heard at the first opportunity concerning their ability to afford money bail and what nonmonetary release conditions, if any, are necessary. The individual must have the opportunity to present evidence, make arguments concerning

---

[8] The court adds the subparagraph numbering, which does not appear in Plaintiffs' complaint, for ease of reference.  (See Doc. 1 at 31-32 (enumerating the sub-claims as bullets instead).)

46

those issues, and to contest any evidence or arguments offered by the government concerning those issues;

[4] The judicial official conducting the hearing must make substantive findings on the record by clear and convincing evidence about why an individual's continued incarceration is warranted and that no less restrictive alternatives to detention address the state's concerns;

[5] The individual must be provided free counsel at the hearing[.]

(Doc. 1 at 31-32.) As the Judicial Defendants correctly point out, however, the 2020 Bond Policy provides virtually all of this. (See Doc. 100 at 13.)

As to requests A through C3, the 2020 Bond Policy clearly states that an "[i]ndividualized [c]onsideration [i]s [r]equired" when evaluating financial resources and the ability to pay as factors in determining the type of release. (Doc. 72-1 at 22.) It also instructs that "[a] rigid bail schedule is incompatible with such an individualized decision" and that "[d]ecisions about pretrial release therefore should consider all of the relevant statutory factors, including the defendant's ability to pay." (Id.) To make these determinations, a "court shall conduct an inquiry into the defendant's ability to pay the full amount of monetary bail . . . [and] determine the amount of money the defendant can pay at the time of the proceeding." (Id. at 23.) The accused, their relatives, "or other persons" at the hearing

47

can provide information so long as the court determines it is reliable. (Id.)

As to request C4, the 2020 Bond Policy requires written findings for secured bonds, which must adhere to the following guidelines:

> (a) individual findings, based on clear and convincing evidence, that support the judicial official's determination that a secured bond is warranted as provided pursuant to G.S. 15A-534.
>
> (b) A finding, based on clear and convincing evidence, that either (i) the defendant is able to pay the bond imposed, or (ii) the defendant appears to be unable to pay the bond imposed, but pretrial detention is necessary, because no less-restrictive type of release will serve the State's compelling interests in assuring appearance, avoiding risk of injury, or avoiding interference with the criminal proceeding.

(Id. at 20-21.) This moots request C4, as it provides nearly verbatim Plaintiffs' requested relief.

Importantly, as to the above claims, Plaintiffs admitted at oral argument that "[t]here is no challenge to the factors that the magistrate is considering." (Doc. 152 at 35.) When asked whether Plaintiffs believed Alamance County was considering "constitutional factors, or at least there is nothing unconstitutional about the factors," Plaintiffs responded, "[t]hat's correct." (Id.)

As to Plaintiffs' request C5 – demanding counsel at hearings – the 2020 Bond Policy requires the provision of "contract counsel" for all first appearances. The First Appearance

48

Order states that "[b]efore the first appearance, [a defendant] will have a chance to talk with a first appearance attorney appointed specifically to assist [him] at that appearance." (Doc. 72-2 at 7.) Further, "[t]he first appearance attorney is appointed to protect [the defendant's] rights at the first appearance, so [he] can talk with him or her confidentially." (Id.) The Judicial Defendants argue that any counsel claim is cognizable, if at all, under the Sixth, and not the Fourteenth, Amendment. (Doc. 100 at 19 (citing Albright, 510 U.S. at 273; Turner v. Rogers, 564 U.S. 431, 452-53 (2011) (Thomas, J., dissenting)).) Because the current policy calls for defendants at first appearances to be provided contract counsel, however, the court need not resolve the constitutional issue as there is no live claim of Fourteenth Amendment injury. See N.Y. State Rifle & Pistol Ass'n v. City of N.Y., 140 S. Ct. 1525, 1526 (2020) (per curiam). This request as to a Fourteenth Amendment challenge to first appearances is therefore moot.[9]

Nor can plaintiffs save these claims by adapting their challenges to the 2020 Bond Policy. Only Plaintiff Katherine Guill remains in the case.[10] She was subjected to the 1995 Policy, which

---

[9] Arguments related to Count IV, the Sixth Amendment claim to a right to counsel at pretrial proceedings, are addressed separately in Part III.D, infra.

[10] The court refers to "Plaintiffs," however, in recognition of the fact that Judge Tilley earlier certified a class.

49

has been superseded by the 2020 Bond Policy. She was arrested and held for four weeks under the 1995 Policy before a bail hearing was held.[11] (Doc. 1 ¶¶ 41-48.) Under the 2020 Bond Policy, detainees now have a bail determination (with the factors Plaintiffs sought) at the initial appearance and, within 48 hours of detention, a bail hearing at the first appearance.[12] (Doc. 72-2 at 2.) The current class representative Plaintiff, therefore, was simply not injured by the 2020 Bond Policy.

Similarly, Plaintiffs' proffered evidence pertains to procedures pursuant to the discarded 1995 Policy. Indeed, much of Plaintiffs' memorandum in support of their motion for summary judgment as to the Fourteenth Amendment claims discusses "practices before entry of the consent preliminary injunction." (Doc. 107 at 2; see id. at 2-18 (discussing practices pursuant to the 1995 Bond Policy and how those practices violated Plaintiffs' constitutional rights).) In their arguments regarding the need for counsel at bail determination hearings, Plaintiffs cite to deposition testimony discussing the "old policy." (See, e.g., id. at 21 (citing Doc. 107-8 at 11 (discussing first appearances

---

[11] The dismissed Plaintiffs were similarly subjected to delays of weeks before a first appearance. (Doc. 1 ¶¶ 21-40.) Such a delay cannot happen under the 2020 Bond Policy, which requires a first appearance within 48 hours of arrest.

[12] In cases where the initial appearance is combined with a first appearance, which is permissible under state law, N.C. Gen. Stat. 15A-601(b), the 2020 Bond Policy nevertheless requires that the hearing occur within 48 hours of arrest.

50

generally during a discussion of the "old policy")); id. at 22 (citing Doc. 107-9 at 23 (discussing arrestees' attempts to plead their case at first appearances under the "old policy")); id. at 22 (citing Doc. 107-11 at 7 (discussing statements made by arrestees "in court" but unclear as to whether this was pursuant to 1995 Policy or 2020 Bond Policy)); id. at 22 (citing Doc. 107-9 at 23 (discussing whether "under the old policy" "arrestees ever present[ed] evidence at first appearances")); id. at 22 (citing Doc. 107-8 at 5-6 (Judge Allen discussing his experience as an ADA prior to the promulgation of the "new policy")); id. at 22 (citing Doc. 107-9 at 12 (Judge Lambeth describing his experience in private practice under the "old policy")); id. at 22 (citing Doc. 107-5 at 18 (discussing statements made by arrestees about victims at first appearance, but unclear as to whether events occurred pursuant to 1995 Policy or 2020 Bond Policy)).) Plaintiffs' response to the Judicial Defendants' motion for summary judgment similarly cites evidence from the 1995 Policy. (See, e.g., Doc. 108-8 at 17 (showing Plaintiffs' counsel restating a question regarding procedures "before the new bond policy").) Plaintiffs also do not cite to evidence from procedures under the 2020 Bond Policy in their reply. (See Doc. 117.)

As in Daves, even if some of the facts developed in this case pertain to practices under the 2020 Bond Policy, the factual record is plainly developed based on the previous, abandoned policy. As

51

in Daves, the policy originally challenged before the court – the 1995 Policy – is no longer at issue.  Whether the 2020 Bond Policy "if applied assiduously" meets constitutional requirements has not been challenged by Plaintiffs.

The court therefore finds Plaintiffs' claims in Counts I, II, and III are moot.  The question then remains, though, whether Plaintiffs are correct that the 2020 Bond Policy falls within the voluntary cessation exception to the mootness doctrine.

### b.   Voluntary Cessation

The present case involves a change in Alamance County's policy rather than state law, which Plaintiff argue raises the specter of the "voluntary cessation exception" to mootness.  Under the voluntary cessation exception, a substantial change in law or policy will not moot a claim "when a defendant voluntarily ceases its allegedly improper behavior, [and] there is a reasonable chance that the behavior will resume."  Lighthouse Fellowship, 20 F.4th at 162.  The standard for "whether a pending case 'has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'"  Id.  (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000); see Incumaa v. Ozmint, 507 F.3d 281, 288 (4th Cir. 2007)).  The standard is intended to be demanding, although it is "not impossible" to show

52

that the voluntary cessation exception does not apply. Id. at 162-63 (collecting cases).

Even though the substantial change in bond policy furnishes Plaintiffs with the relief they request as to Counts I, II, and III, Plaintiffs nevertheless contend that the Judicial Defendants' claim is not mooted under the voluntary cessation exception because the Judicial Defendants are likely to revert to the 1995 Policy. Plaintiffs claim that the Judicial Defendants are merely complying with the consent preliminary injunction and do not "meet their 'heavy burden' of proving that it is 'absolutely clear' that their violations cannot reasonably be expected to recur." (Doc. 108 at 2 (citing Porter, 852 F.3d at 364).) Without a court order, Plaintiffs contend, the Judicial Defendants are "free to unilaterally change or rescind the new bond policy at any time." (Id.)

More specifically, Plaintiffs argue that the "[u]nconstitutional [p]ractices [a]re [l]ikely to [r]ecur [g]iven Judge Lambeth's [l]ack of [c]ommitment to [m]aintaining the [n]ew [p]olicies and [h]is [p]rior [a]ttempt to [r]escind a [k]ey [a]spect of the [p]olicy." (Doc. 108 at 3.) Plaintiffs support this contention with several assertions: the impermanence of the court's administrative orders regarding pretrial release; the absence of North Carolina law prohibiting Judge Lambeth from reinstating the challenged policy; the lack of any requirement

53

that Judge Lambeth consult with "any party other than the Chief
District Judge or convene any sort of public deliberative process";
Judge Lambeth's "exclu[sion of] the written findings form that was
negotiated by the parties from his commitment to current policies";
and Judge Lambeth's failure to make a "commitment to maintain the
notice requirements of the First Appearance Administrative Order."
(Doc. 108 at 4-5.)  Further, Plaintiffs contend that Judge Lambeth
"has already attempted to change his administrative orders
required by the preliminary injunction" by, among other things,
"rescinding the guarantee of counsel for indigent arrestees at
First Appearance" after "IDS terminat[ed] funding for counsel at
first appearances."  (Doc. 108 at 5 (emphasis in original
omitted).)  Plaintiffs say that only after this court admonished
the Judicial Defendants that "[t]here certainly has been no order
from the Court excusing nonperformance" under the consent
injunction was the counsel provision left in place.  (Id. at 6
(quoting Doc. 108-2 at 4).)  Plaintiffs also contend that the legal
authority cited by the Judicial Defendants, which purportedly
indicates that Judge Lambeth may not retain the authority to change
the policy at this point, is unpersuasive.  (See Doc. 108 at 8-
10.)

The Judicial Defendants characterize Plaintiffs' concerns as
meritless.  They point out that Judge Lambeth has provided a sworn
statement that he will not reinstate the 1995 Policy.  (See Doc.

54

113 at 1-2 (citing Doc. 112-1 ¶ 2 (stating "so long as I [Judge Lambeth] remain the Senior Resident Superior Court Judge in Alamance County and have statutory authority over the county's pretrial release policies and procedures, I will not reinstitute the 1995 pretrial release policy challenged by Plaintiffs in this lawsuit")).) Further, they point to his testimony that he is committed to retaining the key features of the 2020 Bond Policy, including "a presumption against secured bonds for low-level misdemeanors, an individualized ability-to-pay analysis, a mechanism for judicial officials to make findings on the record of appropriate conditions of release, and the requirement that findings be made by clear and convincing evidence." (Id. (citing Doc. 99-2 ¶¶ 33-34, 37).) Judge Lambeth also states that he will "retain the oral and written notices and advisements, attached as Appendix A, Appendix B, and Appendix D" to the Order. (Doc. 112-1 ¶ 3.) As to the "written findings," the Judicial Defendants appear to take the position that not every condition of release needs to be reduced to writing to comport with the Constitution such that they do not need to maintain writings in all circumstances. (See Doc. 113 at 2.)

Guidance for evaluating whether adoption of a new policy will moot attacks on an old policy or else fall prey to the voluntary cessation exception was recently set out in Porter v. Clarke, 852 F.3d. There, three death row inmates alleged that a prison's

confinement policies violated the Eighth Amendment. After filing suit, the prison, through various administrators, "substantially changed the policies governing the conditions of confinement for inmates . . . addressing virtually all of the issues raised in Plaintiffs' complaint." Id. at 360. As here, the plaintiffs were "not challenging their conditions of confinement under the interim rules and regulations," but instead sought "an injunction that would require [the prison administrators] to essentially keep these improvements in place," as well as declaratory judgment stating the previous conditions violated the Eighth Amendment. Id. at 361-62. The district court concluded that the changes to the policy mooted the claims because the court found the challenged practices "'could not reasonably be expected to recur' in light of [the prison administrators'] 'policy and procedural changes as well as physical changes to the death row facilities.'" Id. at 362 (internal citations omitted). The district court made this finding even though the prison administrators declined to acknowledge explicitly that the previous conditions of confinement were unconstitutional or to offer explicit guarantees that they would not return to them. Id.

The Fourth Circuit reversed, holding that the prison administrators' voluntary cessation of the challenged practice had not mooted the action "because [the officials] failed to meet the Supreme Court's requirement of showing that 'it is absolutely clear

56

the allegedly wrongful behavior could not reasonably be expected to recur.'" Id. at 360 (citing Friends of the Earth, Inc., 528 U.S. at 190). In so holding, the Fourth Circuit found the Corrections Department had not met its "formidable burden" because it "(1) 'retains the authority and capacity' to return to the challenged policies, (2) refuses to 'promise not to resume the prior practice,' and (3) has suggested circumstances may require re-imposing the challenged policies." Id. at 365-66 (internal citations omitted).

Grutzmacher v. Howard County, 851 F.3d 332 (4th Cir. 2017), provides further guidance. There, Grutzmacher sued his employer, the Howard County Fire Department, alleging constitutional violations related to the department's social media policy and code of conduct. Id. at 340. The policy and code had been adopted, following independent review and input, after a volunteer firefighter posted disturbing images on Facebook. Id. at 337. Grutzmacher was terminated pursuant to the social media policy after he made racially-charged posts on social media, and he filed a § 1983 action against the department alleging violations of his First Amendment rights. Id. at 339-40. Thereafter, the department amended the policy and code. As to Grutzmacher's First Amendment claims, the district court granted summary judgment for defendants, finding no First Amendment retaliation. Id. at 340. The court also found that Grutzmacher's facial challenge was mooted

57

by the adoption of the new policies. Id.

The Fourth Circuit affirmed. Id. at 348-49. In doing so, it cited several factors as to why the facial challenge was moot and the voluntary cessation exception did not apply: (1) the adoption of the new social media policy and code of conduct; (2) the fire chief's affidavit stating that he fully intended to follow the new policies and "not . . . re-issue the original versions"; (3) declarations by defendants' counsel that the Fire Department would not re-enact the challenged policies; and (4) finding "from the record . . . 'no hint' that the Department has any intention of reinstituting the prior policies." Id. at 349 (internal citations omitted).

Under the framework established in Grutzmacher and Porter, the court finds that the Judicial Defendants have met their stringent burden of showing that the voluntary cessation exception does not apply. Taken together, the Porter factors weigh in the Judicial Defendants' favor. Porter, 852 F.3d at 365-66. Namely, the Judicial Defendants have made it plain that they not only do not defend the 1995 Policy, they more importantly have no intention of returning to it. (See Doc. 113 at 1-2 (citing Doc. 112-1 ¶ 2 (Judge Lambeth stating he will not reinstitute the 1995 pretrial release policy challenged by Plaintiffs in this lawsuit)).)

Although the first factor - authority or capacity to change the law - supports Plaintiffs' arguments against mootness because

58

the Judicial Defendants retain the statutory right to amend the bond policy at any time, it is unreasonable on this record to expect that. Rather, it is no more than a theoretical possibility, as there is no indication the Judicial Defendants would return to the 1995 Policy. Judge Lambeth initiated this process, which was begun by his predecessor, long before this litigation was filed, motivated by his interest in reforming the county's practices. He consulted with many important constituents, and he involved the University of North Carolina School of Government, which has long provided guidance on legal matters to the state judiciary. Before the filing of this action, he openly stated his desire to have a policy in place in early 2020. After developing the new policy, the Judicial Defendants even committed, voluntarily, to a consent injunction during the pendency of this litigation, providing the substantive relief from the 1995 Policy which Plaintiffs sought. And Judge Lambeth has provided an affidavit setting out his promise not to revert to the 1995 Policy, which he does not purport to defend. The 2020 Bond Policy not only complies with the consent injunction, it provides protections not required by it, such as the notices in Appendix A. The Judicial Defendants have therefore evinced no intent to exercise their statutory authority, minimizing the impact of this factor overall.

As to the second factor, the Judicial Defendants, who are state court judicial officers, have promised not to return to the

59

procedures pursuant to the 1995 Policy. Plaintiffs' contentions
why this court should not credit their assurances are unpersuasive.
For example, Plaintiffs argue that Judge Lambeth is likely to
return to the former practices because of "public
criticism . . . from local officials," including "unfounded
criticism" by Alamance County District Attorney Sean Boone to re-
enact prior policies. (Doc. 108 at 7-8.) They are also concerned
that "Judge Lambeth repeatedly expressed displeasure with how the
current administrative orders were enacted" and "his view [that]
the negotiations with Plaintiffs' counsel did not allow for a
collaborative process." (Id. at 7 (citing Doc. 108-4 at
5)(internal quotations omitted).)

    But Plaintiffs mischaracterize Judge Lambeth's statements.
As the Judicial Defendants argue, Judge Lambeth's point was simply
that "the lawsuit frustrated collaboration with other stakeholders
with whom he had been working to amend the 1995 policy." (Doc.
113 at 3 (citing Doc. 108-4 at 5).) He was merely expressing his
preference for a collaborative solution. This is a manifestly
reasonable desire, not one that portends eviscerating the
substantial work that has been ongoing since 2018. The 2020 Bond
Policy was implemented in July 2020, over three years ago, and
remains in effect. (See Doc. 99-2 ¶ 36.) As to concerns from
other county stakeholders, the record contains no serious
criticism. Unlike Judge Lambeth, District Attorney Boone, an

elected advocate, has no statutory role whatsoever in the pretrial release policy development. N.C. Gen. Stat. § 15A-535. Moreover, the county has already ensured that those responsible for implementing the 2020 Bond Policy have undergone training to adhere to its commands.[13] Speculation that others in the future may wish to change the policy or disagree with its contents is not grounds to undermine the sworn statements of an impartial state judicial official who has taken an oath to uphold North Carolina and federal constitutional law.

Judge Lambeth states that "[s]o long as [he] remain[s] the Senior Resident Superior Court Judge in Alamance County and ha[s] statutory authority over the county's pretrial release policies and procedures, [he] will not reinstitute the 1995 pretrial release policy challenged by Plaintiffs." (Doc. 112-1 ¶ 2; see also Doc. 112 at 3 (noting that "Lambeth has provided sworn testimony that he will retain all its key features moving forward" (citing Doc. 99-2 ¶ 37)).) Further, he has promised that he will retain the oral and written notices and various appendices attached to the First Appearance Order. (Doc. 112-1 ¶ 3.) These promises are comparable to those found persuasive by the Fourth Circuit in Grutzmacher, 851 F.3d at 349, and absent in Porter.

---

[13] Plaintiffs' argument is also undercut by the fact that, while there have been bail reforms in other counties - such as District 30B, which was a precursor to the 2020 Bond Policy - there is no record that any has retrenched. This includes other metropolitan areas of the state, such as Mecklenburg County, cited by Plaintiffs at oral argument.

Moreover, it is important that the Judicial Defendants do not defend the 1995 Policy.  Indeed, they instigated its change before the threat of litigation.  (Doc. 112 at 2 (citing Doc. 99-1 ¶¶ 19-38; Doc. 99-2 ¶¶ 5-28).)  When Judge Lambeth became the county's Senior Resident Superior Court Judge in 2018, he took up the reins from his predecessor, engaged all relevant stakeholders, and met with a local advocacy group – Alamance Steps Up - as he expressed his desire to have the group help change the 1995 Policy.  (Doc. 99-2 ¶¶ 10, 11, 14-16).[14]  He also studied similar reforms in a neighboring judicial district conducted as part of a pilot project overseen by the UNC School of Government.  (Id. ¶ 20.)  These discussions reiterated the stakeholders' "mutual interest in revising the 1995 Policy and the importance of [their] District Court Judges reviewing misdemeanor pretrial conditions sooner for in-custody defendants who did not bond out quickly."  (Id. ¶ 21.)  This is consistent with the more recent national trend to modernize bail policies and led to the chief district judge's adoption of a misdemeanor first appearance docket to permit non-domestic violence misdemeanor defendants an early pretrial release hearing, often within seventy-two hours of arrest.  (Id. ¶ 22.)  Not until November 12, 2019, some three weeks after Judge Lambeth called

---

[14] At oral argument, the Judicial Defendants represented that the desire to amend the 1995 Policy was not in response to a threat of a lawsuit but instead from Judge Lambeth's personal interest in "pretrial reform." (Doc. 152 at 89-90.)

together the October bond policy committee meeting to appoint a group to draft a revised policy, did Plaintiffs file this lawsuit challenging the 1995 Policy. (Doc. 1.)

This history clearly indicates that the Judicial Defendants intended to amend the 1995 Policy of their own accord, through considerable efforts including numerous stakeholders, before Plaintiffs instituted this litigation. Once the 2020 Bond Policy was adopted, the Judicial Defendants consented to the preliminary injunction during the pendency of this litigation "to avoid unnecessary and costly litigation." (Doc. 56 ¶ 2.) This is not a case where a defendant is brought reluctantly to account, defends its old practices, and refuses to promise not to return to them. The Judicial Defendants not only reject any intent to revert to the 1995 Policy, they have sworn they will not do so. To impose a permanent injunction on these Defendants, after their good faith efforts reforming the practices of Alamance County, would give life to the cynical admonition that no good deed goes unpunished.

Finally, the Judicial Defendants have not suggested there are any circumstances that might require it to revert to the 1995 Policy. To the contrary, they have abandoned it and, by all appearances, have been operating successfully under the 2020 Bond Policy for over three years. Moreover, Plaintiffs for their part do not point to any outside circumstances, apart from vague political pressures, that indicate any possible need to restore

63

the old policy.  (Doc. 108 at 6-8.)  The court therefore harbors

no skepticism as to the permanence of the 2020 Bond Policy.[15]

The Judicial Defendants are therefore not subject to the

voluntary cessation exception.  Consequently, Plaintiffs' motion

for summary judgment as to Counts I, II, and III will be denied

without prejudice, and the Judicial Defendants' cross-motion will

be granted to the extent that these claims should be dismissed

without prejudice as moot.

### 2.    Sixth Amendment Right to Counsel Claim

This leaves for consideration Plaintiffs' claim in Count IV

---

[15] The only possible contingent circumstance Plaintiffs claim applies only to Count III - the provision of counsel under the Fourteenth Amendment.  Plaintiffs point to the fact that Judge Lambeth cannot commit to providing contract counsel at first appearances.  (Doc. 152 at 98-99.)  This is because the contract attorney position is funded through North Carolina's Indigent Defense Services ("IDS"), an entity created by the North Carolina General Assembly.  (Id. at 29-30.)  IDS provided the county with $72,000 in December 2021 for contract counsel for first appearances, some portion of which remained at the time of oral argument on these motions.  (Id. at 16-17.)  Plaintiffs argue that the legislature is not obligated to provide such funds unless they are court-ordered, but it is apparent that the legislature did so in this case in the absence of an order, and there is no indication it would not similarly fund the position in the future if these funds are exhausted. Separately, the county is seeking the appointment of a public defender's office, which exists in other metropolitan areas of the state, and "all of the stakeholders in Alamance County" support the effort, including the legislative delegation in the county, as well as IDS.  (Id. at 101 (noting that the county is "one of two or three counties that are in line to get a public defender's office if the legislature decides to fund that").)  While these potential contingencies may present issues as to any Sixth Amendment claim, they do not affect the process laid out in the 2020 Bond Policy itself, which calls for such counsel.  Indeed, Judge Tilley earlier declined to find a violation of the consent injunction because the parties' agreed-to policy required counsel.  (See Doc. 83.)  Therefore, this circumstance does not affect the balance of voluntary cessation factors on Count III.

of the complaint, which challenges Defendants' failure to provide counsel at "each post-attachment critical stage of the criminal process" in violation of the Sixth Amendment right to counsel at bail determinations. (Doc. 1 ¶ 112.) Plaintiffs contend that Defendants violate the Sixth Amendment "by conducting critical bail determinations" at the initial and first appearances "without providing counsel." (Id. ¶ 114) The complaint charges that failure to provide counsel in pretrial detention "prejudices Plaintiffs' immediate liberty interests and the ultimate outcomes of their cases." (Id. ¶ 113.)

The Judicial Defendants move for summary judgment as to this count, conceding this claim is not moot.[16] They argue that they are immune from suit on the Sixth Amendment issue, and even if they are not, they claim that there is no right to counsel at the initial and first appearance stages as conducted. (Doc. 100 at 18-25.) As the court has already found, and as Plaintiffs conceded at the hearing on these motions, Plaintiffs' motion only challenges the provision of counsel at the first appearance.

Neither party has addressed whether Count IV presents a facial

---

[16] Both parties assume in their briefing that the Sixth Amendment issue is not moot, and the Judicial Defendants confirmed as much at oral argument. (Doc. 152 at 98-99.) This appears correct. The 2020 Bond Policy does not provide for counsel at the initial appearance, leaving it in the same position as the 1995 Bond Policy, at least as to the right to counsel issue. (See Docs. 72-1 & 72-2.) And while the 2020 Bond Policy does provide for contract counsel for indigent defendants at the first appearance, that provision is subject to possible defunding.

65

or as-applied challenge to Alamance County's procedures. The distinction "is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 331 (2010). But it is "instructive and necessary, for it goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." Id. (citing United States v. Treasury Emps., 513 U.S. 454, 477–78 (1995)). Based on Plaintiffs' counsel's statement at the hearing that "[o]ur challenge in this case is to orders of detention" (Doc. 152 at 44), it would appear that Plaintiffs are lodging an as-applied challenge, where they must only prove that the statute was unconstitutional as applied to the class they represent. See City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 758–59 (1988). To succeed in a facial constitutional challenge, in contrast, a movant "must establish that no set of circumstances exists under which the Act would be valid." United States v. Hosford, 843 F.3d 161, 165 (4th Cir. 2016) (citing United States v. Salerno, 481 U.S. 739, 745 (1987)). A facial challenge is "perhaps 'the most difficult challenge to mount successfully.'" Id.

### a. Judicial Defendants' Immunity

At the outset, the Judicial Defendants contend they are immune from suit under the Eleventh Amendment as to claims related to

furnishing counsel at the initial and first appearances because they lack any "special relation" between them and the challenged practice. (Doc. 100 at 25-28.) They contend they have no power to provide counsel, such determination being within the authority of the legislature. (Id.) As a result, they argue, they cannot be enjoined under Ex Parte Young. (Id.)

Plaintiffs respond that the Judicial Defendants waived any such immunity by consenting to this court's jurisdiction. (Doc. 108 at 22-23.) Moreover, they argue, the Judicial Defendants are directly responsible for implementing the challenged practices and thus have the authority to grant relief. (Id. at 23-24.) The Judicial Defendants reply that the court's consent injunction did not constitute an express waiver of immunity as to them, and certainly not as to any claim as to the provision of counsel. (Doc. 113 at 9-10.)

Plaintiffs are correct that the Judicial Defendants unmistakably waived any Eleventh Amendment immunity by entering into the consent injunction in this case. Sovereign immunity may be waived by a "clear declaration" that a defendant intended to submit itself to the court's jurisdiction, which is a "stringent [test]." Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675-76 (1999). In this case, the statements by the Judicial Defendants urging the court to accept its agreement to be bound by the consent injunction, and their

67

agreement to the terms of the injunction, pass this stringent test. See Bragg v. W. Va. Coal Ass'n, 248 F.3d 275, 300 (4th Cir. 2001) (noting that sovereign immunity may be waived by the state and it is possible that a consent decree may constitute such a waiver). As is apparent on the face of Plaintiffs' and Defendants' joint motion to approve the consent order, Defendants "consented to the entry of this preliminary injunction without an adjudication of the merits on any issue of fact or law," preserving only their "privilege under the Fifth Amendment" and "without admitting or denying the allegations of the Complaint." (Doc. 55 at 2.) The joint motion ends with "the parties['] request that the Court exercise jurisdiction and enter the proposed Consent Preliminary Injunction." (Id. at 3.) And the agreement to be bound by the consent order was voluntarily entered into by Plaintiffs and all Defendants, who petitioned the court jointly for its entry. (See id. at 1)

On May 8, 2020, the court did as all parties requested and entered the consent preliminary injunction. The order noted that the parties "have agreed to the entry of this Consent Order of Preliminary Injunction." (Doc. 56 ¶ 2.) Under the "Findings" section of the order, the court stated: "THE PARTIES AGREE AND THE COURT FINDS THAT: 4. This Court has jurisdiction over the subject matter of this action and the Defendant[s] hereto pursuant to 28 U.S.C. §§ 1331 and 1343." (Id. ¶ 4.) There is no doubt from this

68

language that the Judicial Defendants intentionally subjected themselves to the jurisdiction of this court. The Judicial Defendants' claim of immunity is therefore waived,[17] allowing the court to evaluate the merits of the Sixth Amendment claims.

### b. Constitutional Contours of Sixth Amendment Protections

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. amend. XI. The Amendment's counsel guarantee attaches once a prosecution is commenced. McNeil v. Wisconsin, 501 U.S. 171, 175 (1991). This occurs at the "initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Rothgery v. Gillespie County, 554 U.S. 191, 198 (2008) (citations omitted). "'The rule is not 'mere formalism,' but a recognition of the point at which 'the government has committed itself to prosecute,' 'the adverse positions of

_____

[17] Notably, even if they had not waived any immunity defense, the Judicial Defendants are still subject to being enjoined for violations of Plaintiffs' constitutional rights. The Eleventh Amendment to the U.S. Constitution bars suits against states in federal court. Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001). This immunity does not bar a suit for prospective injunctive relief against state officials who have a "special relation" to the enforcement of the challenged state law that allegedly violates federal law. Ex Parte Young, 209 U.S. 123, 157, 159-60 (1908); Doyle v. Hogan, 1 F.4th 249, 254 (4th Cir. 2021). The Judicial Defendants maintain such a "special relation" to enforcement by virtue of their statutory authority to design local court procedures that must comply with the Constitution. Therefore, Eleventh Amendment immunity is not available to them here.

69

government and defendant have solidified,' and the accused 'finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.'" Id. (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972)).  Once the right attaches, an accused "is entitled to the presence of appointed counsel during any 'critical stage' of the postattachment proceedings."  Id. at 212.

The Judicial Defendants agreed at the hearing on these motions that by the initial appearance, the Sixth Amendment right to counsel has attached.  (Doc. 152 at 67.)  The question is whether the initial and first appearances in Alamance County – which include some form of bail determinations - constitute critical stages.  Rothgery did not answer this question, as it only decided when the Sixth Amendment right attached.  554 U.S. at 213 ("We merely reaffirm what we have held before and what an overwhelming majority of American jurisdictions understand in practice: a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel.").

A critical stage is "a step of a criminal proceeding . . . that h[olds] significant consequences for the accused."  Bell v. Cone, 535 U.S. 685, 696 (2002) (citations omitted).  Critical stages are "proceedings between an individual

70

and agents of the State . . . that amount to trial-like confrontations, at which counsel would help the accused in coping with legal problems or meeting his adversary." Rothgery, 554 U.S. at 212 n.16 (internal quotation marks and citations omitted). In determining whether a stage is critical, a court must ask "whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." United States v. Wade, 388 U.S. 218, 227 (1967). The Court has acknowledged that, in the United States, criminal proceedings involve "pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality." Id. at 224. Thus, it noted in Wade, "the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." Id. at 226 (citations omitted).

Several forms of proceedings have now been found to constitute critical stages: preliminary hearings (see Coleman v. Alabama, 399 U.S. 1, 9-10 (1970)); arraignments (see Hamilton v. Alabama, 368 U.S. 52, 54 (1961)); plea negotiations (see Missouri v. Frye, 566 U.S. 134, 141 (2012)); post-indictment identification lineups (see Wade, 388 U.S. at 237); guilty pleas (see Argersinger v. Hamlin, 407 U.S. 25, 34 (1972)); and post-indictment interrogations (see Massiah v. United States, 377 U.S. 201, 205-06 (1964)). As the

71

Court has noted that "the core purpose of the counsel guarantee was to assure 'Assistance' at trial," United States v. Ash, 413 U.S. 300, 309 (1973); see also United States v. Gouveia, 467 U.S. 180, 190 (1984) (noting that "the right to counsel exists to protect the accused during trial-type confrontations with the prosecutor"), it has conversely rejected the argument that the Sixth Amendment entitles a criminal defendant to the assistance of appointed counsel at a probable cause hearing, even though it is post-attachment, because it "'is addressed only to pretrial custody' and has an insubstantial effect on the defendant's trial rights." Rothgery, 554 U.S. at 216 (Alito, J., concurring) (quoting Gerstein v. Pugh, 420 U.S. 103, 122-23 (1975)). Relevant here, the Court has not addressed whether a bail hearing constitutes a critical stage. The closest it may have come is its statement in Coleman, where, in finding Alabama's preliminary hearing to be a critical stage, it observed that "counsel can also be influential at the preliminary hearing in making effective arguments for the accused on such matters as . . . bail." 399 U.S. at 9.

From these cases, at least three points can be gleaned to guide the analysis whether a post-attachment stage is critical such that the Sixth Amendment requires counsel: (1) whether the accused "stand[s] alone against the state" (Id. at 7 (citing Wade, 388 U.S. at 226)); (2) whether the proceeding is confrontational

72

in nature (see Wade, 388 U.S. at 227); and (3) whether the proceeding creates "potential substantial prejudice to defendant's rights" to a fair trial such that counsel would help avoid that prejudice (Coleman, 399 U.S. at 7 (collecting cases)).

Finally, the critical stage question does not turn on either the name of the proceeding or a state's determination of the critical stage analysis. For example, in Coleman, the Court outlined several reasons why the preliminary hearing pursuant to Alabama law was a critical stage, even though Alabama courts determined it was not. See 399 U.S. at 7-11 (overruling Coleman v. State, 211 So. 2d 917 (Ala. App. 1968)).

With this legal framework in mind, the court turns to the claim in Count IV involving both pre-trial proceedings.

### c.   Initial Appearances

Plaintiffs have not moved for summary judgment on Count IV as to the initial appearance, though the Judicial Defendants have. Therefore, the court must determine whether the Judicial Defendants have met their burden to show the absence of a genuine dispute of material fact and thus entitlement to judgment as a matter of law. The Judicial Defendants' motion is premised on the contention that, under the 2020 Bond Policy, initial appearances are not critical stages as a matter of law.

At the outset, the Judicial Defendants note that "no authority" construes a North Carolina initial appearance as a

critical stage. (Doc. 100 at 21.) This is true; North Carolina General Statute § 15A-511 is silent on the issue. The Judicial Defendants point to the fact that the North Carolina State Supreme Court in State v. Detter, 260 S.E.2d 567, 582 (N.C. 1979)[18] held, and North Carolina General Statute § 15A-601(a) expressly affirms, that first appearances are not critical stages, and by extension, initial appearances cannot be construed as such either. (Doc. 100 at 21.) Moreover, the Judicial Defendants cite the absence of participation by a district attorney, cross-examination of witnesses, or any opportunity - let alone requirement - to enter a plea. (Id. at 22-23 (citing Doc. 99-3 ¶ 30; N.C. Gen. Stat. § 15A-511).) "Aside from the conditions of release set by the magistrate and, specifically, the potential for detention under a secured bond," they conclude, "nothing determined at the initial appearance has any potential legal consequence for the arrestee moving forward." (Id. at 23.)

Plaintiffs respond that initial appearances in Alamance

---

[18] The North Carolina Supreme Court stated: "It is apparent from the relevant case law that the initial appearance before a district court judge is not a critical stage because it is not an adversarial judicial proceeding where rights and defenses are preserved or lost or a plea taken [sic]." 260 S.E.2d at 582. At the time of Detter, the court noted, "[t]the relevant functions of the district court judge at the initial appearance are to determine the sufficiency of the charges; to inform the defendant of the charges against him and to furnish him a copy of same; to assure defendant's right to counsel for the next stages of the proceedings; to obtain either a demand for or waiver of the probable cause hearing; and to determine or review the defendant's eligibility for release on bail." Id. (internal citations omitted).

74

County are critical stages because they "[r]isk [s]ubstantial [p]rejudice by [p]rompting [i]nculpatory [s]tatements" that can lead to the "irrevocabl[e] waive[r] [of] defenses and admit guilt." (Doc. 108 at 11-13.) At an initial appearance, Plaintiffs argue, arrestees are "prompt[ed] . . . to argue for their release," disclose "facts," "and say numerous things that may or may not be true" after they observe an arresting officer provide a magistrate sworn testimony. (Id. at 12.) Further, Plaintiffs contend, arrestees try to "explain the incident that led to their arrest," which can, in the view of Plaintiffs, imply guilt, waive defenses, and provide impeachment material. (Id. at 12-13.) Initial appearances also "[r]isk [s]ubstantial [p]rejudice by [o]rdering [c]oercive [p]retrial [d]etention," Plaintiffs contend, because once "[d]etention [is] ordered at initial appearance[s]" arrestees are "prompt[ed] . . . to plead guilty at first appearance[s] in exchange for speedier release." (Id. at 14-15.)

The court starts with Plaintiffs' contention that substantial prejudice may arise from the dynamics of the initial appearance that incentivize criminal defendants to speak out on their own behalf. Plaintiffs point to the fact that the 2020 Bond Policy contemplates a potential examination of the defendant by the magistrate under oath. (Doc. 99-3 at 19 (noting that the magistrate is to "[s]wear defendant in after giving oral notice").) The First Appearance Order contains an "oral notice" the magistrate

75

is to read to an arrestee at the initial appearance before any colloquy between the magistrate and an arrestee on these subjects. (Doc. 72-2 at 6.)  Plaintiffs argue that this could create "potential substantial prejudice to [an arrestee's] rights," depending on the particular confrontation, which the presence of counsel might help to avoid.  Wade, 388 U.S. at 227 (referencing the "principle of Powell v. Alabama and succeeding cases").  By asking arrestees questions and recording their responses that could later be used against them, Plaintiffs point out, it is possible that an arrestee's rights at trial could be substantially prejudiced.  At oral argument on these motions, the Judicial Defendants conceded that, although they are unaware of circumstances in which a magistrate has written down "something substantive," it was "theoretically" possible that arrestees' statements at the initial appearance could later be used against them.  (Doc. 152 at 9-10.)  Plaintiffs argue that such encounters could run afoul of Wade's command that "the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." 388 U.S. at 226.

The 2020 Bond Policy does contemplate that arrestees be advised of their right to remain silent and that anything they say may be used against them in their criminal proceedings,

76

acknowledging some risk of prejudice. An example oral notice for use by the magistrates states:

> You have the right to provide me with information or evidence about those [financial bond] decisions, but you also have the right to remain silent. Anything you say might be used later in evidence against you, so you should not discuss the events that led to your arrest.

(Doc. 72-2 at 6.) But it does not follow that merely advising a defendant of his right to remain silent prevents a proceeding from becoming a critical stage where the defendant is then to be examined under oath.[19] Nor is it true that permitting an arrestee to waive that right and speak before the court necessarily converts a proceeding into a critical stage. See Detter, 260 S.E.2d at 583 (citing N.C. Gen. Stat. 15A-602) (noting that "[t]he constitutional right that is applicable at this point that we must insure is afforded the defendant is the right to remain silent and the judge at the initial appearance has the duty to inform defendant of this right").

What the court can say is that to the extent Plaintiffs' challenge rests on the county's determination of probable cause at the initial appearance, based on testimony to the magistrate from

---

[19] The Judicial Defendants have not argued that the proposed Miranda-type warning resolves any Sixth Amendment issue as a matter of law even if the initial appearance were deemed a critical stage. So, the court does not consider it. Plaintiffs did concede at oral argument, however, that there is "no problem" with a defendant waiving a right to counsel if the magistrate advises the defendant of his intention to order release with conditions "because there's no detention order issued." (Doc. 152 at 44.) That is because, counsel stated, "[o]ur challenge in this case is to orders of detention." (Id.)

77

a law enforcement officer, it fails by itself to render the proceeding a critical stage. Gerstein, 420 U.S. at 121-24 ("[T]he probable cause determination is not a 'critical stage' . . . ."). No confrontation by the state or cross-examination of witnesses is involved, and thus a defendant does not risk substantial harm to his defenses. Id. at 123. It is a non-adversarial proceeding limited in function to the Fourth Amendment concern of detention. Id. Proceeding without counsel thus would not impair the defendant's defense on the merits. To the extent Plaintiffs disagree because of an occasional defendant's desire to "blurt out" information in response to the law enforcement officer's statements or to affect the bail decision, the Fifth Amendment warning that the 2020 Bond Policy provides, as required by N.C. Gen. Stat. § 15A-602, addresses this.

Plaintiffs' argument founded on delay based on a defendant's exercise of his right to silence on the bail issue is similarly unpersuasive. At the hearing on these motions, Plaintiffs contended that, without counsel at initial appearances, "there's still the fundamental problem that arrestees are being forced to make an uncounseled strategic decision to waive one of their constitutional rights, to waive the right to silence and be heard on bail or to remain silent and give up their right to a prompt hearing on pretrial release." (Doc. 152 at 42-43.) Plaintiffs argue there is delay and insist that "a bail determination must be

78

made within 48 hours." (Id. at 47.) However, Plaintiffs have provided no authority requiring such a timeframe. And when pressed about hypotheticals under the 2020 Bond Policy, Plaintiffs admitted that the question before the court is "what potential substantial prejudice could inure from the [arrestee] having [a] condition of release imposed unnecessarily," but that "without having . . . more evidence in the record about how exactly those conditions function and affect the case down the line, it would be difficult for us to entertain [certain hypotheticals]." (Id. at 46-47.)

At this point, an arrestee's invocation of his right to remain silent at an initial appearance to await the appointment of counsel has not been shown to subject him to an unconstitutional delay in a bail hearing, as Plaintiffs contend. While an arrestee invoking those rights at an initial appearance may not receive a bail determination as quickly as those who waive them, this does not mean that a constitutional violation has occurred. Here, the 2020 Bond Policy itself mandates a first appearance, at which counsel (at least currently) will be provided, within 48 hours of arrest, or if that falls on a weekend, the next business day, at which a judge will make a bail determination. (Doc. 72-2 at 2.) This modest delay has not been shown by Plaintiffs to be unconstitutional. Cf. Salerno, 481 U.S. (finding constitutional the Bail Reform Act of 1984, 18 U.S.C. § 3142(f)2), which permits

79

a bail determination to be delayed on the government's motion up to three days after the first appearance (not including any intermediate Saturday, Sunday, or legal holiday)).

Importantly, Plaintiffs seem to agree with this logic. At oral argument, the court and Plaintiffs' counsel had the following colloquy:

> THE COURT: So even if the magistrate were to decide -- in other words, if you take this policy the county has, my impression is from the paperwork the county is and the judges are saying, We understand bail needs to be determined based on a host of factors and not just financial basis, and so we want to honor that. And in honoring that, your argument is, well, now you created a situation where a lawyer should be presented in the initial appearance. So my question is, just hypothetically, if the county were to say, We're going to make bail on a different basis, but you'll still get this full constitutionally required bail hearing within 24 to 48 hours, then the county gets to release people earlier based on criminal history, or whatever they look at, not all of the proper constitutional factors, if you will, but that hearing does occur within a constitutional period of time for the balance of people who aren't released, any constitutional objection to that or is that at least not unconstitutional?
>
> MS. HUBBARD: Your Honor, I do not think we have any constitutional objection to that. I think -- maybe as a policy choice, I think it might keep people in jail who do not need to be there if that were the choice that Alamance County were to make, but, no, I do not have a constitutional objection to that.

(Doc. 152 at 52-53.)

It is notable, moreover, that the initial appearance protocol does, at a minimum, make criminal defendants aware of their constitutional right to counsel. The warning by the magistrates

80

expressly states, "You will be able to address the charges against you with the court soon, and if you want a lawyer to assist you in court and cannot afford one, the court will provide one for you." (Doc. 72-2 at 6.) The Policy also expressly provides that defendants who have already retained their own counsel must "be allowed to communicate fully and confidentially with [their] attorney[s] before and during" any proceeding at which pretrial release conditions are considered. (Doc. 72-1 at 5.) These protections further reduce the claimed urgency a defendant may feel to argue his case uncounseled.

That all being said, the Judicial Defendants have not carried their burden to show that they are entitled to summary judgment as to the initial appearance. Detter is of course not controlling; apart from being a state court decision, it was decided in 1979 when bail determinations at initial appearances appear not to have involved any testimony from or examination of a defendant, as is contemplated by the 2020 Bond Policy. See Detter, 260 S.E.2d at 582 (citing N.C. Gen. Stat. § 15A-605(3) (addressing first appearances and providing only that the judge must "[d]etermine or review the defendant's eligibility for release   for release on bail."). The 2020 Bond Policy now provides the type of bail reform Plaintiffs sought, such that Defendants receive prompt consideration of a host of factors related to the detention decision starting at the initial appearance, but it also now falls

81

beyond the vision of Detter.

Moreover, the question is not whether the statutory requirements for an initial appearance render it a critical stage, but whether Alamance County's initial appearance procedures do so. The 2020 Bond Policy provides only that the "court shall conduct an inquiry into the defendant's ability to pay the full amount of the monetary bond," and that the inquiry "shall allow the prosecutor, defense counsel, and the defendant the opportunity to provide the court with information pertinent to the defendant's ability to pay monetary bail, as appropriate to the context of setting at which conditions of release are being determined." (Doc. 72-1 at 23.) The policy language does not provide any particulars, such as how the defendant's information is collected.

The Judicial Defendants have tried to shed some light on the specifics by providing a questionnaire for defendants that "some" magistrates use, as well as a template of questions for magistrates to ask the defendants who waive their right to remain silent, which consider a panoply of factors for non-cash bail, including financial situation, employment status, prior record, family ties, length of residence in the community, etc., related to risk of flight and dangerousness. (Doc. 99-3 at 10, 19-21.) The Judicial Defendants' statement that "some" magistrates use these procedures suggests that not all magistrates do so, however, and there is no record developed as to the current practice (again, perhaps because

82

no plaintiff was processed under the current policy).

In sum, the record is unsettled as to how the 2020 Bond Policy is implemented at initial appearances, including, importantly, the nature and scope of any examination of a defendant that occurs. As such, while the Judicial Defendants' argument is that this proceeding is not a critical stage, they have not shown that a magistrate's examination of a defendant under the 2020 Bond Policy, as applied, cannot render it one. As Plaintiffs note, determining whether a proceeding is a critical stage is "fact specific," and the court must "inquire into . . . how what happens at the bail hearing can affect later stages of the case," if at all. (Doc. 152 at 73.) The court is therefore constrained to deny the Judicial Defendants' motion for summary judgment on Count IV as it relates to initial appearances.

d.  **First Appearances**

Plaintiffs and Judicial Defendants each move for and brief summary judgment on Plaintiffs' Sixth Amendment right to counsel claim at first appearances. The crux of Plaintiffs' argument is that first appearances in Alamance County "inherently risk[] substantial prejudice to an arrestee, and counsel can help avoid that prejudice," thus rendering it a critical stage. (See Doc. 107 at 20.) As with the initial appearance, Plaintiffs offer numerous reasons why substantial prejudice may arise at the first appearance: "[a]rrestees must 'make critical decisions without

83

counsel's advice' about waiving either the right to silence or right to be heard" (id. at 21) (citations omitted); arrestees "inadvertently" waive defenses because "[a]nnouncing the charges naturally prompts arrestees to explain . . . [their] version of events" (id. at 22); the outcome of bail determinations at first appearances "effectively dictates whether an offense will be punished with incarceration," and "pretrial detention affects Alamance County arrestees' decisions to plead guilty" (id. at 24-25); and pretrial detention restricts arrestees ability to participate in their own defense (id. at 28).[20]

The Judicial Defendants' motion is made on the same grounds

---

[20] Plaintiffs rely on what they contend are expert reports from three criminal defense attorneys as to the potential for prejudice at first appearances without counsel, the admissibility of which the Judicial Defendants challenge under Federal Rule of Evidence 702. (See Doc. 107 at 19-32; Doc. 112 at 10-21.) In substance, each proposed expert offers only generalized opinions that first appearances are inherently coercive, that spending even a minimal amount of time in custody encourages negative consequences for a defendant (such as making inculpatory statements despite warnings not to do so), and that providing counsel would mitigate such risks. No doubt the last point is true, but that is not the test. Importantly, none of the proposed experts bases his or her opinion on the 2020 Bond Policy. Indeed, two of them have only ever practiced in Mecklenburg County, North Carolina, not Alamance. (Docs. 107-13 at 1-2 & 107-24 at 1-2.) Therefore, even assuming, without deciding, that the reports are admissible, their generalized conclusions do not answer the question before the court – namely, whether first appearances as they are being conducted in Alamance County constitute a critical stage - as to warrant a grant of summary judgment in Plaintiffs' favor. See Fed. R. Evid. 702(b) ("the testimony is based on sufficient facts or data") and (d) ("the expert has reliably applied the principles and methods to the facts of the case"); Trana Discovery, Inc. v. S. Res. Inst., 915 F.3d 249,255 (4th Cir. 2019)(holding that experts must "account[] for evidence in the record" and "offer an opinion that fits the case at hand, not some other, hypothetical case").

as their motion as to the initial appearances; namely, contending that the first appearance, including the bail determination, is not a critical stage.  What differs at this stage is that in addition to being advised of their right to remain silent, defendants are advised of their right to have an attorney present and, if they cannot afford one, that a contract lawyer will be provided for them.  (Doc. 100 at 21-23; Doc. 99-2 at 60.)[21]

The same considerations that apply to the court's discussion of initial appearances arise here.  Plaintiffs' principal problem is that the record they developed largely relates to the practices under the 1995 Policy and not the 2020 Bond Policy.  Plaintiffs do not articulate a facial challenge the 2020 Bond Policy, and they lack a record on which to argue how it is implemented in an unconstitutional fashion.  Moreover, even if Plaintiffs are correct that the first appearance constitutes a critical stage, all defendants are being informed of their right to retain counsel under the 2020 Bond Policy, which is waivable, and of the fact that counsel will be appointed if they cannot afford one.  (Doc. 72-2 at 7.)  Under current practice, contract counsel are being appointed for this purpose.  If contract counsel are not available,

---

[21] Perhaps consistent with the Judicial Defendants' contention that the first appearance is not a critical stage, Appendix B to the First Appearance Order advises of a "chance to talk with a first appearance attorney appointed specifically to assist you at that appearance" "to protect your rights at the first appearance," and "the right to hire an attorney, if you can afford it."  (Doc. 72-2 at 7.)

the record is not clear that the bail determination at first appearances (which on occasions is consolidated with an initial appearance pursuant to state statute) is conducted in a fashion that violates the Constitution.[22]

Judicial Defendants' motion suffers from similar problems. As with the initial appearance, whether the first appearance constitutes a critical stage turns on the practices under the 2020 Bond Policy. But here, too, the record is undeveloped as to how the bail inquiry of a defendant is made. More to the point, the Judicial Defendants have not demonstrated the absence of a genuine issue of material fact whether a defendant who is examined under oath by a district court judge, with a prosecutor present in court, cannot incriminate himself with answers that can be used against him later at trial (something they concede is "theoretically" possible (Doc. 152 at 9-10), thus compromising defenses. If a defendant can incriminate himself, the Judicial Defendants have not shown how that does not convert the proceeding into a critical stage. Indeed, at oral argument the Judicial Defendants conceded that a similar-looking motion to reduce bail filed after a first appearance is a critical stage.[23] (Doc. 152 at 70.) But when

_____

[22] This is keeping in mind that a defendant has the right thereafter to demand a contested bail hearing. N.C. Gen. Stat. § 15A-538.

[23] Indeed, by statute, a bail reduction hearing is a critical stage. N.C. Gen. Stat. § 7A-451(b).

Case 1:19-cv-01126-TDS-LPA   Document 155   Filed 09/21/23   Page 86 of 94

pressed, the Judicial Defendants could not say why a bail determination made with an examination of the defendant under oath at a first appearance would not also be a critical stage. (Id.)

For these reasons, Plaintiffs' and Judicial Defendants' cross-motion for summary judgment as to the Sixth Amendment claim at first appearances contained in Count IV are DENIED.

### C. Claims Against Sheriff Johnson

Sheriff Johnson and Plaintiffs both move for summary judgment as to all claims.[24] (Docs. 104, 106.) For the same reasons the court finds Plaintiffs' claims against enforcement of the 1995 Policy moot as to the Judicial Defendants, the court necessarily finds that Plaintiffs' claims in Counts I, II, and III against Sheriff Johnson, who is being sued for enforcing the 1995 Policy, are moot as well. Similarly, as to Count IV, for the reasons noted, the parties' cross-motions for summary judgment as to alleged Sixth Amendment violations are denied. Johnson raises separate arguments in his briefing, however, that he enjoys sovereign immunity against suit and otherwise should not be included in this dispute. The court therefore considers those contentions as to Plaintiffs' claims against him in Count IV.

As noted earlier, the Eleventh Amendment provides a form of sovereign immunity from suit in federal court for a state and state

_____

[24] As noted, Plaintiffs did not move for summary judgment as to the right to counsel at the initial appearance in Count IV.

employees acting within their official capacity.  Harter v. Vernon, 101 F.3d 334, 337 (4th Cir. 1996).  Sovereign immunity under the Eleventh Amendment specifically acts as a "jurisdictional bar" and a "constitutional limitation on the federal judicial power established in Art. III."  Hutto v. S.C. Ret. Sys., 773 F.3d 536, 542 (4th Cir. 2014) (citations omitted).  Various exceptions apply, however.  A state can waive its immunity, as discussed above with the Judicial Defendants.[25]  Id. at 543.  The amendment also "affords no protection to local government entities and employees."  Harter, 101 F.3d at 337.  Pursuant to Ex parte Young, moreover, a federal court may "issue prospective, injunctive relief against a state officer to prevent ongoing violations of federal law."  McBurney v. Cuccinelli, 616 F.3d 393, 399 (4th Cir. 2010).  "The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent."  Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 330 (4th Cir. 2001).

Here, Johnson was sued in his official capacity as sheriff of Alamance County for injunctive and declaratory relief.  (Doc. 1 ¶ 20.)  In North Carolina, the office of sheriff is created by the North Carolina Constitution.  N.C. Const. Art. VII, § 2.  It has

---

[25] Plaintiffs do not argue that Sheriff Johnson waived any immunity defense even though he moved for entry of the consent injunction as well. (Docs. 55, 56.)

long been the law that the "Eleventh Amendment does not bar a suit against a North Carolina sheriff in his official capacity," because "[t]he relevant state constitutional and statutory provisions indicate that sheriffs in North Carolina are not state officials" but rather local ones.  Harter, 101 F.3d at 342-43 (reviewing the factors enumerated in Ram Ditta v. Md. Nat'l Cap. Park & Plan. Comm'n, 822 F.2d 456 (4th Cir. 1987)).  Though Sheriff Johnson raised this argument in his brief, he conceded at oral argument that he is not shielded by the Eleventh Amendment.  (Doc. 152 at 130.)  Accordingly, the court need not consider either party's arguments for Eleventh Amendment protection or for an exception pursuant to Ex parte Young.

Notwithstanding his lack of Eleventh Amendment protection, Sheriff Johnson advances several arguments as to why he is not an appropriate party to this lawsuit.  First, he argues that he has no authority, and exercises no influence over the decision whether, to release or detain arrestees; has no authority to provide counsel; and is bound to follow the directives of the judicial officials as to detention, who have the sole authority for bail determinations.[26]  (Doc. 105 at 5-9.)  Second, he argues that

---

[26] Johnson notes that under state law, an arrestee who is not given bail must "be committed by a written order of the judicial official who conducted the initial appearance . . . to an appropriate detention facility."  (Doc. 105 at 7 (emphasis in original omitted) (citing N.C. Gen. Stat. § 15A-521(a)).)  Given that his participation in the bond policy is merely administrative, he argues, he cannot be enjoined.  (Doc. 152 at 110-11 (citing Hutto, 773 F.3d.)

89

injunctive relief is not warranted against him because Plaintiffs already have an appropriate remedy under North Carolina law through an action against a magistrate's bond.  (Id. at 10.)  Third, he contends that he did not cause any Plaintiff's injuries and he has complied with the consent order.  (Id. at 10-11.)  Finally, he maintains that the public would be disserved by a permanent injunction that would create disparate bail policies across the state.  (Id. at 10-12.)

Plaintiffs, in response, argue that Sheriff Johnson, acting under color of state law, is causing the deprivation of constitutional rights.  (Doc. 111 at 4 (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 60 n.1, 71 n.10 (1989)).)  By enforcing unconstitutional money bail orders and detaining people who cannot afford to pay bail after proceedings where they are not provided counsel, Plaintiffs conclude, Sheriff Johnson is "directly responsible for enforcing the court's unconstitutional bail orders."  (Id. at 2-3.)  To be sure, Plaintiffs note, they do not seek an injunction requiring the sheriff to set conditions of release or provide counsel at bail hearings.  (Id. at 3.)  Instead, they seek a permanent injunction to bar him from enforcing judicial orders that result from an unconstitutional bail process.  (Id.)  Recovering against a magistrate's bond, moreover, is inadequate to remedy a constitutional violation, Plaintiffs argue.  (Id. at 10-11.)  And, it cannot be that an injunction against Sheriff Johnson

90

will create disjointed procedures across North Carolina, they note, because "[d]istricts across the state . . . already have unique rules and obligations concerning pretrial release." (Id. at 12.)

Sheriff Johnson's arguments do not warrant granting his motion for summary judgment. The conclusion that he does not enjoy Eleventh Amendment immunity – a proposition he now concedes – is consistent with the conclusion of other circuits that have recently rejected challenges to injunctive relief against county sheriffs to prevent alleged unconstitutional bail determinations. See, e.g., Schultz v. Alabama, 42 F.4th 1298 (11th Cir. 2022); McNeil v. Community Probation Services, LLC, 945 F.3d 991 (6th Cir. 2019). The existence of an action against a magistrates' bond, moreover, does not foreclose an injunctive remedy. Indeed, the Fourth Circuit has found that "denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction." Ross v. Meese, 818 F.2d 1132, 1135 (4th Cir. 1987). An action against a bond is therefore not an adequate remedy to avoid the constitutional violation altogether.

Under North Carolina's statutory scheme, each judicial district is permitted to tailor its pretrial policies, as long as they comport with the statute. See N.C. Gen. Stat. § 15A-535(a). Thus, Alamance County's unique process will not create any additional confusion statewide. It is also true that the sheriff

91

must abide orders of the judicial officers. As the Sixth Circuit noted in McNeil, however, while sheriffs are required to obey the lawful orders and direction of the courts, including taking custody of arrestees, they can be sued in an injunction action because a "public official 'actively involved with administering' [alleged constitutional] violations" is not protected by sovereign immunity and "[the state] statutes command [involvement in alleged constitutional violations] when they place the sheriff in charge of keeping detainees in the county jail." 945 F.3d at 995 (internal citations omitted). Here, too, sheriffs in North Carolina are required by statute to hold arrestees until "they can pay the secured financial condition of release." (Doc. 111 at 3 (citing N.C. Gen. Stat. § 15A-521(b)(3)).) The "Sheriff's Department Release and Transfer Procedures" similarly authorize jail staff to release arrestees only after notice from an appropriate judicial authority or clerk of court. (See Doc. 107-7.) The sheriff is "keeper of the jail" where arrestees are detained. (See, e.g., Doc. 111 at 2.) As Plaintiffs allege that Sheriff Johnson, like the sheriff in McNeil, participates in "administering" constitutional violations by detaining arrestees who were not provided constitutional bail protections, he can be sued in his official capacity for injunctive relief.

For these reasons, Plaintiffs' motion for summary judgment will be denied, and Sheriff Johnson's motion for summary judgment

will be granted as to Counts I, II, and III, which will be dismissed without prejudice, and denied as to Count IV.[27]

## IV.  CONCLUSION

For the reasons stated, Plaintiffs' claims challenging the enforcement of Alamance County's 1995 Policy on pretrial procedures under the Fourteenth Amendment is moot. Those procedures have been replaced by the 2020 Bond Policy that substantially, if not fully, provides the relief which Plaintiffs sought in their complaint, and it is clear that there is no reasonable likelihood that the Judicial Defendants, who are responsible for maintaining the policy, will revert to the complained of practices. Lighthouse Fellowship, 20 F.4th at 162.

IT IS THEREFORE ORDERED that Plaintiffs' motion for summary judgment challenging Defendants' application of the 1995 Policy in Counts I, II, and III (Doc. 106) are DENIED AS MOOT;

IT IS FURTHER ORDERED that the Judicial Defendants' motion for summary judgment (Doc. 99) is GRANTED IN PART and that

---

[27] Sheriff Johnson argues that because his office is bound by law to follow the detention order of the Judicial Defendants, an injunction against him would be superfluous.  (Doc. 105 at 11.)  Though the court does not reach an issue of injunctive relief at this stage, Plaintiffs should be prepared to address why Sheriff Johnson's presence as a Defendant is necessary to enforce any injunctive relief that may be granted in this case when Plaintiffs already have the judicial officers who crafted and implement the policies present as Defendants and any injunction under Federal Rule of Civil Procedure 65 would bind those with notice of it and acting in concert with the enjoined Defendants.

Plaintiffs' claims in Counts I, II, and III are DISMISSED WITHOUT PREJUDICE AS MOOT;

IT IS FURTHER ORDERED that the Judicial Defendants' motion for summary judgment as to Count IV of the complaint is DENIED;

IT IS FURTHER ORDERED that Plaintiffs' motion for summary judgment as to Count IV of the complaint is DENIED;

IT IS FURTHER ORDERED that Sheriff Johnson's motion for summary judgment (Doc. 104) is GRANTED IN PART and that Plaintiffs' claims in Counts I, II, and III are DISMISSED WITHOUT PREJUDICE AS MOOT, and it is DENIED as to Plaintiffs' claims in Count IV.


       /s/   Thomas D. Schroeder
       United States District Judge

September 21, 2023